**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| MOLECULAR LOOP BIOSCIENCES, INC.,<br><br>Plaintiff,<br><br>v.<br><br>ILLUMINA, INC. and<br>VERINATA HEALTH, INC.<br><br>Defendants. | Civil Action No. 1:24-cv-00680-RGA-SRF<br><br>JURY TRIAL DEMANDED |

# DEFENDANTS' AMENDED ANSWER AND COUNTERCLAIMS TO THE COMPLAINT

Defendants Illumina, Inc. ("Illumina") and Verinata Health, Inc. ("VHI") (collectively, "Defendants") by and through their counsel, hereby submit their Answer to the Complaint of Plaintiff Molecular Loop Biosciences, Inc. ("Molecular Loop" or "Plaintiff"), set forth their defenses to the Complaint, and set forth their Counterclaims. The Complaint's section headings are carried over in this Answer for ease of reference only, and Defendants deny any allegations contained in the section headings.

By submitting this Answer and Counterclaims, Defendants expressly preserve and do not waive any applicable rights, defenses, or objections. Defendants also expressly reserve the right to amend this Answer, their defenses, and their Counterclaims based on, *inter alia*, discovery, factual developments, and Defendants' ongoing investigation of Plaintiff's claims. Unless expressly stated herein, nothing in this Answer should be construed as an admission by Defendants regarding the existence of any facts set forth in the Complaint.

## ANSWER

Defendants hereby answer the Complaint as follows:

## NATURE OF THE ACTION

**ANSWER TO PARAGRAPH 1:** To the extent this paragraph contains legal conclusions, no response is required. Defendants admit that Plaintiff purports to allege an action for patent infringement arising under the patent laws of the United States, 35 U.S.C. §§ 271 et seq., but deny that they have committed any acts of infringement of a valid and enforceable claim of any of the Patents-in-Suit, or caused any injury or damage to Plaintiff. Defendants admit that this Court has subject matter jurisdiction over actions arising under the patent laws of the United States. Except as so admitted, Defendants deny the allegations of this paragraph.

## THE PARTIES

**ANSWER TO PARAGRAPH 2:** Defendants deny that Molecular Loop is a pioneering company or that its technology is a fundamental part of what makes NGS more scalable, efficient, and practical. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph, and therefore deny them.

**ANSWER TO PARAGRAPH 3:** Defendants admit that Illumina is a company organized and existing under the laws of the state of Delaware, with its principal place of business at 5200 Illumina Way, San Diego, California, 92122. Defendants admit that Illumina has appointed The Corporation Trust Company, Corporation Trust Center 1209 Orange Street, Wilmington, Delaware 19801, as its agent for service of process. Except as so admitted, Defendants deny the allegations of this paragraph.

**ANSWER TO PARAGRAPH 4:** Defendants admit that VHI is a company organized and existing under the laws of the state of Delaware. Defendants admit that VHI has appointed The

Corporation Trust Company, Corporation Trust Center 1209 Orange Street, Wilmington, Delaware 19801, as its agent for service of process. Defendants admit that VHI is a wholly owned subsidiary of Illumina. Except as so admitted, Defendants deny the allegations of this paragraph.

**ANSWER TO PARAGRAPH 5:** Defendants admit that Illumina and/or certain of its subsidiaries and affiliates make, use, and commercialize genetic tests marketed under the tradename "VeriSeq." Defendants admit that the VeriSeq tests utilize NGS techniques and may include DNA library preparation kits that incorporate certain nucleic-acid-based adapters. Defendants admit that the VeriSeq tests may be used with certain data analysis methods to reduce certain errors that may arise after amplification and sequencing steps. Except as so admitted, Defendants deny the allegations of this paragraph.

**ANSWER TO PARAGRAPH 6:** Defendants admit that Illumina and/or certain of its subsidiaries and affiliates make, use, and commercialize non-invasive prenatal tests marketed under the tradename "Verifi." Defendants admit that the Verifi tests utilize NGS techniques and may include DNA library preparation kits that incorporate certain nucleic-acid-based adapters. Defendants admit that the Verifi tests may be used with certain data analysis methods to reduce certain errors that may arise after certain amplification and sequencing steps. Except as so admitted, Defendants deny the allegations of this paragraph.

**ANSWER TO PARAGRAPH 7:** Defendants admit that Illumina and/or its certain of its subsidiaries and affiliates make, use, and commercialize oncology tests marketed under the tradename "TruSight." Defendants admit that the TruSight tests utilize NGS techniques and may include DNA library preparation kits that incorporate certain nucleic-acid-based adapters. Defendants admit that the TruSight tests may be used with certain data analysis methods to reduce

certain errors that may arise after certain amplification and sequencing steps. Except as so admitted, Defendants deny the allegations of this paragraph.

**ANSWER TO PARAGRAPH 8:** Defendants admit that Illumina and/or its subsidiaries and affiliates make, use, and commercialize sequencing products under the names "Illumina DNA/RNA UD Indexes," "Illumina RNA UD Indexes," "IDT for Illumina DNA/RNA UD Indexes," "IDT for Illumina RNA UD Indexes," "Nextera DNA Indexes," and "AmpliSeq UD Indexes for Illumina." Defendants admit that certain of these products may be used in NGS applications, including to reduce certain errors that may arise after amplification and sequencing steps when combined with data analysis methods. Except as so admitted, Defendants deny the allegations of this paragraph.

**ANSWER TO PARAGRAPH 9:** Defendants admit that Illumina and/or certain of its subsidiaries and affiliates offer services that utilize NGS techniques to its customers, and that these services may include DNA library preparation methods that include the use of certain nucleic-acid-based adapters. Defendants further admit that certain of its NGS-based services may include data analysis methods that reduce certain errors that occur after amplification and sequencing steps. Except as so admitted, Defendants deny the allegations of this paragraph.

**ANSWER TO PARAGRAPH 10:** Defendants admit that they offer and market products, including products under the tradenames Verifi; VeriSeq; TruSight; Illumina DNA/RNA UD Indexes, Tagmentation; IDT for Illumina DNA/RNA UD Indexes, Tagmentation; IDT for Illumina Nextera UD Indexes; and AmpliSeq UD Indexes for Illumina, in the United States via Illumina's website. Except as so admitted, Defendants deny the allegations of this paragraph.

## JURISDICTION AND VENUE

**ANSWER TO PARAGRAPH 11:** Defendants repeat and re-allege their responses to paragraphs 1-10 of the Complaint as if fully set forth herein.

**ANSWER TO PARAGRAPH 12:** This paragraph states legal conclusions to which no response is required. To the extent a response is required, Defendants admit that Plaintiff purports to allege an action for patent infringement, but deny that they have committed any acts of infringement of a valid and enforceable claim, or caused any injury or damage to Plaintiff. Defendants admit that this Court has subject matter jurisdiction over actions arising under the patent laws of the United States. Except as so admitted, Defendants deny the allegations of this paragraph.

**ANSWER TO PARAGRAPH 13:** This paragraph states legal conclusions to which no response is required. For purposes of this Action only, Defendants do not contest that venue is proper in this District. Defendants deny that they have committed any acts of infringement of a valid and enforceable claim, or caused any injury or damage to Plaintiff. Except as so admitted, Defendants deny the allegations of this paragraph.

**ANSWER TO PARAGRAPH 14:** This paragraph states legal conclusions to which no response is required. For purposes of this Action only, Defendants do not contest that this Court has personal jurisdiction over Defendants. Defendants deny that they have committed any acts of infringement of a valid and enforceable claim, or caused any injury or damage to Plaintiff. Except as so admitted, Defendants deny the allegations of this paragraph.

**ANSWER TO PARAGRAPH 15:** Paragraph 15 states legal conclusions to which no response is required. For purposes of this Action only, Defendants do not contest that this Court has personal jurisdiction over Defendants. Defendants admit that they are each entities organized under the laws of the state of Delaware. Except as so admitted, Defendants deny the allegations of this paragraph.

## BACKGROUND OF THE "INVENTIONS"

**ANSWER TO PARAGRAPH 16:** Defendants deny that Molecular Loop has novel techniques in targeted sequencing or has demonstrated a basis to innovate the field of sequencing. Defendants

lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph, and therefore deny them.

**ANSWER TO PARAGRAPH 17:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore deny them.

**ANSWER TO PARAGRAPH 18:** Defendants admit that NGS applications are capable of processing multiple samples collected from different patients or sample types that are pooled together to be sequenced at the same time, and that such techniques may decrease costs and increase efficiency relative to prior methods of DNA analysis. Defendants admit that methods of processing multiple samples collected from different patients or sample types that are pooled together to be sequenced at the same time are generally known as multiplex sequencing. Except as so admitted, Defendants deny the allegations of this paragraph.

**ANSWER TO PARAGRAPH 19:** Defendants admit that errors are sometimes introduced during NGS (for example during amplification and sequencing) and may impact the ability to accurately analyze sequencing reads. Defendants deny that the Patents-in-Suit are inventive or the first to provide a solution to this issue. Defendants further deny that the Patents-in-Suit are valid and enforceable. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph, and therefore deny them.

**ANSWER TO PARAGRAPH 20:** Defendants admit that there are various types of errors that may arise during sequencing or amplification. Defendants deny that the Patents-in-Suit are inventive or the first to provide a solution to this issue. Defendants further deny that the Patents-in-Suit are valid and enforceable. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph, and therefore deny them.

**ANSWER TO PARAGRAPH 21:** Defendants admit that, in general, various types of errors that may arise during sequencing workflows may have effects on the accuracy of downstream data analysis. Except as so admitted, Defendants deny the allegations of this paragraph.

**ANSWER TO PARAGRAPH 22:** Denied.

**ANSWER TO PARAGRAPH 23:** Defendants deny that the Patents-in-Suit are inventive or the first to provide a solution to this issue. Defendants further deny that the Patents-in-Suit are valid and enforceable. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph, and therefore deny them.

## THE PATENTS-IN SUIT

**ANSWER TO PARAGRAPH 24:** Defendants repeat and re-allege their responses to paragraphs 1-23 of the Complaint as if fully set forth herein.

**ANSWER TO PARAGRAPH 25:** Denied.

### A. The ’852 Patent

**ANSWER TO PARAGRAPH 26:** Defendants admit that what purports to be a true and correct copy of U.S. Patent No. 11,041,852, entitled “Methods for Maintaining the Integrity and Identification of a Nucleic Acid Template in a Multiplex Sequencing Reaction” is attached to the Complaint as Exhibit 1. Defendants admit that the ’852 Patent states on its face that its inventors are Gregory Porreca, Mark Umbarger, and George Church. Defendants admit that ’852 Patent states on its face that Molecular Loop Biosciences, Inc. is the assignee. Except as so admitted, Defendants deny the allegations of this paragraph.

**ANSWER TO PARAGRAPH 27:** This paragraph states a legal conclusion to which no response is required. To the extent a response is required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore deny them.

**ANSWER TO PARAGRAPH 28:** Defendants admit that Paragraph 28 reproduces Claim 1 of the ’852 Patent. Defendants deny that the ’852 Patent is inventive or the first to provide a solution to errors that may arise during sequencing workflows. Defendants further deny that the ’852 Patent is valid and enforceable. Except as so admitted, Defendants deny the allegations in this paragraph.

**ANSWER TO PARAGRAPH 29:** Denied. The specification and figures of the ’852 Patent speak for themselves.

**ANSWER TO PARAGRAPH 30:** Denied. The specification and figures of the ’852 Patent speak for themselves.

**ANSWER TO PARAGRAPH 31:** Denied. The specification and figures of the ’852 Patent speak for themselves.

**ANSWER TO PARAGRAPH 32:** Denied. The “teaching” in the reproduced language was substantially taken from another company’s prior published patent application. Defendants further aver that the cited portion of the ’852 Patent was copied substantially from, for example, pages 5-7 of PCT Patent Publication No. WO 2010/056728 to Steinman et al., which was assigned to Helicos Biosciences Corporation. Defendants therefore further deny that the quoted portions reflect any invention that could be attributed to the named inventors of the ’852 Patent or Molecular Loop.

**ANSWER TO PARAGRAPH 33:** Denied. The “teaching” in the reproduced language was taken from Illumina’s prior published patent application. Defendants further aver that the cited portion of the ’852 Patent was copied nearly verbatim from paragraphs 33 through 37 of U.S. Patent Publication No. 2009/0226975 A1 (Sabot), which was assigned to Illumina. Defendants therefore further deny that the quoted portions reflect any invention that could be attributed to the named inventors of the ’852 Patent or Molecular Loop.

B. **The ’200 Patent**

**ANSWER TO PARAGRAPH 34:** Defendants admit that what purports to be a true and correct copy of U.S. Patent No. 11,768,200, entitled “Methods for Maintaining the Integrity and Identification of a Nucleic Acid Template in a Multiplex Sequencing Reaction” is attached to the Complaint as Exhibit 2. Defendants admit that the ’200 Patent states on its face that its inventors are Gregory Porreca, Mark Umbarger, and George Church. Defendants admit that ’200 Patent states on its face that Molecular Loop Biosciences, Inc. is the assignee. Except as otherwise admitted, Defendants deny the allegations in this paragraph.

**ANSWER TO PARAGRAPH 35:** This paragraph states a legal conclusion to which no response is required. To the extent a response is required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore deny them.

**ANSWER TO PARAGRAPH 36:** Defendants admit that the ’200 Patent states on its face that it is a continuation of the ’852 Patent. Defendants further admit that Paragraph 36 reproduces Claim 1 of the ’200 patent. Defendants deny that the ’200 Patent is inventive or the first to provide a solution nucleic acid sequences during multiplex sequencing reactions. Defendants further deny that the ’200 Patent is valid and enforceable. Except as otherwise admitted, Defendants deny the allegations in this paragraph.

**ANSWER TO PARAGRAPH 37:** Denied. The “teaching” of the cited language was taken from Helicos’s and Illumina’s prior published patent applications. Defendants further aver that the cited portions of the ’200 Patent were copied nearly verbatim from, for example, pages 5-7 of PCT Patent Publication No. WO 2010/056728 to Steinman et al., which was assigned to Helicos Biosciences Corporation, and paragraphs 33 through 37 of U.S. Patent Publication No. 2009/0226975 A1 (Sabot), which was assigned to Illumina. Defendants therefore further deny

that the quoted portions reflect any invention that could be attributed to the named inventors of the ’200 Patent or Molecular Loop.

### C. The ’730 Patent

**ANSWER TO PARAGRAPH 38:** Defendants admit that what purports to be a true and correct copy of U.S. Patent No. 11,840,730 entitled “Methods and Compositions for Evaluating Genetic Markers” is attached to the Complaint as Exhibit 3. Defendants admit that the ’730 Patent states on its face that its inventors are Gregory Porreca and Uri Laserson. Defendants admit that the ’730 Patent states on its face that Molecular Loop Biosciences, Inc. is the assignee. Except as otherwise admitted, Defendants deny the allegations in this paragraph.

**ANSWER TO PARAGRAPH 39:** This paragraph states a legal conclusion to which no response is required. To the extent a response is required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore deny them.

**ANSWER TO PARAGRAPH 40:** Defendants admit that that Paragraph 40 reproduces Claim 1 of the ’730 Patent. Defendants deny that the ’730 Patent is inventive or the first to provide a solution to this issue. Defendants further deny that the ’730 Patent is valid and enforceable. Except as otherwise admitted, Defendants deny the allegations in this paragraph.

**ANSWER TO PARAGRAPH 41:** Defendants admit that this paragraph contains what purports to be a quotation from the ’730 Patent. Defendants deny that the ’730 Patent is inventive or the first to provide a solution to this issue. Defendants further deny that the ’730 Patent is valid and enforceable. Except as otherwise admitted, Defendants deny the allegations in this paragraph.

**ANSWER TO PARAGRAPH 42:** Defendants admit that this paragraph contains what purports to be a quotation from the ’730 Patent. Defendants deny that the ’730 Patent is inventive or the

first to provide a solution to this issue. Defendants further deny that the ’730 Patent is valid and enforceable. Except as so admitted, Defendants deny the allegations in this paragraph.

**ANSWER TO PARAGRAPH 43:** Defendants admit that this paragraph contains what purports to be a quotation from the ’730 Patent. Defendants deny that the ’730 Patent is inventive or the first to provide a solution to this issue. Defendants further deny that the ’730 Patent is valid and enforceable. Except as so admitted, Defendants deny the allegations in this paragraph.

**ANSWER TO PARAGRAPH 44:** Defendants admit that this paragraph contains what purports to be a quotation from the ’730 Patent. Defendants deny that the ’730 Patent is inventive or the first to provide a solution to this issue. Defendants further deny that the ’730 Patent is valid and enforceable. Except as so admitted, Defendants deny the allegations in this paragraph.

## DEFENDANTS’ ACTIVITIES

**ANSWER TO PARAGRAPH 45:** Defendants repeat and re-allege their responses to paragraphs 1-44 of the Complaint as if fully set forth herein.

### A. The Accused Verifi Prenatal Tests

**ANSWER TO PARAGRAPH 46:** Defendants admit that VHI announced the launch of a non-invasive prenatal test on March 15, 2012. Defendants admit that on January 7, 2013 Illumina announced that it had signed a definitive agreement to acquire VHI. Defendants admit that it began providing the Verifi Plus prenatal test in 2017. Defendants admit that the Verifi Plus prenatal test is marketed as containing “everything in the Verifi Prenatal Test and includes additional panels.” Defendants admit that Verifi Prenatal Test and Verifi Prenatal Plus Test are both currently offered on Illumina’s website. Except as so admitted, Defendants deny the allegations in this paragraph.

**ANSWER TO PARAGRAPH 47:** Defendants aver that the cited exhibits speak for themselves, and admit that this paragraph purports to quote from such exhibits. Except as so admitted, Defendants deny the allegations in this paragraph.

**ANSWER TO PARAGRAPH 48:** Defendants admit that performance of the Verifi Tests may entail incorporating nucleic acid adapters into segments of nucleic acids to be analyzed. Defendants aver that the cited exhibits speak for themselves, and admit that this paragraph purports to quote from such exhibits. Except as so admitted, Defendants deny the allegations in this paragraph.

**ANSWER TO PARAGRAPH 49:** Defendants admit that performance of the Verifi Tests may entail pooling multiple DNA samples. Defendants aver that the cited exhibits speak for themselves, and admit that this paragraph purports to quote from such exhibits. Except as so admitted, Defendants deny the allegations in this paragraph.

**ANSWER TO PARAGRAPH 50:** Defendants admit that performance of the Verifi Tests entails amplifying the DNA to be analyzed on the surface of a flow cell. Defendants aver that the cited exhibit speaks for itself, and admit that this paragraph purports to quote from such exhibit. Except as so admitted, Defendants deny the allegations in this paragraph.

**ANSWER TO PARAGRAPH 51:** Defendants admit that the Verifi Tests entail a sequencing step. Defendants aver that the cited exhibits speak for themselves, and admit that this paragraph purports to quote from such exhibits. Except as so admitted, Defendants deny the allegations in this paragraph.

**ANSWER TO PARAGRAPH 52:** Defendants aver that the cited exhibits speak for themselves, and admit that this paragraph purports to quote from such exhibits. Defendants admit that the Verifi Tests may entail a step of demultiplexing samples. Except as so admitted, Defendants deny the allegations in this paragraph.

**B. <u>The Accused VeriSeq Tests</u>**

**ANSWER TO PARAGRAPH 53:** Defendants admit that Illumina announced the launch of the VeriSeq NIPT solution in April 2017 and that Illumina announced the launch of the VeriSeq NIPT

Solution v2 in June 2019. Defendants admit that they currently offer the VeriSeq Solution v2 for sale on their website, and that this product is sold and distributed in the United States. Defendants aver that the cited exhibits speak for themselves, and admit that this paragraph purports to quote from such exhibits. Except as so admitted, Defendants deny the allegations in this paragraph.

**ANSWER TO PARAGRAPH 54:** Defendants aver that the cited exhibit speaks for itself, and admit that this paragraph purports to quote from such exhibit. Except as so admitted, Defendants deny the allegations in this paragraph.

**ANSWER TO PARAGRAPH 55:** Defendants admit that performance of the VeriSeq Tests may entail incorporating nucleic acid adapters into segments of nucleic acids to be analyzed. Defendants aver that the cited exhibit speaks for itself, and admit that this paragraph purports to quote from such exhibit. Except as so admitted, Defendants deny the allegations in this paragraph.

**ANSWER TO PARAGRAPH 56:** Defendants admit that performance of the VeriSeq Tests may entail pooling multiple DNA samples. Defendants aver that the cited exhibits speak for themselves, and admit that this paragraph purports to quote from such exhibits. Except as so admitted, Defendants deny the allegations in this paragraph.

**ANSWER TO PARAGRAPH 57:** Defendants admit that performance of the VeriSeq Tests entails amplifying the DNA to be analyzed on the surface of a flow cell. Defendants aver that the cited exhibits speak for themselves, and admit that this paragraph purports to quote from such exhibits. Except as so admitted, Defendants deny the allegations in this paragraph.

**ANSWER TO PARAGRAPH 58:** Defendants admit that performance of the VeriSeq Tests entails sequencing nucleic acid segments. Defendants aver that the cited exhibits speak for themselves, and admit that this paragraph purports to quote from such exhibits. Except as so admitted, Defendants deny the allegations in this paragraph.

**ANSWER TO PARAGRAPH 59:** Defendants admit that the VeriSeq tests may entail demultiplexing sequencing data. Defendants aver that the cited exhibit speaks for itself, and admit that this paragraph purports to quote from such exhibit. Except as so admitted, Defendants deny the allegations in this paragraph.

**ANSWER TO PARAGRAPH 60:** Defendants admit that Illumina requests that users of its Web User Interface for the VeriSeq NIPT v2 product to accept an End User License Agreement. Defendants aver that the cited exhibit speaks for itself, and admit that this paragraph purports to quote from such exhibit. Except as so admitted, Defendants deny the allegations in this paragraph.

**ANSWER TO PARAGRAPH 61:** Defendants admit that Illumina offers product support, training solutions, and on-site service to at least certain of its customers that purchase VeriSeq tests. Defendants aver that the cited exhibit speaks for itself, and admit that this paragraph purports to quote from such exhibit. Defendants admit that they provide certain consumable materials to users of the VeriSeq Tests. Except as so admitted, Defendants deny the allegations in this paragraph.

**ANSWER TO PARAGRAPH 62:** Defendants admit that Illumina provides customers with installation instructions, product manuals, and other informational materials regarding the usage of the VeriSeq Tests. Except as so admitted, Defendants deny the allegations in this paragraph.

**ANSWER TO PARAGRAPH 63:** Defendants admit that they offer a software guide for VeriSeq NIPT Solution v2, which is attached to the Complaint as Exhibit 30. Except as so admitted, Defendants deny the allegations in this paragraph.

**C. <u>The Accused TruSight Tests</u>**

**ANSWER TO PARAGRAPH 64:** Defendants admit that on October 30, 2018 Illumina announced the launch of TruSight Oncology 500, a comprehensive pan-cancer assay designed to identify known and emerging tumor biomarkers s. Defendants further admit that on November 5,

2019, Illumina announced the upcoming launch of TruSight Oncology 500 ctDNA and TruSight Oncology 500 High-Throughput. Defendants admit that TruSight Oncology ctDNA is a liquid biopsy solution for detecting cancer biomarkers. Except as so admitted, Defendants deny the allegations in this paragraph.

**ANSWER TO PARAGRAPH 65:** Defendants admit that Illumina currently offers for sale the TSO 500, TSO 500 ctDNA v2, and TSO500 HT (collectively the "TruSight Oncology 500 portfolio") on its website. Defendants admit that this paragraph reproduces a quotation and diagram from Exhibit 34, the TruSight Oncology 500 portfolio brochure, which speaks for itself. Except as so admitted, Defendants deny the allegations in this paragraph.

**ANSWER TO PARAGRAPH 66:** Defendants admit that TSO 500 Tests entail obtaining one or more biological sample that contain one or more sequences of nucleic acids. Defendants aver that the cited exhibits speak for themselves, and admit that this paragraph purports to quote from such exhibits. Except as so admitted, Defendants deny the allegations in this paragraph.

**ANSWER TO PARAGRAPH 67:** Defendants admit that the TSO 500 Tests may entail the introduction of adapters that serve as molecular identifiers to a DNA sample during library preparation. Defendants aver that the cited exhibits speak for themselves, and admit that this paragraph purports to quote from such exhibits. Except as so admitted, Defendants deny the allegations in this paragraph.

**ANSWER TO PARAGRAPH 68:** Defendants admit that the TSO 500 Tests entail amplifying nucleic acid molecules on the surface of a flow cell before sequencing. Defendants admit that the TSO500 Tests generally entail sequencing on Illumina Sequencers. Defendants aver that the cited exhibits speak for themselves, and admit that this paragraph purports to quote from such exhibits. Except as so admitted, Defendants deny the allegations in this paragraph.

**ANSWER TO PARAGRAPH 69:** Defendants admit that the TSO 500 Tests entail software that performs error correction by collapsing certain sequences. Defendants aver that the cited exhibits speak for themselves, and admit that this paragraph purports to quote from such exhibits. Except as so admitted, Defendants deny the allegations in this paragraph.

**ANSWER TO PARAGRAPH 70:** Defendants admit that TSO 500 Tests may entail incorporating nucleic-acid-based adapters into nucleic acid sequences to be analyzed. Defendants aver that the cited exhibits speak for themselves, and admit that this paragraph purports to quote from such exhibits. Except as so admitted, Defendants deny the allegations in this paragraph.

**ANSWER TO PARAGRAPH 71:** Defendants admit that TSO 500 Tests may entail pooling multiple samples of nucleic acids to be sequenced together. Defendants aver that the cited exhibits speak for themselves, and admit that this paragraph purports to quote from such exhibits. Except as so admitted, Defendants deny the allegations in this paragraph.

**ANSWER TO PARAGRAPH 72:** Defendants admit that the TSO 500 Tests entail amplifying nucleic acid sequences on a surface of a flow cell. Defendants aver that the cited exhibits speak for themselves, and admit that this paragraph purports to quote from such exhibits. Except as so admitted, Defendants deny the allegations in this paragraph.

**ANSWER TO PARAGRAPH 73:** Defendants admit that the TSO 500 Tests entail the sequencing of nucleic acids that have been amplified. Defendants aver that the cited exhibits speak for themselves, and admit that this paragraph purports to quote from such exhibits. Except as so admitted, Defendants deny the allegations in this paragraph.

**ANSWER TO PARAGRAPH 74:** Defendants admit that the TSO 500 Tests entail identifying sequence reads that are determined to contain errors that arise from amplification, and that the TSO 500 Tests demultiplex DNA sequence reads. Defendants aver that the cited exhibits speak

for themselves, and admit that this paragraph purports to quote from such exhibits. Except as so admitted, Defendants deny the allegations in this paragraph.

**ANSWER TO PARAGRAPH 75:** Defendants admit that Illumina provides an End-User Software License Agreement that users are requested to sign before utilizing its DRAGEN TruSight Oncology 500 Analysis Software. Except as so admitted, Defendants deny the allegations in this paragraph.

**ANSWER TO PARAGRAPH 76:** Defendants admit that Illumina offers product support, training solutions, and on-site service to its customers for the TSO 500 Tests. Defendants aver that the cited exhibits speak for themselves, and admit that this paragraph purports to quote from such exhibits. Except as so admitted, Defendants deny the allegations in this paragraph.

**ANSWER TO PARAGRAPH 77:** Defendants admit that Illumina provides installation instructions, product manuals, package inserts and other reference guides that describe the operation of its products in the TruSight Oncology 500 portfolio. Except as so admitted, Defendants deny the allegations in this paragraph.

**ANSWER TO PARAGRAPH 78:** Defendants admit that Illumina's materials describe the TruSight Oncology 500 portfolio as offering a "streamlined workflow using proven NGS technology that enables rapid, reliable CGP." Defendants further admit that Illumina provides reference guides with instructions for use of the tests in the TruSight Oncology 500 portfolio. Except as so admitted, Defendants deny the allegations in this paragraph.

**D. <u>Defendants' Knowledge of Molecular Loop's Patents</u>**

**ANSWER TO PARAGRAPH 79:** Denied.

**ANSWER TO PARAGRAPH 80:** Defendants admit that they are the assignee of patents and patent applications that are related to the products accused in this case. Defendants admit that the

’730 Patent was identified to Illumina by Molecular Loop during discussions in December 2023. Except as so admitted, Defendants deny the allegations in this paragraph.

**ANSWER TO PARAGRAPH 81:** Denied.

**ANSWER TO PARAGRAPH 82:** Denied.

**COUNT 1**

**(Infringement of the ’852 Patent)**

**ANSWER TO PARAGRAPH 83:** Defendants repeat and re-allege their responses to paragraphs 1-82 of the Complaint as if fully set forth herein.

**ANSWER TO PARAGRAPH 84:** Defendants deny that the ’852 Patent is valid and enforceable.

**ANSWER TO PARAGRAPH 85:** Defendants deny that they have infringed or continue to infringe any valid and enforceable claim of the ’852 Patent.

**ANSWER TO PARAGRAPH 86:** Defendants deny that they have infringed or continue to infringe any valid and enforceable claim of the ’852 Patent. Defendants aver that the cited exhibits speak for themselves, and admit that this paragraph purports to quote from such exhibits. Except as so admitted, Defendants deny the allegations in this paragraph.

**ANSWER TO PARAGRAPH 87:** Defendants deny that they have infringed or continue to infringe any valid and enforceable claim of the ’852 Patent. Defendants admit that VHI is a wholly owned subsidiary of Illumina. Defendants admit that Verifi Tests are run in response to customer requests. Defendants aver that the cited exhibits speak for themselves, and admit that this paragraph purports to quote from such exhibits. Except as so admitted, Defendants deny the allegations of this paragraph.

**ANSWER TO PARAGRAPH 88:** Defendants deny that they have induced or continue to induce infringement of any valid and enforceable claim of the ’852 Patent. Defendants also deny the remaining allegations of this paragraph.

**ANSWER TO PARAGRAPH 89:** Defendants deny that use of the Verifi Tests would infringe any valid and enforceable claim of the ’852 Patent. Defendants aver that the cited exhibit speaks for itself, and admit that this paragraph purports to quote from such exhibit. Defendants admit that they sell and provide the Verifi Tests, and product manuals or other instructions therefor to their customers. Except as so admitted, Defendants deny the allegations in this paragraph.

**ANSWER TO PARAGRAPH 90:** Defendants deny that they contribute to any infringement by third parties of any valid and enforceable claim of the ’852 Patent. Defendants also deny the remaining allegations of this paragraph.

**ANSWER TO PARAGRAPH 91:** Defendants deny that they infringe any valid and enforceable claim of the ’852 Patent. Defendants aver that the cited exhibits speak for themselves, and admit that this paragraph purports to quote from such exhibits. Except as so admitted, Defendants deny the allegations in this paragraph.

**ANSWER TO PARAGRAPH 92:** Defendants deny that they have infringed or continue to infringe any valid and enforceable claim of the ’852 Patent. Defendants also deny the remaining allegations of this paragraph.

**ANSWER TO PARAGRAPH 93:** Defendants deny that they have induced or continue to induce infringement of any valid and enforceable claim of the ’852 Patent. Defendants also deny the remaining allegations of this paragraph.

**ANSWER TO PARAGRAPH 94:** Defendants deny that use of the VeriSeq Tests and TSO 500 Tests would infringe any valid and enforceable claim of the ’852 Patent. Defendants admit that

they sell and provide the VeriSeq Tests and TSO 500 Tests, and product manuals or other instructions therefor to their customers. Except as so admitted, Defendants deny the allegations in this paragraph.

**ANSWER TO PARAGRAPH 95:** Defendants deny that they contribute to any infringement by third parties of any valid and enforceable claim of the ’852 Patent. Defendants also deny the remaining allegations of this paragraph.

**ANSWER TO PARAGRAPH 96:** Defendants admit that the ’852 Patent was identified by Molecular Loop to Illumina during discussions dated February 10, 2023. Except as so admitted, Defendants deny the allegations in this paragraph.

**ANSWER TO PARAGRAPH 97:** Denied.

**ANSWER TO PARAGRAPH 98:** Denied.

**ANSWER TO PARAGRAPH 99:** Denied.

## COUNT 2

### (Infringement of the ’200 Patent)

**ANSWER TO PARAGRAPHS 100 to 116:** On January 16, 2026, the Patent Trial and Appeal Board found all claims of the ’200 Patent invalid, concluding they were both anticipated and obvious over the prior art. Molecular Loop did not appeal the Board’s decision. On May 15, 2026, the parties filed a joint stipulation dismissing all claims and counterclaims relating to the ’200 Patent with prejudice. D.I. 46. Accordingly, Defendants deny the allegations in Paragraphs 100 to 116.

## COUNT 3

### (Infringement of the ’730 Patent)

**ANSWER TO PARAGRAPH 117:** Defendants repeat and re-allege their responses to paragraphs 1-116 of the Complaint as if fully set forth herein.

**ANSWER TO PARAGRAPH 118:** Defendants deny that the '730 Patent is valid and enforceable.

**ANSWER TO PARAGRAPH 119:** Defendants deny that they have infringed or continue to infringe any valid and enforceable claim of the '730 Patent.

**ANSWER TO PARAGRAPH 120:** Defendants deny that they have infringed or continue to infringe any valid and enforceable claim of the '730 Patent. Defendants aver that the cited exhibits speak for themselves, and admit that this paragraph purports to quote from such exhibits. Except as so admitted, Defendants deny the allegations in this paragraph.

**ANSWER TO PARAGRAPH 121:** Defendants deny that they have infringed or continue to infringe any valid and enforceable claim of the '730 Patent. Defendants also deny the remaining allegations of this paragraph.

**ANSWER TO PARAGRAPH 122:** Defendants deny that they have induced or continue to induce infringement of any valid and enforceable claim of the '730 Patent. Defendants also deny the remaining allegations of this paragraph.

**ANSWER TO PARAGRAPH 123:** Defendants deny that use of the TSO 500 Tests would infringe any valid and enforceable claim of the '730 Patent. Defendants admit that they provide product manuals, guides, and other instructional materials to customers and partners regarding the TSO 500 Tests. Except as so admitted, Defendants otherwise deny the allegations in this paragraph.

**ANSWER TO PARAGRAPH 124:** Defendants deny that they contribute to any infringement by third parties of any valid and enforceable claim of the '730 Patent. Defendants also deny the remaining allegations of this paragraph.

**ANSWER TO PARAGRAPH 125:** Defendants admit that the ’730 Patent was identified to Illumina by Molecular Loop during discussions in December 2023. Except as so admitted, Defendants deny the allegations in this paragraph.

**ANSWER TO PARAGRAPH 126:** Denied.

**ANSWER TO PARAGRAPH 127:** Denied.

**ANSWER TO PARAGRAPH 128:** Denied.

## RESPONSE TO PLAINTIFF’S PRAYER FOR RELIEF

Defendants deny that Plaintiff is entitled to any of the relief requested in its prayer for relief, or any relief whatsoever.

## AFFIRMATIVE DEFENSES

Plaintiffs allege and assert the following defenses to the allegations in the Complaint.

### First Affirmative Defense (Non-Infringement – U.S. Patent No. 11,041,852)

Defendants do not infringe and have not infringed (including directly, indirectly, contributorily, or by active inducement) any valid and enforceable claim of the ’852 Patent, as detailed in Count I of Defendants’ Counterclaims, the allegations of which are incorporated by reference as if fully set forth herein.

### Second Affirmative Defense (Non-Infringement – U.S. Patent No. 11,840,730)

Defendants do not infringe and have not infringed (including directly, indirectly, contributorily, or by active inducement) any valid and enforceable claim of the ’730 Patent, as detailed in Count II of Defendants’ Counterclaims, the allegations of which are incorporated by reference as if fully set forth herein..

**Third Affirmative Defense (Invalidity – U.S. Patent No. 11,041,852)**

Each asserted claim of the ’852 Patent is invalid because it fails to comply with one or more requirements of 35 U.S.C. § 101, 102, 103, and 112, as detailed in Count III of Defendants’ Counterclaims, the allegations of which are incorporated by reference as if fully set forth herein.

**Fourth Affirmative Defense (Invalidity – U.S. Patent No. 11,840,730)**

Each asserted claim of the ’730 Patent is invalid because it fails to comply with one or more requirements of 35 U.S.C. § 101, 102, 103, and 112, as detailed in Count IV of Defendants’ Counterclaims, the allegations of which are incorporated by reference as if fully set forth herein.

**Fifth Affirmative Defense (Prosecution Laches – U.S. Patent No. 11,041,852)**

Defendants’ infringement allegations with respect to the ’852 Patent are barred under the doctrine of prosecution laches, as detailed in Count V of Defendants’ Counterclaims, the allegations of which are incorporated by reference as if fully set forth herein.

**Sixth Affirmative Defense (Inequitable Conduct – U.S. Patent No. 11,041,852)**

The ’852 Patent is unenforceable due to inequitable conduct in the prosecution of the applications leading to its issuance, as detailed in Count VI of Defendants’ Counterclaims, the allegations of which are incorporated by reference as if fully set forth herein.

**Seventh Affirmative Defense (Prosecution Laches – U.S. Patent No. 11,840,730)**

Defendants’ infringement allegations with respect to the ’730 Patent are barred under the doctrine of prosecution laches, as detailed in Count VII of Defendants’ Counterclaims, the allegations of which are incorporated by reference as if fully set forth herein.

**Eighth Affirmative Defense (Inequitable Conduct – U.S. Patent No. 11,840,730)**

The ’730 Patent is unenforceable due to inequitable conduct in the prosecution of the applications leading to its issuance, as detailed in Count VIII of Defendants’ Counterclaims, the allegations of which are incorporated by reference as if fully set forth herein.

**Ninth Affirmative Defense (Unclean Hands – U.S. Patent No. 11,041,852)**

The ’852 Patent is unenforceable due to unclean hands in the prosecution of the applications leading to its issuance and in the enforcement of the patent, as detailed in Count IX of Defendants’ Counterclaims, the allegations of which are incorporated by reference as if fully set forth herein.

**Tenth Affirmative Defense (Unclean Hands – U.S. Patent No. 11,840,730)**

The ’730 Patent is unenforceable due to unclean hands in the prosecution of the applications leading to its issuance and in the enforcement of the patent, as detailed in Count X of Defendants’ Counterclaims, the allegations of which are incorporated by reference as if fully set forth herein.

## COUNTERCLAIMS

For their Counterclaims against Plaintiff and Counterclaim Defendant Molecular Loop Biosciences, Inc. ("Molecular Loop"), Counterclaim Plaintiffs Illumina, Inc. ("Illumina") and Verinata Health, Inc. ("VHI", collectively with Illumina "Counterclaim Plaintiffs") allege as follows:

### PRELIMINARY STATEMENT

1. Counterclaim Plaintiffs seek a declaratory judgment of non-infringement, invalidity, and unenforceability under the Patent Laws of the United States, 35 U.S.C., §§ 101, *et seq.* and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202. Counterclaim Plaintiffs seek relief because Molecular Loop has asserted against Counterclaim Plaintiffs infringement of the '852 Patent and the '730 Patent by certain of Illumina's and Verinata's products and/or services. Counterclaim Plaintiffs seek relief also because, on information and belief, Molecular Loop has baselessly alleged and continues to baselessly allege that certain of Illumina's and Verinata's customers infringe the Patents-in-Suit, at least in part, while using certain products or services they have purchased from Illumina or Verinata, thereby jeopardizing Counterclaim Plaintiffs' relationships with these customers, including Ambry Genetics ("Ambry"), ARUP Laboratories, Inc. ("ARUP"), Fulgent Genetics ("Fulgent"), Helix, Inc. ("Helix"), NeoGenomics Laboratories, Inc. ("NeoGenomics"), Personalis, Inc. ("Personalis"), and Tempus Labs, Inc. ("Tempus").

2. Molecular Loop's activities, including Molecular Loop's claims of infringement against Counterclaim Plaintiffs and their customers, statements that Counterclaim Plaintiffs' products and/or services, or use thereof, allegedly practice the Patents-in-Suit, and Molecular Loop's filing of this lawsuit against Counterclaim Plaintiffs have placed a cloud over Counterclaim Plaintiffs and their products and services and have created a substantial, definite, concrete, and

immediate justiciable controversy between Counterclaim Plaintiffs and Molecular Loop over whether Counterclaim Plaintiffs' products and services infringe any of the Patents-in-Suit.

3. Counterclaim Plaintiffs have not infringed, and are not infringing, directly or indirectly, any claim of the Patents-in-Suit. Counterclaim Plaintiffs thus seek a declaratory judgment that, through their actions or through the normal, advertised, and expected use of their products, services, or technology, they have not infringed, induced others to infringe, or contributed to the infringement by others of any claim of the Patents-in-Suit.

4. Each claim of the Patents-in-Suit also is invalid. For example, the claims are anticipated or obvious based on prior art systems and/or because the alleged inventions were known or used prior to their alleged invention, whether alone or in combination with additional art. In addition, as explained below, each claim of the Patents-in-Suit also is invalid under § 112 and § 101.

5. Each of the patents that Molecular Loop has asserted is unenforceable for at least three reasons. First, Molecular Loop[1] dragged out the prosecution of various patent applications for *more than a decade*—waiting until Illumina launched the products that Molecular Loop now accuses of infringement and then trying to gerrymander the patent claims to read on those products. The equitable doctrine of prosecution laches does not allow patent holders to benefit from their own extreme delay and deception in such a manner. Second, Molecular Loop deceived the Patent Office—multiple times—in order to overcome the Patent Office's prior art rejections and to keep Molecular Loop's applications hidden from the public and from Counterclaim Plaintiffs. The

[1] When referring to activities during prosecution of the asserted patents, "Molecular Loop" is used to refer to the Plaintiff, its predecessors-in-interest to each of the asserted patents (including Good Start Genetics, Inc., another company founded by Gregory Porreca), and/or Gregory Porreca as inventor/applicant of each of the asserted patents.

doctrine of inequitable conduct does not allow patent holders to enforce patents secured through such deceit. Third, for at least those same reasons, Molecular Loop has unclean hands in the prosecution of the patents. In addition, Molecular Loop has taken conflicting positions in this litigation as compared to the positions it took in the IPRs against the ’852 and ’730 Patents. Molecular Loop told the Patent Office that certain prior art features were outside of the scope of the claims only to turn around and accuse those same features of infringing the claims. Molecular Loop’s pattern of misconduct makes enforcement of the ’852 and ’730 Patents against Defendants and their products inequitable.

6. The applications on which Molecular Loop has sued Illumina in 2024 got their start in 2010—nearly 15 years ago.

7. As for the ’730 Patent and its related applications, Molecular Loop unreasonably and inexcusably delayed prosecution for more than 12 years. In 2020, after a decade of procrastination, Molecular Loop asked the Patent Office to substantially amend the application’s claims to change the alleged invention. The proposed changes came two years *after* Illumina’s accused product had launched and were plainly made to try to capture those products. Although Molecular Loop disingenuously labeled this proposed overhaul as “clarify[ing] the invention,” the Patent Office saw through the ploy—recognizing that it was “improper to switch inventions” and requiring a new application for the new claims.

8. Along the way, Molecular Loop made repeated misrepresentations about the filing status of related applications. It filed a “Request Not to Publish” the applications and swore that the invention was not the subject of any patent application in another country or under an international agreement. That was unequivocally false, because there were numerous such applications filed and published. These falsehoods, in turn, kept the claimed contents of the

applications hidden from the public—and from Counterclaim Plaintiffs—for years. And Molecular Loop surely knew exactly what it was doing when it kept its purported inventions under wraps and prevented companies, like Counterclaim Plaintiffs, from considering the impact of the claims on existing and future products.

9. Counterclaim Plaintiffs have suffered prejudice as a result of these delays and misconduct. Most glaringly, for example, Illumina's accused TruSight Oncology 500 assay—the only product accused of infringement of the '730 Patent—was developed and released years before the claims were amended or issued.

10. All claims of the '730 Patent are therefore unenforceable under the doctrines of prosecution laches and of inequitable conduct.

11. The story for the '852 and '200 Patents follows the same patterns of unreasonable and inexcusable delay and deceit.

12. The provisional application that led to these patents was filed in December 23, 2010. During the next decade-plus, Molecular Loop prosecuted only two patent applications: (1) U.S. Patent Application No. 13/081,660, filed on April 7, 2011 and issued on October 20, 2015 as U.S. Patent No. 9,173,281 ("the '281 Patent"); and (2) U.S. Patent Application No. 14/854,629, filed on September 15, 2015 and issued on June 22, 2021 as U.S. Patent No. 11,041,851 ("the '851 Patent"). Molecular Loop does not contend that either of the '281 or '851 Patents covers any of Counterclaim Plaintiffs' products or processes, and in fact has granted them a covenant not to sue under these patents.

13. Molecular Loop waited until 2021 to try to ensnare Counterclaim Plaintiffs' products. More specifically, the application that led to the '852 Patent was filed on January 14, 2021, and issued on June 22, 2021, while the application that led to the '200 Patent was filed on

June 4, 2021 and issued on September 26, 2023. By that time, Illumina's accused TruSight Oncology 500 assay, Verifi Tests, and VeriSeq Tests—the products accused of infringement of these patents—had been developed and on the market for years. Indeed, as Molecular Loop acknowledges, the Verifi Tests were launched in 2012 (Compl., ¶ 46), the VeriSeq tests were launched in 2017 (Compl., ¶ 53), and the TruSight Oncology 500 assays were launched in 2018 (Compl., ¶ 64).

14. During prosecution, Molecular Loop's lawyer and the inventors also made misrepresentations and false statements to the Patent Office. To start, the description of the alleged invention in the '852 patent's specification was not Molecular Loop's work; it was substantially copied from *other* publications and *others' work*—including Illumina's. Of the 17 columns of Detailed Description in the patent, over 11 columns were copied almost entirely verbatim from others (mostly from Illumina). Molecular Loop never told the Patent Office that it had lifted these disclosures from others. Not only that, but Molecular Loop's lawyer and the inventors explicitly misrepresented a prior art disclosure (Parameswaran) that rendered the proposed claims invalid. Molecular Loop told the Patent Office that Parameswaran was limited to a particular context and inapplicable to the field of the proposed invention, but, more than a year prior to Molecular Loop's earliest claimed patent filing date, *one of the named inventors of the '852 Patent had published a paper that cited to and described Parameswaran as saying the opposite*. Molecular Loop did not disclose this other publication to the Patent Office. The Patent Office then relied on Molecular Loop's misstatements about Parameswaran in allowing the patent. Particularly in light of the overlap in people involved, Molecular Loop's statements and its failure to disclose contradictory material prior art were all done with the intent to deceive.

15. Counterclaim Plaintiffs have suffered prejudice attributable to the delays and misconduct in prosecution of the ’852 and ’200 Patents. All of the accused products were developed and launched years before Molecular Loop had even *filed* the applications that led to the ’852 and ’200 Patents. And those patents never would have even issued but for Molecular Loop’s deceptions about the prior art. That renders all claims of the ’852 and ’200 Patents unenforceable under the doctrines of prosecution laches and of inequitable conduct.

## PARTIES

16. Counterclaim Plaintiff Illumina is a Delaware corporation with its principal place of business at 5200 Illumina Way, San Diego, California 92122.

17. Counterclaim Plaintiff VHI is a Delaware corporation with its principal place of business at 200 Lincoln Centre Dr., Foster City, CA 94404.

18. On information and belief, Counterclaim Defendant Molecular Loop is a corporation organized and existing under the laws of the State of Delaware, having a place of business at 300 Tradecenter, Suite 5400, Woburn, MA 01801. On information and belief, Molecular Loop is the owner by assignment of the Patents-in-Suit.

## JURISDICTION AND VENUE

19. This action arises under the patent laws of the United States, 35 U.S.C. §§ 1, et seq.

20. This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1338(a), and 2201(a).

21. Molecular Loop is subject to personal jurisdiction in this District at least because it has availed itself of this Court by filing this action in this District.

22. Venue is proper in this District under 28 U.S.C. §§ 1391 and 1400. By filing its infringement action in this District, Molecular Loop has consented to the adjudication of its disputes with Illumina and VHI in this District.

## FACTUAL BACKGROUND

23. Plaintiffs re-allege and incorporate by reference each of paragraphs 1-22 above.

24. In its Complaint, Molecular Loop purported to be the owner of the ’852 Patent, entitled “Methods for Maintaining the Integrity and Identification of a Nucleic Acid Template in a Multiplex Sequencing Reaction.” The ’852 Patent lists Gregory Porreca, Mark Umbarger, and George Church as the inventors and Molecular Loop Biosciences, Inc. as the sole assignee. A copy of the ’852 Patent was attached to Molecular Loop’s Complaint as Exhibit 1.

25. In its Complaint, Molecular Loop purported to be the owner of the ’730 Patent, entitled “Methods and Compositions for Evaluating Genetic Markers.” The ’730 Patent lists Gregory Porreca and Uri Laserson as the inventors and Molecular Loop Biosciences, Inc. as the sole assignee. A copy of the ’730 Patent was attached to Molecular Loop’s Complaint as Exhibit 3.

26. Illumina is a global leader and pioneer in developing and manufacturing life science tools and systems for analyzing the building blocks of life: DNA that makes up the human genome. DNA is made up of a series of nucleic acids, the exact sequence of which determines the identity of each piece of DNA. Illumina’s portfolio of DNA sequencing and analysis tools is designed to accelerate and simplify DNA analysis, and has enabled studies that were not even imaginable just a few years ago. To that end, Illumina is credited with achieving a significant milestone in medical progress through the launch of sequencing technology capable of pushing the cost of sequencing the human genome from what was as high as six to seven figures down to just $600, and Illumina continues to drive down the cost of sequencing through its innovations. See, e.g., https://www.nature.com/articles/d42473-021-00030-9. Illumina’s innovation has contributed substantially to advancing research of diseases and drug development and is moving the industry closer to realizing personalized medicine.

27. Illumina makes and sells world-leading genome sequencing instruments and chemistry, as well as various products used in sequencing workflows, such as library prep, bioinformatics, and assays such as TruSight Oncology 500 (TSO500) and Noninvasive Prenatal Testing (NIPT) that run on Illumina's sequencing instruments. Illumina's next-generation sequencing systems offer high throughput sequencing, processing a given sample or samples in a massively parallel fashion to quickly determine their genetic sequence(s), i.e., the exact order of the nucleic acids that make up the genetic material of interest. This technology allows researchers to analyze genetic sequences, better understand the source of disease, and continues to facilitate pioneering advances in oncology, genetic and infectious diseases, and reproductive health. Illumina's customers include leading genomic research centers, academic institutions, government laboratories, and hospitals, as well as pharmaceutical, biotechnology, commercial molecular diagnostic laboratories, and consumer genomics companies.

28. Verinata is a wholly-owned subsidiary of Illumina, Inc. Verinata is a leading provider of non-invasive tests for early identification of fetal chromosomal abnormalities that supplies, among other things, noninvasive prenatal testing (NIPT) services.

29. According to its website, Molecular Loop was founded in 2018 by Dr. Greg Porreca and Dr. Eric Boyden and, upon information and belief, has benefited from the pioneering advancements in human genome sequencing developed by Illumina.

30. An actual controversy exists within the jurisdiction of this Court under 28 U.S.C. §§ 2201 and 2202. On June 9, 2024, Molecular Loop filed a complaint against Counterclaim Plaintiffs alleging that certain of Counterclaim Plaintiffs' products and/or services, such as TruSight Oncology 500 Circulating Tumor DNA (ctDNA), infringe at least one claim of the '852 Patent and at least one claim of the '730 Patent. On information and belief, Defendant Molecular

Loop has alleged that certain of Counterclaim Plaintiffs' customers, such as ARUP, Fulgent, Helix, and NeoGenomics, have infringed the '852 Patent and the '730 Patent, at least partially as a result of using certain kits containing Unique Molecular Identifiers ("UMIs") and/or Unique Dual Indices ("UDIs") they have purchased from Counterclaim Plaintiffs. UMIs and UDIs are two types of tags that may be attached to nucleic acid sequences for use during sequencing analysis. They are often employed in certain next generation sequencing applications.

31. In its June 9, 2024 Complaint, Molecular Loop also asserted that Counterclaim Plaintiffs infringed the '200 Patent. On January 16, 2026, the Patent Trial and Appeal Board found all claims of the '200 Patent invalid, concluding they were both anticipated and obvious over the prior art. The Board construed the '200 Patent claims to cover Combinatorial Dual Indices ("CDIs"), and found that CDIs were disclosed in the prior art. Molecular Loop did not appeal the Board's decision. On May 15, 2026, the parties filed a joint stipulation dismissing all claims and counterclaims relating to the '200 Patent with prejudice. D.I. 46.

32. On August 6, 2026, Molecular Loop served Initial Infringement Contentions asserting that Counterclaim Plaintiffs infringed claims of the '852 and '730 Patents. Molecular Loop asserted that Counterclaim Plaintiffs' Verifi, VeriSeq, AmpliSeq, COVIDSeq, and certain TSO500 (TruSight Oncology) products infringed the '852 Patent's claims and those TSO500 products infringed some of the '730 Patent's claims. Molecular Loop continues to assert those patents against those products to date.

33. Counterclaim Plaintiffs reserve all rights to amend these Counterclaims to seek a declaratory judgment of non-infringement, invalidity, and/or unenforceability of any other U.S. Patents Molecular Loop contends are infringed by Counterclaim Plaintiffs and/or Counterclaim Plaintiffs' customers.

## COUNT I

## (Noninfringement of the ’852 Patent)

34. Counterclaim Plaintiffs reallege and incorporate all of the foregoing paragraphs of these Counterclaims as though fully set forth herein.

35. Molecular Loop has accused Counterclaim Plaintiffs’ use in their products of dual indexes such as UDIs, which are used to multiplex multiple samples on a flow cell allowing them to be sequenced simultaneously, of infringing the ’852 Patent claims. Molecular Loop has alleged that the following products infringe the claims: VeriSeq NIPT Solution v2, the Verifi products, AmpliSeq, COVIDSeq, and certain TSO500 products. Illumina also separately sells UDI kits to allow its customers to use UDIs to multiplex samples when they run customer-designed or third-party tests. Whether UDIs are added through the AmpliSeq, COVIDSeq, or TSO500 kits or added through a separate UDI kit, samples are demultiplexed using the same Illumina software (*e.g.*, using Illumina’s bcl2fastq software). In its responses to Illumina’s interrogatories, Molecular Loop has alleged Counterclaim Plaintiffs indirectly infringe the ’852 Patent claims through use of the above mentioned products by Counterclaim Plaintiffs’ customers.

36. Neither Counterclaim Plaintiffs nor the making, using, offering for sale and selling, and importing of any of the accused products have infringed, directly or indirectly, any claim of the ’852 Patent.

37. For example, many of Counterclaim Plaintiffs’ products do not include UDIs at all but include Combinatorial Dual Indexes (“CDIs”). This includes all VeriSeq NIPT Solution v2 and Verifi products, as well as some versions of COVIDSeq, AmpliSeq, and the TSO500 products. These products do not meet the claimed steps “incorporating at least two members of a plurality of identifier sequences into template nucleic acids obtained from at least two different samples,

wherein said two members constitute a distinct pair associated with said template" and "amplifying said nucleic acid templates on a surface of a flow cell thereby to form clusters, at least one of which comprises a chimeric sequence comprising a combination of identifier sequences that are different than any of said distinct pairs" which is required by independent claim 1 of the '852 Patent and all claims that depend on it. These products do not meet these claim elements at least because they do not use "distinct pairs" of identifiers.

38. The TSO500 products do not meet the claimed steps of "incorporating at least two members of a plurality of identifier sequences into template nucleic acids obtained from at least two different samples, wherein said two members constitute a distinct pair associated with said template" and "amplifying said nucleic acid templates on a surface of a flow cell thereby to form clusters." For example, there are no "template nucleic acids" that meet both steps.

39. None of Counterclaim Plaintiffs' products, including its UDI kits, meet the claimed step of "discarding sequence reads obtained in said sequencing step that contain said combination of identifier sequences that are different than any of said distinct pairs, thereby to reduce cross-over error."

40. Counterclaim Plaintiffs' UDI kits do not meet the claimed step of "discarding sequence reads obtained in said sequencing step that contain said combination of identifier sequences that are different than any of said distinct pairs, thereby to reduce cross-over error."

41. Counterclaim Plaintiffs' making, using, offering for sale and selling, and importing of UDI kits does not directly infringe any '852 Patent claim.

42. Counterclaim Plaintiffs do not indirectly infringe the '852 Patent claims. Counterclaim Plaintiffs distribute their products with instructions on how to incorporate UDIs into samples, how to pool and sequence multiple samples simultaneously on Illumina sequencers, and

how to use Illumina software to demultiplex the sequence reads into samples. Counterclaim Plaintiffs' customers do not infringe the '852 Patent when using Counterclaim Plaintiffs' products according to their instructions for the same reasons Counterclaim Plaintiffs do not infringe when using them. Therefore, there is no direct infringement by customers, and Counterclaim Plaintiffs cannot be liable for indirect infringement.

43. Counterclaim Plaintiffs do not indirectly infringe any '852 Patent claim through its customers' use of UDI kits according to their instructions.

44. Because Counterclaim Plaintiffs do not infringe the only independent claim of the '852 Patent, they do not infringe any claim of the '852 Patent.

45. A substantial, definite, concrete, and immediate justiciable controversy exists between Counterclaim Plaintiffs and Molecular Loop with respect to whether the making, using, offering for sale and selling, and importing of any of the accused products infringe any claim of the '852 Patent.

46. Counterclaim Plaintiffs seek a declaration that the making, using, offering for sale and selling, and importing of any of the accused products do not infringe any claim of the '852 Patent.

**COUNT II**

**(Noninfringement of the '730 Patent)**

47. Counterclaim Plaintiffs reallege and incorporate all of the foregoing paragraphs of these Counterclaims as though fully set forth herein.

48. Neither Counterclaim Plaintiffs nor their products, services or technology have infringed, directly or indirectly, any claim of the '730 Patent.

49. During prosecution of the applications that led to the '730 Patent, one of the named inventors, Dr. Gregory Porreca, alleged in sworn declarations that "[a] distinguishing feature of the claims in my patent application is that each individual nucleic acid molecule is tagged with a unique differentiator tag prior to any amplification or sequencing steps."

50. Dr. Porreca's declarations elaborated that prior art identified by the patent examiner was allegedly distinguished because it did not disclose "tagging individual nucleic acid molecules each with a unique barcode sequence," and that, in his invention, "[e]ach differentiator tag has its own unique sequence so that each individual nucleic acid molecule is tagged, and therefore associated, with its own unique differentiator tag."

51. Dr. Porreca further represented to the Patent Office that the prior art did not describe "tagging each individual nucleic acid molecule with a unique barcode sequence as required by my pending claims," and that "my claims require a unique barcode sequence per each individual target nucleic acid molecule."

52. During IPR2024-01419, Molecular Loop made numerous clear and unequivocal statements to the Patent Office that determining a consensus sequence based on duplicate copies of the original starting molecule does not satisfy the "collapsing" step of the '730 Patent claims. For example, it stated "***determining a single consensus read*** by looking at multiple clonal copies of the same original starting molecule ***is not collapsing*** as claimed by the '730 Patent." PO Resp. at 41-42.

53. Neither Counterclaim Plaintiffs nor use of their products, services, or technology have infringed, directly or indirectly, any claim of the '730 Patent, as they do not operate as described by Dr. Porreca in his sworn declarations to the Patent Office or by Molecular Loop during the IPRs.

54. Molecular Loop has accused Counterclaim Plaintiffs' use of UMIs in certain of their TSO500 products of infringing certain '730 Patent claims. Use of those TSO500 products does not infringe. In its responses to Illumina's interrogatories, Molecular Loop has alleged Counterclaim Plaintiffs indirectly infringe certain '730 Patent claims through use of the TSO500 products by Counterclaim Plaintiffs' customers.

55. For example, Illumina's TSO500 ctDNA v2 and UMI plate products do not utilize a "set of differentiator tags, wherein members of said set of differentiator tags are associated with members of said plurality [of target nucleic acid molecules from more than one locus of origin]," which is required by claims 1-8 of the '730 Patent.

56. Likewise, for example, Illumina's TruSight Oncology 500 ctDNA v2 and UMI plate products do not utilize a "set of unique differentiator tags, wherein members of said set of unique differentiator tags are randomly associated with members of said plurality of target nucleic acid molecules, such that any given tag is uniquely associated with said locus of origin," which is required by claim 9 of the '730 Patent.

57. As another example, Illumina's TruSight Oncology 500 ctDNA v2 and UMI plate products also do not practice the limitation of "sequencing the amplicons obtained in said amplifying step to obtain sequence reads of each of the amplicons," which is required by independent claims 1 and 9 of the '730 Patent.

58. As another example, Illumina's TSO500 ctDNA v2 and UMI plate products do not "correct[] for error or bias introduced during said workflow by collapsing target:differentiator tag combinations observed more than once into a single count," which is required by claims 1-8 of the '730 Patent. The products use UMIs to determine a single consensus read by looking at multiple clonal copies of the same original starting molecule—the exact functionality Molecular Loop told

the Patent Office was not covered by claim 1. Nor do the products meet the step of "correcting for error or bias in claim 9.

59. Because Counterclaim Plaintiffs do not infringe either of the independent claims of the '730 Patent, they do not infringe any claim of the '730 Patent.

60. A substantial, definite, concrete, and immediate justiciable controversy exists between Counterclaim Plaintiffs and Molecular Loop with respect to whether the making, using, offering for sale and selling, and importing of any of the accused products infringe any claim of the '730 Patent.

61. Counterclaim Plaintiffs seek a declaration that the making, using, offering for sale and selling, and importing of any of the accused products do not infringe any claim of the '730 Patent.

**COUNT III**

**(Invalidity of the '852 Patent)**

62. Counterclaim Plaintiffs reallege and incorporate all of the foregoing paragraphs of these Counterclaims as though fully set forth herein.

63. The '852 Patent claims are invalid under at least 35 U.S.C. §§ 101, 102, 103, and 112.

64. The '852 Patent claims are invalid under 35 U.S.C. §§ 102 and 103 in view of prior art systems or public uses of technology, including for example, Roche's 454 Sequencing System and analysis software (v2.5.1), G. Gloor's Presentation of combinatorial sequence tagging, Parallel Tagged Sequencing, Illumina's Genome Analyzer II and analysis software, and/or Illumina's HiSeq 2000 and analysis software.

65. Illumina had multiple sequencers that were commercially available in 2009 and 2010, including the Genome Analyzer II and the HiSeq 2000. Those systems are prior art under at least §§ 102(a) and (b). It would have been obvious to combine the Illumina systems with any of Roche's 454 Sequencing System and analysis software (v2.5.1), G. Gloor's Presentation of combinatorial sequence tagging, or Parallel Tagged Sequencing.

66. For example, Roche's 454 Sequencing System and analysis software (v2.5.1) was released by August 2010 and is prior art under at least § 102(a). The Roche system supported multiplexing using dual indexes called MIDs and supported unique dual indexes. The system could be configured to discard reads with indexes that do not match an expected value.

67. As another example, Parallel Tagged Sequencing ("PTS") software was released in December 9, 2009, and is prior art under at least §§ 102(a) and (b). The PTS software supported multiplexing using dual indexes where each index was unique to the sample. The PTS software discarded sequence reads where the indexes did not match the expected sequences.

68. As another example, Dr. Greggory Gloor publicly presented in the United States how to use CDIs to multiplex on Illumina sequencers in August or September 2010. The information he presented was publicly known and is prior art under at least § 102(a). Molecular Loop has accused several of Counterclaim Plaintiffs' products that use CDIs of infringing the '852 Patent claims. To the extent those allegations are accepted, Dr. Gloor's presentation anticipates the claims.

69. The '852 Patent claims are invalid under § 112.

70. For example, the claim elements "template cross-over error", "amplifying said nucleic acid templates on a surface of a flow cell thereby to form clusters, at least one of which comprises a chimeric sequence comprising a combination of identifier sequences that are different

than any of said distinct pairs", and "cross-over error" lack written description at least because Molecular Loop did not show possession of those elements under its interpretation[2] of the claims.

71. As another example, Molecular Loop has not enabled "amplifying said nucleic acid templates on a surface of a flow cell thereby to form clusters, at least one of which comprises a chimeric sequence comprising a combination of identifier sequences that are different than any of said distinct pairs" under its interpretation of the claims.

72. As another example, the claim element "incorporating at least two members of a plurality of identifier sequences into template nucleic acids obtained from at least two different samples, wherein said two members constitute a distinct pair associated with said template" lacks written description in the specification.

73. As another example, Molecular Loop has not enabled "discarding sequence reads obtained in said sequencing step that contain said combination of identifier sequences that are different than any of said distinct pairs, thereby to reduce cross-over error".

74. As another example, the claim elements "reducing template cross-over error introduced during sequencing workflow" and "amplifying said nucleic acid templates on a surface of a flow cell thereby to form clusters, at least one of which comprises a chimeric sequence comprising a combination of identifier sequences that are different than any of said distinct pairs" are indefinite under Molecular Loop's interpretation of the claims.

75. The '852 Patent claims are patent ineligible under § 101.

76. Claim 1 is invalid because it claims the abstract idea of using two tags to associate nucleic acid templates with a sample for later analysis, and it fails to provide an inventive concept.

[2] During IPR2024-00964, Molecular Loop argued that "cross-over error" means "error from sequences of chimeric molecules created during cluster amplification and made from template nucleic acids derived from different samples."

The additional elements recited in the claim (*e.g.*, incorporating tags into template nucleic acids, combining nucleic acid templates from different samples into a single sample, amplifying the nucleic acid templates on a surface of a flow cell to form clusters, sequencing amplicons, discarding sequence reads based on analysis of the tags, chimeric sequences, reducing cross-over error) were conventional, routine, and well-known elements in the genomic sequencing field and do not save the claim from patent ineligibility.

77. Claim 1 is the only independent claim and is representative of all remaining dependent claims for purposes of § 101 analysis. All of the additional elements in the dependent claims (nucleic acid sequence tags, barcode sequences, incorporating tags into a 5' portion or end and a 3' portion or end of the template, configuration of first sequence-barcode-second sequence-nucleotide-third sequence-barcode-fourth sequence, template is directly attached to a substrate before sequencing) are also conventional, routine, and well-known elements in the genomic sequencing field and do not save any of the claims from patent ineligibility.

**COUNT IV**

**(Invalidity of the '730 Patent)**

78. Counterclaim Plaintiffs reallege and incorporate all of the foregoing paragraphs of these Counterclaims as though fully set forth herein.

79. The '730 Patent claims are invalid under at least 35 U.S.C. §§ 101, 102, 103, and 112.

80. The '730 Patent claims are invalid under 35 U.S.C. §§ 102 and 103 in view of prior art systems or public uses of technology, including for example, the research done by Meghan McCloskey and others at the University of Washington, the work done by Mark Chee of Prognosys, and Illumina's Genome Analyzer II and analysis software.

81. Meghan McCloskey and others performed experiments adding unique barcodes to nucleic acids prior to amplification to identify and correct bias between 2004 and 2007. That work was done in the United States and is prior art under at least §§ 102(a) and (b).

82. Mark Chee developed techniques for using unique identifiers to correct for amplification bias in 2009, as documented in U.S. 9,085,798. On information and belief, Dr. Chee conceived of the inventions in that patent months prior to April 30, 2009, and was diligent in reducing them to practice. That work was done in the United States and is prior art under at least §§ 102(a) and (g).

83. Illumina had multiple sequencers that were commercially available by March 2009, including the Genome Analyzer II. Those systems are prior art under at least §§ 102(a) and (b). It would have been obvious to combine the Illumina systems with any of the techniques described above.

84. The ’730 Patent claims are invalid under § 112.

85. For example, the claim element “correcting for error[s] or bias” lack written description at least because Molecular Loop did not show possession of a method for correcting errors. As another example, the claim element “correcting for errors or bias” is not enabled at least because Molecular Loop did not describe a method for correcting errors. As another example, claim 2’s step of “wherein said correcting step further comprises collapsing all sequence reads comprising a same differentiator tag into a single read before determining a consensus base call for the target nucleic acid molecule sequences” is indefinite under Molecular Loop’s interpretation of the claims.

86. The ’730 Patent claims are invalid under § 101.

87. Claim 1 is invalid because it claims the abstract idea of using unique tags to identify unique nucleic acid molecules, and it fails to provide an inventive concept. The additional elements recited in the claim (*e.g.*, obtaining a biological sample of nucleic acid molecules from more than one locus of origin, introducing tags to the sample, amplifying the tagged nucleic acid molecules, sequencing the amplicons, and correcting for error or bias by collapsing multiple amplicons with the same tag into a single count) were conventional, routine, and well-known elements in the genomic sequencing field and do not save the claim from patent ineligibility.

88. Claim 9 is invalid for the same reasons identified above for Claim 1. Instead of correcting error or bias by collapsing multiple amplicons with the same tag into a single count, Claim 9 recites correcting for error or bias by recognizing multiple amplicons with the same tag as being derived from the same input molecule. That is also a conventional, routine, and well-known element in the genomic sequencing field and does not save the claim from patent ineligibility.

89. Claims 1 is representative of all asserted dependent claims for purposes of § 101 analysis. All of the additional elements in the asserted dependent claims (determining a consensus base call, determining error based on a number of tag sequences, samples taken from blood and biopsy tissue, circulating tumor nucleic acid molecules, determining the copy number of a genomic region or transcript in a patient) are also conventional, routine, and well-known elements in the genomic sequencing field and do not save any of the claims from patent ineligibility.

**COUNT V**

**(Unenforceability of the '852 Patent Due to Prosecution Laches)**

90. Counterclaim Plaintiffs reallege and incorporate all of the foregoing paragraphs of these Counterclaims as though fully set forth herein.

91. The ’852 Patent is unenforceable due to, at least, the doctrine of prosecution laches.

92. Prosecution laches bars enforcement of the ’852 Patent, which issued after an unreasonable and inexcusable delay in prosecution caused by Molecular Loop, and Counterclaim Plaintiffs have suffered prejudice attributable to the delay. The equitable doctrine of prosecution laches is intended to avoid abuses of the patent system and unreasonable delays by a patent holder in claiming its alleged rights.

93. On its face, the ’852 Patent claims priority to Provisional Application No. 61/426,817 (“’817 Provisional Application”) filed on December 23, 2010. Compl. Ex. 1 (’852 Patent) (Face).

94. U.S. Patent Application No. 13/081,660 was filed on April 7, 2011 and issued on October 20, 2015 as U.S. Patent No. 9,173,281 (“the ’281 Patent”). U.S. Patent Application No. 13/081,660 was the first application filed based on the December 2010 provisional.

95. U.S. Patent Application No. 14/854,629 was filed on September 15, 2015 and issued on June 22, 2021 as U.S. Patent No. 11,041,851 (“the ’851 Patent”).

96. U.S. Patent Applications Nos. 13/081,660 and 14/854,629 were the only applications filed from the ’817 Provisional Application between December 2010 and the end of 2020.

97. Molecular Loop does not contend that either of the ’281 or ’851 Patents cover any of Counterclaim Plaintiffs’ products or processes, and in fact has granted them a covenant not to sue under these patents.

98. The application that led to the ’852 Patent was not filed until January 14, 2021, over 10 years after its earliest effective filing date based on the 2010 provisional application, and over 5 years after issuance of the first filed patent in its family.

99. Counterclaim Plaintiffs have suffered prejudice attributable to the delays in prosecution of the ’852 Patent, because, *inter alia*, Counterclaim Plaintiffs’ accused TruSight Oncology 500 assay, Verifi Tests, and VeriSeq Tests—the products accused by Molecular Loop of infringement of the ’852 Patent—were developed and released years before the 2021 filing and issuance of the ’852 Patent. In particular, as Molecular Loop acknowledges, the Verifi Tests were launched in 2012 (Compl., ¶ 46), the VeriSeq tests were launched in 2017 (Compl., ¶ 53), and the TruSight Oncology 500 assays were launched in 2018 (Compl., ¶ 64). Thus, all of these products were developed and launched by Counterclaim Plaintiffs years before Molecular Loop had even *filed* the application that led to the ’852 Patent. In the decade between the filing of the 2010 provision and the 2021 filing of the ’852 Patent, Molecular Loop prosecuted claims that it acknowledges have no relevance to Counterclaim Plaintiffs’ products and services.

100. Around 2017, Illumina released UDIs and began publicizing potential benefits of using UDIs for multiplexing multiple samples during sequencing. Illumina spent at least a year and a half developing UDIs, and it made substantial investments into that development. It also invested in publicizing UDIs and their potential benefits by publishing a white paper and through other marketing efforts. In response to Illumina’s efforts, many of its customers began using UDIs. These investments were made before the 2021 filing of the ’852 Patent.

101. After Illumina had made substantial investments into UDIs, Molecular Loop expanded the patent’s scope trying to encompass Illumina’s later-developed UDI products. For example, in 2021, years after Illumina released UDIs, Molecular Loop drafted the ’852 claims to require using a first and second identifier sequence where ***each identifier sequence*** is uniquely associated with templates in a sample. In contrast, the specification discloses combinatorial indexes that reuse identifier sequences across multiple samples as long as ***the pair of identifier***

***sequences*** is uniquely associated with the sample. Ex. 1 at 2:50-53 ("While the pair of barcodes associated with any given template is unique, individual barcode sequences can be used with multiple templates as long as no pair is used across two different samples."). The concept that ***each*** identifier sequence must be uniquely associated with one sample was not added to the patent family until years after Illumina released its products. As another example, Molecular Loop's earlier '281 patent claimed only methods for validating analytes, not for reducing cross-over error. It was not until October 2020, more than ***two years after*** Illumina launched a product that included UDIs, that Molecular Loop allegedly "clarified" the invention was directed to reducing crossover error using unique individual identifier sequences. Molecular Loop laid in wait while Illumina developed new technology, and then drafted its claims in an attempt to cover Illumina's later-released technology.

102. Compounding this prejudice, Molecular Loop's '852 Patent seeks to take credit for advances in DNA sequencing technologies that were earlier taught and publicly disclosed by others, *including Illumina.*

103. On information and belief, when the '817 Provisional Application was written, at least those who prepared that application were aware of and/or had a copy of the text of the specification from PCT Patent Publication No. WO 2010/056728 and/or U.S. Patent Publication No. 2009/0226975 A1.

104. On information and belief, at least those who prepared the '817 Provisional Application and each of the named inventors on the '852 Patent knew that the content of the text was almost entirely copied from PCT Patent Publication No. WO 2010/056728 and/or U.S. Patent Publication No. 2009/0226975 A1 and was not obtained from the named inventors of the '852 patent or from Molecular Loop.

105. The "Detailed Description" portion of the specification of Molecular Loop's '852 Patent substantially copied from at least PCT Patent Publication No. WO 2010/056728 to Steinman et al., which has been assigned to Helicos Biosciences Corporation. *Compare* Compl. Ex. 1 ('852 Pat.) at 7:45-8:53 *with* Ex. A (WO 2010/056728 (Steinman)) at 9-11; *compare* Compl. Ex. 1 ('852 Pat.) at 9:5-28 *with* Ex. A (WO 2010/056728 (Steinman)) at 5; *compare* Compl. Ex. 1 ('852 Pat.) at 9:29-10:2 *with* Ex. A (WO 2010/056728 (Steinman)) at 6-7.

106. The portions of Helicos's patents that were substantially copied by Molecular Loop include Helicos's disclosures concerning the design of unique oligonucleotide barcode sequences, including those with length of 4 nucleotides or greater, the preparation of nucleic templates, and the attachment of such unique oligonucleotide sequences to such template nucleic acid molecules.

107. For example, the specification of the '852 Patent copied almost entirely verbatim the following disclosure from page 5 of WO 2010/056728 (Steinman) regarding the nucleotide length of barcode sequences:

> Methods of designing sets of unique oligonucleotide sequences is shown for example in Brenner et al. (U.S. patent number 6,235,475), the contents of which are incorporated by reference herein in their entirety. In certain embodiments, the unique portion of the oligonucleotide sequence ranges from about 5 nucleotides to about 15 nucleotides. In a particular embodiment, the unique portion of the oligonucleotide sequence ranges from about 4 nucleotides to about 7 nucleotides. Since the bar coded portion of the oligonucleotide is sequenced along with the template nucleic acid molecule, the oligonucleotide length should be of minimal length so as to permit the longest read from the template nucleic acid attached. Generally, the unique portion of the oligonucleotide sequence is spaced from the template nucleic acid molecule by at least one base (minimizes homopolymeric combinations).

108. The specification of Molecular Loop's '852 Patent also copied almost entirely verbatim from over 50 paragraphs of U.S. Patent Publication No. 2009/0226975 A1 (Sabot), which

has been assigned to Illumina. *Compare* Compl. Ex. 1 ('852 Pat.) at 10:11-20:46 *with* Ex. B (U.S. Patent Publication No. 2009/0226975 A1 (Sabot)) at ¶¶ 20-78.

109. The portions of Illumina's patent application that were copied nearly verbatim by Molecular Loop include Illumina's disclosures concerning methods of amplifying segments of nucleic acid sequencing methods.

110. In total, over half of the specification of the '852 Patent, held out to the public as a detailed description of Molecular Loops' own invention, was actually copied from the descriptions of the inventions taught by the Helicos and Illumina patent publications.

111. During prosecution of the '852 Patent and its related applications, Molecular Loop did not inform the Patent Office that it had copied over half of its patent specification from patent publications filed by third parties.

112. In particular, Molecular Loop did not disclose WO 2010/056728 (Steinman) to the Patent Office during prosecution of the '852 Patent, or any other patent in its family, despite all of the patents in this family sharing a substantially identical specification.

113. Molecular Loop also did not disclose U.S. Patent Publication No. 2009/0226975 A1 (Sabot) to the Patent Office during prosecution of the first patent to issue in this family, the '281 Patent, again despite all of the patents in this family sharing a substantially identical specification.

114. Molecular Loop has relied on the portions of the specification that were copied from others (including Helicos) to argue its claimed inventions are differentiated from the prior art.

115. For example, during prosecution of the '281 Patent, Molecular Loop ultimately obtained allowance of the claims over the Examiner's prior art rejections by amending the claims

to require that the "sequence identifiers" incorporated into the template nucleic acids "comprise four or more nucleotides."

116. Molecular Loop argued that the prior art identified by the Examiner, Parameswaran, was "silent on the element of incorporating two of the same barcodes into a template, wherein the barcodes comprise four nucleotides." Molecular Loop likewise argued the claims were allowable over a prior art combination of Kawashima, Parameswaran, and Kircher "because those references fail to disclose or suggest incorporating at least two of the same sequence identifiers into a nucleic acid template, wherein the sequence identifiers comprise four or more nucleotides."

117. After Molecular Loop made this amendment and corresponding arguments using the amended language, the Examiner withdrew its rejections and allowed the claims to issue as the '281 Patent. The Examiner specified the importance of the amendment, stating in the Notice of Allowability that "Applicant's amendments overcame the previously presented rejections."

118. The requirement that identifier sequences have four or more nucleotides is also a limitation of the claims of the '851 Patent and the '200 Patent.

119. The support for the four or more nucleotide limitation comes from the portion of the specification copied almost entirely verbatim from the Helicos patent publication, WO 2010/056728 (Steinman), which was not made known to the examiner when Molecular Loop made its arguments.

120. On information and belief, Molecular Loop knew that the concept of using sequence identifiers comprising four or more nucleotides had already been invented by others, including Helicos, and intentionally withheld that information from the Examiner.

121. Molecular Loop continues its practice of taking credit for the work of others in its Complaint, which cites to portions of the specification that are copied nearly verbatim from the

Illumina and Helicos patents, but claims they reflect "benefit[s] of Molecular Loop's inventions." *See, e.g.*, Compl. ¶¶ 32, 33, 37.

122. In light of Molecular Loop's substantial and unreasonable delays in prosecution of the '852 Patent, and considering the substantial prejudice to Counterclaim Plaintiffs and the totality of Molecular Loop's bad faith conduct in prosecuting the '852 Patent, the '852 Patent is unenforceable due to prosecution laches.

123. Counterclaim Plaintiffs seek a declaration that all claims of the '852 Patent are unenforceable.

**COUNT VI**

**(Unenforceability of the '852 Patent Due to Inequitable Conduct)**

124. Counterclaim Plaintiffs reallege and incorporate all of the foregoing paragraphs of these Counterclaims as though fully set forth herein.

125. All claims of the '852 Patent are unenforceable due to, at least, inequitable conduct during prosecution of the patent application.

126. The '852 Patent was filed as U.S. Patent Application No. 17/149,504 ("the '504 Application") on January 14, 2021.

127. The named inventors of the '852 Patent are Gregory Porreca, Mark Umbarger, and George Church.

128. Under 37 C.F.R. 1.56, each of the named inventors had "a duty of candor and good faith in dealing with the [Patent] Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability" of any pending claim. No patent shall be granted "on an application in connection with which fraud on the Office was

practiced or attempted or the duty of disclosure was violated through bad faith or intentional misconduct."

129. On information and belief, each of the named inventors were aware of the duty of candor and good faith and the duty of disclosure that they owed to the Patent Office.

130. During prosecution of the '504 Application, on February 26, 2021 the examiner rejected certain of the then-pending claims as anticipated under 35 U.S.C. 102(b) by Parameswaran et al., (Nucl. Acids Res., vol. 35, c130, pp. 1-9, 2007) ("Parameswaran").

131. On April 13, 2021, the applicants amended the claims to add the requirement of "amplifying said nucleic acid templates <u>on a surface of a flow cell</u>."

132. In arguing that the amendment overcame Parameswaran, the applicants argued that "[t]he Parameswaran paper is directed to overcoming a problem unique to pyrosequencing in which bead-bound DNA must be physically separated on a sequencing medium, thus limiting the number of output sequences," and that "Parameswaran reports a barcoding approach in which homopolymer length must be strictly limited due [to] limitations inherent in pyrosequencing."

133. The applicants continued that "Parameswaran does not mention forming clusters in a flow cell" and claimed this was "not at all surprising given that Parameswaran is all about pyrosequencing."

134. Applicants thus argued that Parameswaran was applicable only to pyrosequencing using bead-based amplification, and that Parameswaran was *not* applicable to other forms of sequencing that use a flow cell to form clusters of amplified nucleic acids.

135. The Applicant summarized an examiner interview dated April 13, 2021, which involved its representative, Thomas C. Meyers, Aditya Dean Ramanathan, and named inventor Gregory Porreca.

136. During that interview, the Applicant "pointed to the prior art reference Parameswaran as being limited to pyrosequencing, and therefore failing to disclose amplifying nucleic acids to form clusters." The examiner "understood the distinction pointed out by Applicant but requested that applicant distinguish in the claim from the bead-based amplification methods reported by Parameswaran."

137. In a summary of the examiner interview dated April 13, 2021, the examiner likewise stated that Applicants' representative, Mr. Meyers, "argued that the claims are not anticipated by Parameswaran et al., since the claims require amplification using clusters, which are used in Illumina sequencing machines," and the "the claims should be amended to read on Illumina-type clusters to distinguish from Parameswaran et al."

138. A Notice of Allowance issued on April 27, 2021. In the Notice of Allowance, the examiner stated that "Applicant's claim amendments overcame the previously presented claim rejections."

139. On information and belief, the statements made by Applicants (at least by prosecuting attorney Thomas C. Meyers on information and belief in consultation with Dr. Porreca and/or Dr. Church) distinguishing Parameswaran as limited to pyrosequencing and inapplicable to amplification using a flow cell (as in "Illumina sequencing machines") were knowingly and unmistakably false, and made with intent to deceive the Patent Office.

140. In particular, in November 2009, named inventor George M. Church co-authored a paper entitled "The challenges of sequencing by synthesis" in Nature Biotechnology, vol. 27, no. 11, pp. 1013-1023, 2009 ("Fuller"). Ex. C.

141. Fuller has an online publication date of November 6, 2019, which is more than one year before the earliest effective filing date of the ’852 Patent, making Fuller prior art to the ’852 Patent and all other patents in its family.

142. In Fuller, Dr. Church and his co-authors described issues common to “ensemble sequencing methods,” which the authors described as including *both* Illumina flow cell-based amplification and sequencing and Roche/454 bead-based pyrosequencing. Ex. C at 1013-1015 (describing that “ensemble based” methods involve “sequencing of multiple identical copies of a DNA molecule, typically amplified together on isolated surfaces or beads” and identifying Illumina’s “Genome Analyzer” and Roche/454 Life Sciences’ “Genome Sequencer FLX”).

143. Dr. Church and his co-authors then went on to explain a problem common to all “ensemble-based” sequencing methods and offered a solution for overcoming that ***common*** problem (to *both* Illumina flow cell-based amplification and sequencing, *and* bead-based pyrosequencing). Namely, they discussed Parameswaran, explaining that “one option” to “reduce[] the inefficiencies of ensemble-based [sequencing-by-synthesis] architectures” “would be an effective technology to judiciously add sequence tags to the fragments of several different samples, then combine and process the DNA samples (encoding and binning) together, separating the resulting sequences by their tags in the computer analysis phase[60].” Ex. C at 1015.

144. The cited reference 60 in Fuller is Parameswaran, P. *et al.*, A pyrosequencing-tailored nucleotide barcode design unveils opportunities for large-scale multiplexing. *Nucleic Acids Res.* 35, e130 (2007). Ex. C at 1023.

145. The Parameswaran reference cited in Fuller is the same Parameswaran referenced cited in the examiner’s rejection during prosecution of the ’504 Application.

146. Dr. Church and his co-authors therefore acknowledged that Parameswaran's disclosed technique of "add[ing] sequence tags to fragments of several different samples, [and] then combin[ing] and process[ing] the DNA samples… together, [and] separating the resulting sequences by their tags in the computer analysis phase," was directly applicable to multiple methods of sequencing, including those that utilize the formation of clusters on a flow cell (i.e., Illumina-type clusters).

147. The Applicants' statements to the Examiner distinguishing Parameswaran as limited to bead-based pyrosequencing and having no application to "Illumina-type clusters" are directly contradicted by Fuller.

148. On information and belief, the statement in Fuller citing Parameswaran demonstrates that at least George Church, a named inventor of the '852 Patent, and on information and belief at least Mr. Meyers and Dr. Porreca, understood that Parameswaran is ***not*** limited to bead-based pyrosequencing.

149. Such an unmistakably false statement made to the PTO is a type of affirmative egregious misconduct, and the materiality of such a statement is presumed. In addition, the prosecution history shows that, but-for the Applicants' false statements distinguishing Parameswaran, the claims of the '852 Patent would not have issued.

150. During IPR2024-00964, Molecular Loop doubled-down on its false characterization of Parameswaran. For example, Molecular Loop asserted that Parameswaran "only states that its 'pyrosequencer-tailored ***barcodes***'—and specifically its individual 'barcode specification'—might be compatible with other platforms, not the entire pyrosequencing-tailored unique dual indexing approach." IPR2024-00964, Paper 18 (P.O. Resp.) at 36 (Apr. 17, 2025). But Dr. Church and his coauthors acknowledged Parameswaran's overall approach was directly

applicable to other platforms, including "ensemble-based" sequencing architectures. Ex. C. at 1015, 1021. "Ensembled-based" sequencing architectures is a category of sequencing technologies that includes both pyrosequencing and Illumina sequencing. *Id.* at 1013 ("ensemble-based" creates copies of DNA molecules), 1015 (Table 1).

151. The Applicants also violated their duty of disclosure to the Patent Office by withholding disclosure of Fuller during prosecution of the '504 Application, and during prosecution of all of the related applications in the family of the '852 Patent.

152. Inventor George Church was a named author of the Fuller paper, and therefore, must have been aware of the reference at the time of prosecution of the '504 Application.

153. On information and belief, Gregory Porreca and/or Mark Umbarger were aware that Dr. Church had cited Parameswaran in a paper before the filing of the '817 Provisional Application, given their prior work together in the George Church laboratory at Harvard Medical School, and publications in which all three are named authors.

154. On information and belief, the Fuller reference was also known to inventors Gregory Porreca and/or Mark Umbarger, given their prior work together in the George Church laboratory at Harvard Medical School, and publications in which all three are named authors.

155. On information and belief, the inventors, including George Church, knew that Fuller was material to the patentability of the pending claims of the '504 Application, but intentionally withheld the reference from the Patent Office.

156. But-for the Applicants' withholding of Fuller from the Patent Office, the examiner would have understood that Parameswaran was not limited to pyrosequencing, and would not have allowed the claims of the '852 Patent to issue.

157. At least Dr. Porreca, Dr. Church, and Dr. Umbarger, each of which had a duty of candor to the Patent Office, made false statements about what was disclosed in the prior art.

158. During IPR2024-00964, Fuller was submitted to the PTAB as background art in connection with a reply brief. The submission of Fuller during a later IPR does not cure Molecular Loop's earlier withholding during prosecution. For example, the Board's consideration of invalidity during an IPR is constrained by the grounds and arguments presented in the petition. It is different than prosecution where the Examiner can consider different grounds if new art is disclosed. As another example, the claim construction standard applied during prosecution is different than during an IPR, and thus, an IPR decision cannot control whether a reference was material during prosecution.

159. Counterclaim Plaintiffs seek a declaration that all claims of the '852 Patent are unenforceable.

**COUNT VII**

**(Unenforceability of the '730 Patent Due to Prosecution Laches)**

160. Counterclaim Plaintiffs reallege and incorporate all of the foregoing paragraphs of these Counterclaims as though fully set forth herein.

161. The '730 Patent is unenforceable due to, at least, the doctrine of prosecution laches.

162. Prosecution laches bars enforcement of the '730 Patent, which issued after an unreasonable and inexcusable delay in prosecution caused by Molecular Loop and its attorneys, and Counterclaim Plaintiffs have suffered prejudice attributable to the delay. The equitable doctrine of prosecution laches is intended to avoid abuses of the patent system and unreasonable delays by a patent holder in claiming its alleged rights.

163. According to the public records of the United States Patent & Trademark Office ("Patent Office"), the '730 Patent is the first issued U.S. patent in its family, issuing on December 12, 2023. Compl., Ex. 3 (Face)

164. The first filed nonprovisional application in the family that led to the issued '730 Patent was filed as PCT/US2010/001293 on April 30, 2010, allegedly based on a series of provisional applications, the first of which was filed on April 30, 2009. *Id.*

165. On August 8, 2016, Molecular Loop filed U.S. Patent Application No. 15/231,687 ("the '687 Application"), which claimed priority to PCT/US2010/001293.

166. During prosecution of the '687 Application, Molecular Loop waited until October 2, 2020—over 4 years after filing of the '687 Application and nearly two years after the October 30, 2018 public release of Illumina's TSO 500 assay products—to amend the pending claims to "clarify[]" that the purported invention is directed to a "method for correcting for errors or biased introduced during nucleic acid analysis workflow" and entails "correcting for error or bias introduced during said workflow by collapsing target:differentiator tag combinations observed more than once into a single count."

167. An interview with the patent examiner was held on November 18, 2020. During that interview, representatives for Molecular Loop explained that the claims had been amended to "clarify the invention." The patent examiner objected, stating that "the amendments provide a new invention drawn to correcting errors or bias" and that it was "improper to switch inventions." The examiner explained that "the originally filed claims did not provide for [correction of errors or bias] and thus the instant claims were a distinct invention."

168. No further action was taken in the prosecution of the '687 Application, which was officially deemed abandoned by the Patent Office on July 28, 2021.

169. Instead, on November 19, 2020, Molecular Loop filed U.S. Patent Application No. 16/952,764 ("the '764 Application") as a continuation of the '687 Application. The '764 Application contained the same claims that had been rejected and abandoned during prosecution of the '687 Application.

170. The '764 Application did not issue as the '730 Patent until December 12, 2023, some 5 years after the public release of Illumina's TSO500 products, over 14 years after filing of the first provisional application in this patent family, over 13 years after the filing of Molecular Loop's 2010 PCT application, and over 7 years after the filing of the '687 Application.

171. Between 2015 and when the '730 patent issued in December 2023, Illumina invested substantial amounts of time and money into developing UMIs and marketing them. Prior to selecting to use UMIs, Illumina generated internal reports and analyses evaluating UMIs and their ability to correct sequencing errors during deep sequencing. Had Illumina been aware that Molecular Loop would purport to claim UMIs, Illumina could have instead invested in developing different technologies to correct or reduce errors. In addition to developing UMIs, Illumina spent time marketing UMIs and teaching the public how to use them and how they can be useful.

172. Molecular Loop's claims directed to "correcting errors or bias" were not made available to the public, including Illumina, as a direct result of the misconduct of Molecular Loop and its representatives during prosecution of the underlying applications. The use of "differentiator tags" as part of a method for "correcting errors or bias" was a different concept than what Molecular Loop had previously tried to claim. Molecular Loop's previous claims were directed towards molecular inversion probes, not tags or correcting errors or bias.

173. At the times of filing of the '687 Application and the '764 Application (August 8, 2016 and November 19, 2020, respectively), Molecular Loop filed a "Request Not to Publish,"

which represented that "the invention disclosed in the attached application has not and will not be the subject of an application filed in another country, or under a multilateral international agreement, that requires publication at eighteen months after filing."

174. The representations made in the "Request Not to Publish" made in connection with the '687 Application and the '764 Application were false, as PCT/US2010/001293 had been filed in April 2010, many years earlier.

175. The Patent Cooperation Treaty is a multilateral international agreement that requires publication at 18 months after filing.

176. In the same filings that contained the "Request Not to Publish," Molecular Loop identified "PCT/US2010/001293" or "US2010/001293" as a related application, thus confirming Molecular Loop's knowledge of the PCT application.

177. The alleged invention had also been published previously in connection with at least the following related international applications: (1) IL 216054 A (published March 31, 2016); (2) JP 2016000046A (published January 7, 2016); (3) AU 2010242073 C1 (published December 24, 2015); (4) AU 20100242073 B2 (published September 3, 2015); (5) EP 2425240 A4 (published December 12, 2012); (6) JP 2012525147A (published October 22, 2012); (7) EP 2425240 A2 (published March 7, 2012); (7) AU 2010242073 A1 (published November 24, 2010); and (8) CA 2760439 A1 (published November 4, 2010).

178. On information and belief, the false representations in the "Request Not to Publish" were made in order to conceal the contents of the claims of the then-pending '687 Application and '764 Application, contrary to law.

179. The result of Molecular Loop's filing of the false "Request[s] Not to Publish" is that the '687 Application and '764 Application, and the documents filed during prosecution of

those applications, were not published or made available by the Patent Office for the public, including Counterclaim Plaintiffs, to see.

180. Molecular Loop's conduct during the prosecution of the alleged invention of the '730 Patent, including (1) delaying approximately 10 years from the filing of PCT/US2010/001293 on April 30, 2010—waiting until Illumina's TSO 500 products were released in October 2018—and then changing the invention and amending the claims to direct them to "methods for correcting for errors or bias introduced during nucleic acid workflow," and (2) using false representations in order to conceal the prosecution of the alleged inventions, exemplifies unreasonable and inexcusable delays in prosecution.

181. Molecular Loop's unreasonable and inexcusable delays in prosecution have prejudiced Illumina. During Molecular Loop's concealed, 13 year prosecution of the applications that led to the '730 Patent, Illumina developed and released products (e.g., TruSight Oncology 500 in October 2018) that Molecular Loop now alleges infringe the '730 Patent. Illumina's release of products that utilize its UMI technology occurred years before Molecular Loop had even amended its claims to direct them to the correction of errors or bias. As a result of Molecular Loop's false representations to the Patent Office and "Request Not to Publish," Illumina had no ability to access the pending prosecution of Molecular Loop's applications during the development of Illumina's accused products, including for purposes of assessing potential impact on its existing and future products.

182. Accordingly, the '730 Patent is unenforceable due to prosecution laches and cannot be infringed by Counterclaim Plaintiffs.

183. Counterclaim Plaintiffs seek a declaration that all claims of the '730 Patent are unenforceable.

## COUNT VIII

### (Unenforceability of the '730 Patent Due to Inequitable Conduct)

184. Counterclaim Plaintiffs reallege and incorporate all of the foregoing paragraphs of these Counterclaims as though fully set forth herein.

185. The '730 Patent is unenforceable due to inequitable conduct that occurred during prosecution of the '764 Application and the '687 Application to which the '730 Patent claims priority.

186. In particular, Molecular Loop and individuals having a duty of candor to the U.S. Patent and Trademark Office ("Patent Office") made multiple, unmistakably false statements regarding the filing status of other patent applications in order to conceal the scope of the claims and the prosecution record of the '764 Application and the '687 Application from the public, including Counterclaim Plaintiffs.

187. Gregory Porreca and Uri Laserson are named as alleged inventors on the face of the '730 Patent.

188. Upon Information and belief, Gregory Porreca is the founder and Chief Executive Officer of Molecular Loop.

189. Thomas C. Meyers of the law firm Withers Bergman LLP (formerly of the law firm Brown Rudnick LLP), prosecuted the '764 Application and the '687 Application.

190. Mr. Meyers and Dr. Porreca had a duty of candor and good faith in dealing with the U.S. Patent Office in connection with the '764 and '687 Applications.

191. The first filed non-provisional application in the family that led to the issued '730 Patent was filed by Patrick R.H. Waller of Wolf, Greenfield & Sacks, P.C. on behalf of Good Start Genetics, Inc. as PCT/US2010/001293 on April 30, 2010, allegedly based on a series of provisional

applications, the first of which was filed on April, 30, 2009. Dr. Porreca is a named inventor on PCT/US2010/001293.

192. On August 8, 2016, Mr. Meyers filed the ’687 Application, which claimed priority to PCT/US2010/001293. At the time of filing of the ’687 Application, Mr. Meyers submitted an Application Data Sheet that contained a “Request Not to Publish,” in which he stated “I hereby request that the attached application not be published under 35 U.S.C. 122(b) and certify that the invention disclosed in the attached application has not and will not be the subject of an application filed in another country, or under a multilateral international agreement, that requires publication at eighteen months after filing.” Mr. Meyers’ representation was unmistakably false, as PCT/US2010/001293 had been filed on April 30, 2009 under the Patent Cooperation Treaty, a multilateral international agreement that requires publication at 18 months after filing.

193. PCT/US2010/001293 was in fact published on November 4, 2010 as WO/2010/126614.

194. At the time of the false “Request Not to Publish,” the alleged invention disclosed in the ’687 Application had also been published previously in connection with at least the following related international applications: (1) IL 216054 A (published March 31, 2016); (2) JP 2016000046A (published January 7, 2016); (3) AU 2010242073 C1 (published December 24, 2015); (4) AU 20100242073 B2 (published September 3, 2015); (5) EP 2425240 A4 (published December 12, 2012); (6) JP 2012525147A (published October 22, 2012); (7) EP 2425240 A2 (published March 7, 2012); (7) AU 2010242073 A1 (published November 24, 2010); and (8) CA 2760439 A1 (published November 4, 2010).

195. Mr. Meyers was involved in filing U.S. patent applications that claimed priority to PCT/US2010/001293 since at least October 28, 2011, when he filed U.S. Application No.

13/266,862 ("the '862 Application"), which claimed priority to PCT/US2010/001293. Therefore, Mr. Meyers was the attorney of record prosecuting patent applications in this patent family at the time of publication of at least six of the eight international publications identified in the preceding paragraph. On information and belief, Mr. Meyers was aware of at least those six international publications when he submitted the false "Request Not to Publish."

196. Mr. Meyers was admitted to practice before the U.S. Patent Office on April 19, 1993 and, upon information and belief, was knowledgeable about the provisions of the Manual of Patent Examining Procedure ("MPEP") during prosecution of the '764 and '687 Applications.

197. Mr. Meyers' false representation in the "Request Not to Publish" violated at least Section 1122 of the MPEP.

198. In particular, Section 1122 of the MPEP required that before making the required certification in connection with a "Request Not to Publish," "the person who signs the certification must make an actual inquiry to determine whether the certification under 35 U.S.C. 122(b)(2)(B)(i) and 37 CFR 1.213(a)(3) can be appropriately made." https://www.uspto.gov/web/offices/pac/mpep/old/e9r07-2015_nov/mpep-1100.pdf. Mr. Meyers' false statement violated 37 CFR 11.18(b).

199. Section 1122 of the MPEP continues that "A nonpublication request is not appropriate unless the person who is signing the nonpublication request has made an actual inquiry consistent with the requirements of 37 CFR 11.18(b) to determine that: (A) The application under 35 U.S.C. 111(a) has not been the subject of a foreign or international application filed in another country, or under a multilateral international agreement, that requires publication of applications at eighteen months after filing (e.g., a counterpart PCT application); and (B) The applicant's intent at the time the nonpublication request is being filed is that the application under 35 U.S.C. 111(a)

will not be the subject of a foreign or international application filed in another country, or under a multilateral international agreement, that requires publication of applications at eighteen months after filing." https://www.uspto.gov/web/offices/pac/mpep/old/e9r07-2015_nov/mpep-1100.pdf.

200. Section 1122 of the MPEP further states that "A nonpublication request is not appropriate if applicants have already filed a counterpart foreign or international application in another country, or under a multilateral international agreement, that requires publication of applications at eighteen months after filing. A nonpublication request is not proper even if the foreign or international application is abandoned before the foreign or international application is published." https://www.uspto.gov/web/offices/pac/mpep/old/e9r07-2015_nov/mpep-1100.pdf.

201. The MPEP also provides that "[a]ny applicant or applicant's representative who makes a false statement (e.g., an improper certification) may be in violation of 37 CFR 11.18(b). In addition, false statements by registered patent practitioners may also violate other Disciplinary Rules (*see* 37 CFR Part 11)." https://www.uspto.gov/web/offices/pac/mpep/old/e9r07-2015_nov/mpep-1100.pdf. Mr. Meyers' false statement violated 37 CFR 11.18(b).

202. "PCT/US2010/001293" was listed in the Application Data Sheet submitted and signed by Mr. Meyers on August 8, 2016 that contained the "Request Not to Publish," thus confirming Mr. Meyers' knowledge of the PCT application that had been filed and published years earlier on April 30, 2010 and November 4, 2010, respectively.

203. On information and belief, Mr. Meyers' false representation made in the "Request Not to Publish" the '687 Application was made in order to improperly conceal the contents of the claims and prosecution record of the then-pending '687 Application.

204. The result of Molecular Loop's filing of the "Request Not to Publish" is that the '687 Application and the prosecution record revealing, *inter alia*, the scope of the pending patent claims, were not published or made publicly available by the Patent Office.

205. Absent the "Request Not to Publish," the '687 Application would have been expected to publish no later than 18 months after the August 2016 filing of the '687 Application, and likely much sooner under § 1120 of the MPEP that was in force of at the time of the request. *See* https://www.uspto.gov/web/offices/pac/mpep/old/e9r07-2015_nov/mpep-1100.pdf. In addition to the publication of the '687 Application, the prosecution record of the '687 Application would also have been publicly available from the publication of the '687 Application via the Patent Office's website. MPEP, Section 1128.

206. By engaging in the foregoing actions, Mr. Meyers and Molecular Loop were able to covertly change the scope of Molecular Loop's pending claims in a misguided attempt to capture the products of others that already been brought to market, including by Illumina, without the knowledge of Illumina and other concerned members of the public.

207. Specifically, during prosecution of the '687 Application, Molecular Loop (through Mr. Meyers) waited until October 2, 2020—over four years after filing, and nearly two years after the October 30, 2018 public release of Illumina's TSO 500 assay products—to substantially change the direction of the application by substantially amending the pending claims to "clarify" that the purported invention is directed to a "method for correcting for errors or bias introduced during nucleic acid analysis workflow" that entails "correcting for error or bias introduced during said workflow by collapsing target:differentiator tag combinations observed more than once into a single count."

208. Because of Mr. Meyers' false "Request Not to Publish" the '687 Application, blocking the publication of the '687 Application, Molecular Loop's amended claims and statements "clarify[ing]" the invention were not made publicly available by the Patent Office.

209. An interview including the patent examiner, Mr. Meyers and Dr. Porreca, was held on November 18, 2020. During that interview, Mr. Meyers and Dr. Porreca, as representatives of Molecular Loop, explained that the new claim amendments had "clarif[ied] the invention." However, the patent examiner would not allow the amendments and "noted that the amendments provide a new invention drawn to correcting errors or bias" and that it was "improper to switch inventions." The examiner explained that "the originally filed claims did not provide for [correction of errors or bias] and thus the instant claims were a distinct invention."

210. No further action was taken by Mr. Meyers and Dr. Porreca in the prosecution of the '687 Application, which was officially deemed abandoned by the Patent Office on July 28, 2021.

211. Instead, on November 19, 2020, Molecular Loop again through Mr. Meyers filed U.S. Patent Application No. 16/952,764 ("the '764 Application") as a continuation of the '687 Application which contained the new claim amendments that the patent examiner would not allow in the '687 Application.

212. In connection with the new '764 Application filing, Mr. Meyers and Molecular Loop made a second unmistakably false representation in order to maintain their scheme to conceal from the public, including Illumina, the amended scope of Molecular Loop's patent claims and prosecution record of the '764 Application.

213. Specifically, in Molecular Loop's November 19, 2020 filing, Mr. Meyers again submitted an Application Data Sheet that contained a "Request Not to Publish," in which he falsely

stated "I hereby request that the attached application not be published under 35 U.S.C. 122(b) and certify that the invention disclosed in the attached application has not and will not be the subject of an application filed in another country, or under a multilateral international agreement, that requires publication at eighteen months after filing." This representation again was unmistakably false, as PCT/US2010/001293, to which the issued '730 Patent claims priority, had been filed on April 30, 2010 under the Patent Cooperation Treaty, a multilateral international agreement that requires publication at 18 months after filing, and in fact published on November 4, 2010.

214. At the time of the second false statement, the alleged invention disclosed in the '764 Application had also been published previously in connection with at least eight international applications, six of which had published during the time Mr. Meyers was filing patent applications in this patent family on behalf of Molecular Loop or its predecessor.

215. As further evidence of an intent to conceal the amended claims and prosecution record, in the Application Data Sheet for the '764 Application filed November 19, 2020 that contained the "Request Not to Publish," Mr. Meyers identified "US2010/001293" as a priority application, but omitted the crucial fact that this prior application had been filed under the Patent Cooperation Treaty. The Application Data Sheet expressly calls for the applicant to "indicate National Stage entry from a PCT application."

216. Mr. Meyers' unmistakably false representations in the "Request Not to Publish" violated at least Section 1122 of the MPEP, which, as of filing in November 2020, contained substantially identical provisions to those discussed above, as well as 37 CFR 11.18(b). *See* https://www.uspto.gov/web/offices/pac/mpep/old/e9r10-2019/mpep-1100.pdf.

217. Upon information and belief, the inclusion of "US2010/001293" in the Application Data Sheet, and Mr. Meyers' omission of the critical fact that this submission had been made under

the PCT as PCT/US2010/001293, demonstrates Mr. Meyers' knowledge that the PCT application had been filed and published years earlier, and reflects his decision to intentionally withhold that information from the Patent Office in connection with the filing of the '764 Application.

218. Upon information and belief, Mr. Meyers' knowingly false representation in the "Request Not to Publish" was made in order to conceal the prosecution record of the then-pending '764 Application, and any changes being made to the scope of the claims of the '764 Application.

219. The result of Molecular Loop's filing of the "Request Not to Publish" is that the '764 Application and the documents from its associated prosecution were not published or made publicly available by the Patent Office until after issuance of the '730 Patent.

220. Absent the "Request Not to Publish," the '764 Application and the contents of its prosecution would have been expected to publish within 14 weeks of filing of the '764 Application, or February 2021, prior to its issuance on December 12, 2023, under § 1120 of the MPEP that was in force of at the time of the filing. *See* https://www.uspto.gov/web/offices/pac/mpep/old/e9r10-2019/mpep-1100.pdf.

221. Dr. Porreca was one of the inventors and applicants named on the PCT/US2010/001293 application, and was also named as an inventor in the Application Data Sheets submitted for the '687 Application and the '764 Application.

222. On information and belief, Dr. Porreca was aware of the publication of the PCT/US2010/001293 application during the prosecution of the '687 and '764 Applications.

223. On information and belief, Dr. Porreca was aware of the decision to submit a "Request Not to Publish" the '687 Application and the '764 Application.

224. In recent discussions with Illumina (which Dr. Porreca attended), Molecular Loop represented that the priority date of the '730 Patent is based on the filing of PCT/US2010/001293,

thus confirming that Molecular Loop, including at least Dr. Porreca and Mr. Meyers, were aware that the published PCT/US2010/001293 was a priority application for the alleged invention that issued as the '730 Patent.

225. On information and belief, the two unmistakably false statements to the Patent Office submitted and signed by Mr. Meyers were made with the full knowledge of Mr. Meyers and Dr. Porreca of their falsity.

226. On information and belief, these false statements were made to prevent publication of the U.S. applications that led to the '730 Patent and its prosecution record and constitute egregious misconduct, violated the applicant's duty of candor and good faith and fair dealing with the Patent Office, and constitute inequitable conduct that renders the '730 Patent unenforceable.

227. At least Dr. Porreca, who had a duty of candor to the Patent Office, made false statements about what was disclosed in the prior art.

228. Prior to filing the '862 Application, Dr. Porreca expressed concern about the "Bias-detecting barcodes" application by "McCloskey et al." that was "US 2007/0020640 A1." IPR2024-01419, EX1053 at 1, 6. To address that concern, Molecular Loop misrepresented the bias-detecting function of the barcodes to the Patent Office. In the '730 Patent specification, Molecular Loop stated "In addition, barcodes may be included, for example, to uniquely identify individual samples (e.g., patient samples) that may be mixed together. (See, e.g., USPTO Publication Number US 2007/0020640 A1 (McCloskey et al.)" Ex. 3 at 31:5-9. But it is McCloskey's batch-stamp, not its barcode, that uniquely identifies individual samples.

229. McCloskey discloses a system and method for correcting bias by attaching tags to each nucleic acid in a sample. The tag has multiple parts, including a barcode and a batch-stamp. McCloskey's barcodes are used to track molecules in the original sample and correct for bias.

McCloskey's batch-stamp is used to identify what sample each molecule belongs to. Every molecule in a sample gets the same batch-stamp and each molecule gets its own unique barcode.

230. Molecular Loop cannot contest that McCloskey's batch-stamp distinguishes samples and McCloskey's barcode identifies molecules to correct bias. During an IPR on the '730 Patent, Molecular Loop's expert testified that:

> Q Would it be fair to say that McCloskey discloses barcodes that may be used to uniquely identify individual samples?
>
> [A] He has -- he has a batch-stamp. It's not the barcode. The barcode is something else.
>
> * * *
>
> Q McCloskey's barcode uniquely identifies target nucleic acid molecules in a sample, correct?
>
> THE WITNESS: The McCloskey technology, as outlined here, has a barcode which is hopefully allowing you to identify a sequence that you targeted this to, and it has a batch-stamp to allow you to distinguish Sample 1 from Sample 2, Patient 1 from Patient 2.
>
> Those are the two aspects of the McCloskey technology.
>
> Q The barcode and the batch-stamp are different, in your opinion?
>
> A In my opinion, they are different.

IPR2024-01419, EX1066 at 63:20-66:4.

231. The statements about McCloskey's barcode were unmistakably false. As Molecular Loop's expert explained, McCloskey "claims to use barcodes as a way to correct for amplification bias. That there's no doubt about." IPR2024-01419, EX1066 at 86:3-13.

232. Not only were the statements about McCloskey's barcode false, at least Dr. Porreca made those statements with the intent to deceive the Patent Office. In communications with his attorney, Dr. Porreca expressed concern about McCloskey's "bias-detecting barcodes." He further expressed concern that those barcodes anticipated his work:

> There is some prior art associated with random barcodes, but I'm not sure if it anticipates the applications we are interested in. See, mainly, USPTO Publication Number US 2007/0020640 A1 (McCloskey et al.)

IPR2024-01419, EX1053 at 6. Dr. Porreca was well-aware that McCloskey's barcodes were used for detecting bias. Even Molecular Loop's expert agreed that McCloskey "claims to use barcodes as a way to correct for amplification bias. That there's no doubt about." IPR2024-01419, EX1066 at 86:3-13. The most reasonable inference from these facts is that at least Dr. Porreca misrepresented McCloskey's barcodes with the intent to deceive the Patent Office.

233. McCloskey and its bias-detecting barcodes would have been material to patentability. The claims were allowed because the prior art did not disclose combining a target with a differentiator tag. U.S. Appl. No. 16/952,764, PTAB Decision at 20. McCloskey discloses that exact feature. Had Dr. Porreca and Molecular Loop not misrepresented the teachings of McCloskey during prosecution, the Patent Office would not have issued the claims.

234. Counterclaim Plaintiffs are therefore entitled to a judgment that the '730 Patent is unenforceable due to inequitable conduct that occurred during the prosecution of the '730 Patent.

**COUNT IX**

**(Unclean Hands for the '852 Patent)**

235. Counterclaim Plaintiffs reallege and incorporate all of the foregoing paragraphs of these Counterclaims as though fully set forth herein.

236. The same facts showing prosecution laches and inequitable conduct also show that Molecular Loop is barred from enforcing the '852 Patent against Defendants by the doctrine of unclean hands. For example, as described above, Molecular Loop copied portions of Illumina's patents and tried to pass those off as its own work. As another example, Molecular Loop added new features into the claims that are not disclosed in the specification, and it added those years after Illumina had released the products it now accuses of having those features. Molecular Loop

laid in wait, and attempted to draft claims to ensnare Illumina's later-developed products. As another example, Molecular Loop made false statements to the Examiner distinguishing the Parameswaran reference as limited to bead-based pyrosequencing and having no application to "Illumina-type clusters." Molecular Loop made those same false statements to the Patent Office again during the IPR in an attempt to deceive and mislead the Patent Office.

237. In addition, Molecular Loop told the PTAB that its claims did not cover certain features only to turn around and argue that Illumina's products infringe because they include those same features. In IPR2024-00964, Molecular Loop told the Patent Office that the '852 claims require UDIs, and that they do not cover combinatorial dual indexes ("CDIs"). Molecular Loop stated that its invention required adding "multiple identifier sequences that were ***unique*** to each starting template" as a solution for "identify[ing] and discard[ing] invalid sequence reads attributable to the chimeric molecules." PO Resp. at 4. Molecular Loop then made clear that CDIs do not satisfy the claim. It explained that "use of combinatorial indexes mean[s] that [a] method could not have unearthed [] cross-over error." IPR2024-00964, Paper 18 (PO Resp.) at 34 (citing EX2001, ¶74); IPR2024-00964, EX2001, ¶74 ("Because combinatorial sequences use the same tags in different combinations for different samples, chimeric molecules… would be incorrectly identified and analyzed as sequences from a different sample."). Molecular Loop further explained that the prior art Gloor reference could not "reduce cross-over error because Gloor's combinatorial or 'non-unique' indexing approach would include cross-over error." IPR2024-00964, Paper 18 (PO Resp.) at 44. Molecular Loop stated Gloor could not satisfy the claims because "Gloor disclosed non-unique indexing." IPR2024-00964, Paper 6 (PO Prelim. Resp.) at 19.

238. In this case, Molecular Loop has accused Illumina products that use CDIs of infringing the '852 Patent claims. After telling the PTAB that the claims do not cover CDIs, it has

turned around and alleged that its claims do cover CDIs. Moreover, in IPR2024-00965 involving the related ’200 Patent which has claims covering CDIs, the PTAB found that the prior art discloses CDIs, and it invalidated the ’200 Patent on that basis.

239. Considering Molecular Loop’s pattern of misconduct in the prosecution and litigation of the ’852 Patent, it would be inequitable to allow Molecular Loop to enforce the ’852 Patent against Defendants and their products. Molecular Loop’s pattern of misconduct has an immediate and necessary relation to its infringement allegations against Defendants in this case.

**COUNT X**

**(Unclean Hands for the ’730 Patent)**

240. Counterclaim Plaintiffs reallege and incorporate all of the foregoing paragraphs of these Counterclaims as though fully set forth herein.

241. The same facts showing prosecution laches and inequitable conduct also show that Molecular Loop is barred from enforcing the ’730 Patent against Defendants by the doctrine of unclean hands. For example, as described above, Molecular Loop submitted a false do not publish request to the Patent Office to keep its prosecution activity hidden from the public. Meanwhile, Molecular Loop introduced new claims that lack support in the specification in an attempt to ensnare Illumina’s later-released products.

242. In addition, Molecular Loop told the PTAB that it claims did not cover certain features only to turn around and argue that Illumina’s products infringe because they include those same features. During IPR2024-01419, Molecular Loop made numerous clear and unequivocal statements to the Patent Office that determining a consensus sequence based on duplicate copies of the original starting molecule does not satisfy the “collapsing” step of the ’730 Patent claims. For example, it stated “***determining a single consensus read*** by looking at multiple clonal copies

of the same original starting molecule ***is not collapsing*** as claimed by the '730 Patent." IPR2024-01419, Paper 18 (PO Resp.) at 41-42. Illumina's TSO500 products that include UMIs use the exact approach—determining a consensus sequence while based on duplicate copies—that Molecular Loop repeatedly told the Patent Office is ***not*** covered by its claims. After telling the PTAB that the claimed "collapsing" step does not cover determining a consensus sequence, it has turned around and alleged that the collapsing step does cover determining a consensus sequence.

243. Considering Molecular Loop's pattern of misconduct in the prosecution and litigation of the '730 Patent, it would be inequitable to allow Molecular Loop to enforce the '730 Patent against Defendants and their products. Molecular Loop's pattern of misconduct has an immediate and necessary relation to its infringement allegations against Defendants in this case.

## PRAYER FOR RELIEF

WHEREFORE, Counterclaim Plaintiffs ask this Court to enter judgment in Plaintiffs' favor and against Molecular Loop by granting the following relief:

a) Declaring that the making, using, offering for sale and selling, and importing of any of the accused products do not directly or indirectly infringe the '852 Patent;

b) Declaring that the making, using, offering for sale and selling, and importing of any of the accused products do not directly or indirectly infringe the '730 Patent;

c) Declaring that the '852 Patent is invalid;

d) Declaring that the '730 Patent is invalid;

e) Declaring that the '852 Patent is unenforceable;

f) Declaring that the '730 Patent is unenforceable;

g) Finding that Counterclaim Plaintiffs are the prevailing party and that this is an exceptional case under 35 U.S.C. § 285;

h) Awarding Counterclaim Plaintiffs their costs, expenses, and reasonable attorneys' fees in connection with this action; and

i) Granting such further and additional relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Counterclaim Plaintiffs, under Rule 38 of the Federal Rules of Civil Procedure, request a jury trial for all issues deemed to be triable by a jury.

Date: November 3, 2026

Respectfully submitted,
**RICHARDS, LAYTON & FINGER, P.A.**
*/s/ Kely E. Farnan*

Kelly E. Farnan (#4395)
One Rodney Square
920 North King Street
Wilmington, DE 19801
302-651-7700
farnan@rlf.com

**MORRISON FOERSTER LLP**
Ching-Lee Fukuda (*admitted pro hac vice*)
250 W 55th St.
New York, NY 10019
clfukuda@mofo.com
(212) 336-4485

Thomas A. Broughan III (*admitted pro hac vice*)
2100 L Street, N.W.
Washington, D.C. 20037
tbroughan@mofo.com
(202) 887-1598

Amanda Potter (*admitted pro hac vice*)
425 Market Street
San Francisco, CA 94105
APotter@mofo.com
Tel: (415) 268-7000

**COUNSEL FOR DEFENDANTS AND COUNTERCLAIM PLAINTIFFS ILLUMINA, INC. AND VERINATA HEALTH, INC.**

# EXHIBIT A

(12) INTERNATIONAL APPLICATION PUBLISHED UNDER THE PATENT COOPERATION TREATY (PCT)

(19) World Intellectual Property Organization
International Bureau

(43) International Publication Date
20 May 2010 (20.05.2010)

PCT

(10) International Publication Number
WO 2010/056728 A1

(51) International Patent Classification:
*C12P 19/00* (2006.01) *C12P 19/34* (2006.01)

(21) International Application Number:
PCT/US2009/064001

(22) International Filing Date:
11 November 2009 (11.11.2009)

(25) Filing Language: English

(26) Publication Language: English

(30) Priority Data:
61/113,312 11 November 2008 (11.11.2008) US

(71) Applicant *(for all designated States except US)*: **HELICOS BIOSCIENCES CORPORATION** [US/US]; One Kendall Square, Suite 7301, Cambridge, MA 02139 (US).

(72) Inventors; and
(75) Inventors/Applicants *(for US only)*: **STEINMAN, Kathleen** [US/US]; 115 Washington Street, Apt. 3b, Winchester, MA 01890 (US). **JOSEPH, Elaine** [US/US]; One Kendall Square, Suite 7301, Cambridge, MA 02139 (US). **CAUSEY, Marie** [US/US]; 86 Cushing Avenue, Belmont, MA 02478 (US). **THOMPSON, John, F.** [US/US]; 80 Hallmark Drive, Warwick, RI 02886 (US). **GILADI, Eldar** [US/US]; One Kendall Square, Suite 7301, Cambridge, MA 02139 (US). **THAYER, Ed** [US/US]; One Kendall Square, Suite 7301, Cambridge, MA 02139 (US).

(74) Agents: **SCHOEN, Adam, M.** et al.; BROWN RUDNICK LLP, One Financial Center, Boston, MA 02111 (US).

(81) Designated States *(unless otherwise indicated, for every kind of national protection available)*: AE, AG, AL, AM, AO, AT, AU, AZ, BA, BB, BG, BH, BR, BW, BY, BZ, CA, CH, CL, CN, CO, CR, CU, CZ, DE, DK, DM, DO, DZ, EC, EE, EG, ES, FI, GB, GD, GE, GH, GM, GT, HN, HR, HU, ID, IL, IN, IS, JP, KE, KG, KM, KN, KP, KR, KZ, LA, LC, LK, LR, LS, LT, LU, LY, MA, MD, ME, MG, MK, MN, MW, MX, MY, MZ, NA, NG, NI, NO, NZ, OM, PE, PG, PH, PL, PT, RO, RS, RU, SC, SD, SE, SG, SK, SL, SM, ST, SV, SY, TJ, TM, TN, TR, TT, TZ, UA, UG, US, UZ, VC, VN, ZA, ZM, ZW.

(84) Designated States *(unless otherwise indicated, for every kind of regional protection available)*: ARIPO (BW, GH, GM, KE, LS, MW, MZ, NA, SD, SL, SZ, TZ, UG, ZM, ZW), Eurasian (AM, AZ, BY, KG, KZ, MD, RU, TJ, TM), European (AT, BE, BG, CH, CY, CZ, DE, DK, EE, ES, FI, FR, GB, GR, HR, HU, IE, IS, IT, LT, LU, LV, MC, MK, MT, NL, NO, PL, PT, RO, SE, SI, SK, SM, TR), OAPI (BF, BJ, CF, CG, CI, CM, GA, GN, GQ, GW, ML, MR, NE, SN, TD, TG).

**Published**:
— *with international search report (Art. 21(3))*
— *before the expiration of the time limit for amending the claims and to be republished in the event of receipt of amendments (Rule 48.2(h))*

**(54) Title**: NUCLEIC ACID ENCODING FOR MULTIPLEX ANALYSIS




FIG. 1

**(57) Abstract**: Methods for sequencing a plurality of nucleic acids from different samples in which a unique oligonucleotide sequence is attached to the template nucleic acid so that the template nucleic acid may be differentiated from other template nucleic acid molecules, detecting a signal from the incorporated labeled nucleotide, and repeating the contacting and detecting steps are provided.

WO 2010/056728 A1

# NUCLEIC ACID ENCODING FOR MULTIPLEX ANALYSIS

## Related Application

The present application claims the benefit of and priority to U.S. provisional patent application serial number 61/113,312, filed November 11, 2008, the contents of which are incorporated by reference herein in their entirety.

## Field of the Invention

The invention generally relates to methods for sequencing a plurality of nucleic acids from different samples.

## Background

Sequencing-by-synthesis involves template-dependent addition of nucleotides to a template/primer duplex. Nucleotide addition is mediated by a polymerase enzyme and added nucleotides may be labeled in order to facilitate their detection. Single molecule sequencing has been used to obtain high-throughput sequence information on individual DNA or RNA. See, Braslavsky, Proc. Natl. Acad. Sci. USA 100: 3960-64 (2003). Recently, all four Watson-Crick nucleotides may be added simultaneously, each with a different detectable label or nucleotides may be added one at a time in a step-and-repeat manner for imaging incorporations.

One issue that presents itself in sequencing-by-synthesis is the difficulty of tracking template nucleic acid molecules from different samples throughout the sequencing process. Without an ability to correlate which template molecules are from which sample, samples must be analyzed separately, i.e., no multiplexing or pooling of samples is possible. Such a limitation increases costs and decreases throughput for sequencing-by-synthesis platforms.

## Summary

The invention generally relates to methods for sequencing a plurality of nucleic acids

from different samples at the same time on the same platform. Methods of the invention accomplish sequencing of a plurality of template nucleic acid molecules from different samples at the same time on the same platform by attaching a unique oligonucleotide sequence (i.e., a bar code) to the template nucleic acid molecules from different samples prior to pooling and sequencing of the template molecules. The bar code allows for template nucleic acid sequences from different samples to be differentiated from each other. Once bar coded, template molecules from different samples may be pooled and sequenced at the same time on the same platform. Because the bar code on each template molecule is sequenced as part of the sequencing reaction, the bar code is a component of the sequence data, and thus the sequence data for different samples is always associated with the sample from which it originated. Due to the association in the sequence data, the sequence data from the pooled samples may be separated after sequencing has occurred and correlated back to the sample from which it originated.

An aspect of the invention provides a method for sequencing a nucleic acid including contacting a nucleic acid duplex including a primer nucleic acid hybridized to a template nucleic acid with a polymerase enzyme in the presence of a first detectably labeled nucleotide under conditions that permit the polymerase to add nucleotides to the primer in a template-dependent manner, in which a unique oligonucleotide sequence is attached to the template nucleic acid so that the template nucleic acid may be differentiated from other template nucleic acid molecules, detecting a signal from the incorporated labeled nucleotide, and sequentially repeating the contacting and detecting steps at least once, wherein sequential detection of incorporated labeled nucleotide determines the sequence of the nucleic acid.

Prior to the contacting step, the method may further include ligating the oligonucleotide sequence to the template molecule. Prior to sequencing, the duplexes may optionally be attached, directly or indirectly, to a substrate. In certain embodiments, at least a portion of the duplexes on the substrate are individually optically resolvable.

The oligonucleotide sequence generally includes certain features that make the sequence useful in sequencing reactions. For example, the oligonucleotide sequence may include a primer

site, e.g., a primer sequence such as a polyA tail, that hybridizes to a primer sequence. The oligonucleotide also includes the unique set of nucleotides that allow the template molecule to be distinguished from other template molecules, i.e., the bar code portion of the oligonucleotide. The bar code portion may be any length of nucleotides. In particular embodiments, the bar code portion ranges from about 5 nucleotides to about 15 nucleotides. The oligonucleotide sequence may also include at least one non-natural nucleotide, such as a peptide nucleic acid or a locked nucleic acid, to enhance certain properties of the oligonucleotide. In particular embodiments, the non-natural nucleotide is a locked nucleic acid.

In certain embodiments, the oligonucleotide sequence excludes a terminal thymine on both the 5' and the 3' end of the oligonucleotide. In other embodiments, the oligonucleotide sequence excludes any homopolymer region.

Methods of the invention involve detecting a signal from the incorporated labeled nucleotide. Exemplary detectable labels include radiolabels, florescent labels, enzymatic labels, etc. In particular embodiments, the detectable label may be an optically detectable label, such as a fluorescent label. Exemplary fluorescent labels include cyanine, rhodamine, fluorescien, coumarin, BODIPY, alexa, or conjugated multi-dyes.

Another aspect of the invention provides a method for sequencing a plurality of nucleic acids from different samples including contacting a plurality of nucleic acid duplexes including a primer nucleic acid hybridized to a template nucleic acid with a polymerase enzyme in the presence of a first detectably labeled nucleotide under conditions that permit the polymerase to add nucleotides to the primer in a template-dependent manner, in which the template nucleic acids are provided from a plurality of samples, and a unique oligonucleotide sequence is attached to the template nucleic acids from each sample so that the template nucleic acids from the different samples may be differentiated from each other, detecting a signal from the incorporated labeled nucleotide, and sequentially repeating the contacting and detecting steps at least once, wherein sequential detection of incorporated labeled nucleotide determines the sequence of the plurality of nucleic acids. The samples may be obtained from different tissues or body fluids in a

single subject. Alternatively, the samples may be obtained from different subjects.

Another aspect of the invention provides a method for sequencing a plurality of nucleic acids from different samples including obtaining template nucleic acids from a plurality of samples, ligating the template nucleic acids from each sample with a unique oligonucleotide sequence so that the template nucleic acids from the different samples may be differentiated from each other, pooling the template nucleic acid molecules from the plurality of samples, hybridizing the pooled template nucleic acid molecules with a plurality of primers to form duplexes including a primer nucleic acid hybridized to a template nucleic acid, contacting the plurality of nucleic acid duplexes with a polymerase enzyme in the presence of a first detectably labeled nucleotide under conditions that permit the polymerase to add nucleotides to the primer in a template-dependent manner, detecting a signal from the incorporated labeled nucleotide, and sequentially repeating the contacting and detecting steps at least once, wherein sequential detection of incorporated labeled nucleotide determines the sequence of the plurality of nucleic acids.

## Brief Description of the Drawings

Figure 1 is a schematic shows a method for ligating a bar code oligonucleotide sequence to a template nucleic acid molecule.

Figure 2 is a schematic showing another method for ligating a bar code oligonucleotide sequence to a template nucleic acid molecule.

## Detailed Description

The invention generally relates to methods for sequencing a plurality of nucleic acids from different samples. Methods of the invention take a plurality of template nucleic acid molecules from different samples and attach a unique oligonucleotide sequence (i.e., a bar code) to the template nucleic acid molecules from different samples prior to pooling and sequencing of the template molecules. The bar code allows for template nucleic acids from different samples to

be differentiated from each other throughout the sequencing process.

The oligonucleotide sequence generally includes certain features that make the sequence useful in sequencing reactions. For example the oligonucleotide sequences are designed to have minimal or no homopolymer regions, i.e., 2 or more of the same base in a row such as AA or CCC, within the unique portion of the oligonucleotide sequence. The oligonucleotide sequences are also designed so that they are at least one edit distance away from the base addition order when performing base-by-base sequencing, ensuring that the first and last base do not match the expected bases of the sequence.

The bar code oligonucleotide sequences may also include blockers, e.g. chain terminating nucleotides, to block base addition to the 3'-end of the template nucleic acid molecules. The oligonucleotide sequences are also designed to have minimal similarity to the base addition order, e.g., if performing a base-by-base sequencing method generally bases are added in the following order one at a time: C, T, A, and G. The oligonucleotide sequence may also include at least one non-natural nucleotide, such as a peptide nucleic acid or a locked nucleic acid, to enhance certain properties of the oligonucleotide.

Depending upon the number of samples to be multiplexed, the bar code portion (unique portion) of the oligonucleotide sequence may be of different lengths. Methods of designing sets of unique oligonucleotide sequences is shown for example in Brenner et al. (U.S. patent number 6,235,475), the contents of which are incorporated by reference herein in their entirety. In certain embodiments, the unique portion of the oligonucleotide sequence ranges from about 5 nucleotides to about 15 nucleotides. In a particular embodiment, the unique portion of the oligonucleotide sequence ranges from about 4 nucleotides to about 7 nucleotides. Since the bar coded portion of the oligonucleotide is sequenced along with the template nucleic acid molecule, the oligonucleotide length should be of minimal length so as to permit the longest read from the template nucleic acid attached. Generally, the unique portion of the oligonucleotide sequence is spaced from the template nucleic acid molecule by at least one base (minimizes homopolymeric combinations).

The oligonucleotide sequence also includes a portion that is used as a primer binding site. The primer binding site may be used to hybridize the now bar coded template nucleic acid molecule to a sequencing primer, which may optionally be anchored to a substrate. The primer binding sequence may be a unique sequence including at least 2 bases but likely contains a unique order of all 4 bases and is generally 20-50 bases in length. One example of a specific sequence binding primer is: 5'-CAG GGC AGA GGA TGG ATG CAA GGA TAA GTG GA-3' (SEQ ID NO: 1). In a particular embodiment, the primer binding sequence is a homopolymer of a single base, e.g. polyA, generally 20 – 70 bases in length.

The oligonucleotide sequence also may include a blocker, e.g., a chain terminating nucleotide, on the 3'-end. The blocker prevents unintended sequence information from being obtained using the 3'-end of the primer binding site inadvertently as a second sequencing primer, particularly when using homopolymeric primer sequences. The blocker may be any moiety that prevents a polymerase from adding bases during incubation with a dNTPs. An exemplary blocker is a nucleotide terminator that lacks a 3'-OH, i.e., a dideoxynucleotide (ddNTP). Common nucleotide terminators are 2',3'-dideoxynucleotides, 3'-aminonucleotides, 3'-deoxynucleotides, 3'-azidonucleotides, acyclonucleotides, etc. The blocker may have attached a detectable label, e.g. a fluorophore. The label may be attached via a labile linkage, e.g., a disulfide, so that following hybridization of the bar coded template nucleic acid to the surface, the locations of the template nucleic acids may be identified by imaging. Generally, the detectable label is removed before commencing with sequencing. Depending upon the linkage, the cleaved product may or may not require further chemical modification to prevent undesirable side reactions, for example following cleavage of a disulfide by TCEP the produced reactive thiol is blocked with iodoacetamide.

Methods of the invention involve attaching the unique oligonucleotide sequences to the template nucleic acid molecules. Template nucleic acids are able to be fragmented or sheared to desired length, e.g. generally from 100 to 500 bases or longer, using a variety of mechanical, chemical and/or enzymatic methods. DNA may be randomly sheared via sonication, e.g.

Covaris method, brief exposure to a DNase, or using a mixture of one or more restriction enzymes. RNA may be fragmented by brief exposure to an RNase, heat plus magnesium, or by shearing. The RNA may be converted to cDNA before or after fragmentation.

In certain embodiments, the unique oligonucleotide is attached to the template nucleic acid molecule with an enzyme. The enzyme may be a ligase or a polymerase. The ligase may be any enzyme capable of ligating an oligonucleotide (RNA or DNA) to the template nucleic acid molecule. Suitable ligases include T4 DNA ligase and T4 RNA ligase (such ligases are available commercially, from New England Biolabs. In a particular embodiment. Methods for using ligases are well known in the art. The polymerase may be any enzyme capable of adding nucleotides to the 3' terminus of template nucleic acid molecules. The polymerase may be, for example, yeast poly(A) polymerase, commercially available from USB. The polymerase is used according to the manufacturer's instructions.

The ligation may be blunt ended or via use of complementary over hanging ends. In certain embodiments, following fragmentation, the ends of the fragments may be repaired, trimmed (e.g. using an exonuclease), or filled (e.g., using a polymerase and dNTPs), to form blunt ends. Upon generating blunt ends, the ends may be treated with a polymerase and dATP to form a template independent addition to the 3'-end of the fragments, thus producing a single A overhanging. This single A is used to guide ligation of fragments with a single T overhanging from the 5'-end in a method referred to as T-A cloning.

Alternatively, because the possible combination of overhangs left by the restriction enzymes are known after a restriction digestion, the ends may be left as is, i.e., ragged ends. In certain embodiments double stranded oligonucleotides with complementary over hanging ends are used. In a particular example, the A:T single base over hang method is used (see Figures 1-2).

In a particular embodiment, the substrate has anchored a reverse complement to the primer binding sequence of the oligonucleotide, for example 5'-TC CAC TTA TCC TTG CAT CCA TCC TCT GCC CTG or a polyT(50). When homopolymeric sequences are used for the

primer, it may be advantageous to perform a procedure known in the art as a “fill and lock”. When polyA (20-70) on the sample and polyT (50) on the surface hybridize there is a high likelihood that there will not be perfect alignment, so the hybrid is filled in by incubating the sample with polymerase and TTP. Following the fill step, the sample is washed and the polymerase is incubated with one or two dNTPs complementary to the base(s) used in the lock sequence. The fill and lock can also be performed in a single step process in which polymerase, TTP and one or two reversible terminators (complements of the lock bases) are mixed together and incubated. The reversible terminators stop addition during this stage and can be made functional again (reversal of inhibitory mechanism) by treatments specific to the analogs used. Some reversible terminators have functional blocks on the 3’-OH which need to be removed while others, for example Helicos BioSciences Virtual Terminators have inhibitors attached to the base via a disulfide which can be removed by treatment with TCEP.

In another embodiment, following ligation of the bar code oligonucleotide to the template nucleic acid, the sample is denatured, for example by heating to 95°C for 5-10 minutes followed by snap cooling to 4°C, and then applied to a surface for hybridization capture. The double stranded barcode oligonucleotide includes features that allow specific degradation of portions of one strand of the hybrid. Desirable locations for such modifications are at base locations closest to the 5’-end of the sample nucleic acid following ligation. Modifications that may be included are the inclusion of one or more uracil residues replacing T’s. One, a few, or all of the T’s may be substituted with U’s in the complementary strand. When using U substitutions, the strand with the U’s may be degraded using the enzyme mixture USER (a mixture of Uracil DNA glycosylase (UDG) and the DNA glycosylase-lyase Endonuclease VIII) which creates strand breaks at every U base.

Alternative modifications that may be included are the inclusion of one or more thiophosphate linkages. When using a thiophosphate, the strand can be degraded using a 5’-nuclease degrading bases up until the thiophosphate linkage is reached.

Bar coding of template molecules is useful for all sequencing reactions employing

sequencing-by-synthesis approaches but is particularly useful in sequencing methods utilizing single molecule, sequencing-by-synthesis.

In a particular embodiment, the bar code oligonucleotides are used in a single-molecule sequencing-by-synthesis reaction. Single-molecule sequencing is shown for example in Lapidus et al. (U.S. patent number 7,169,560), Quake et al. (U.S. patent number 6,818,395), Harris (U.S. patent number 7,282,337), Quake et al. (U.S. patent application number 2002/0164629), and Braslavsky, et al., PNAS (USA), 100: 3960-3964 (2003), the contents of each of these references is incorporated by reference herein in its entirety. Briefly, a single-stranded nucleic acid (e.g., DNA or cDNA) is hybridized to oligonucleotides attached to a surface of a flow cell. The oligonucleotides may be covalently attached to the surface or various attachments other than covalent linking as known to those of ordinary skill in the art may be employed. Moreover, the attachment may be indirect, e.g., via the polymerases of the invention directly or indirectly attached to the surface. The surface may be planar or otherwise, and/or may be porous or non-porous, or any other type of surface known to those of ordinary skill to be suitable for attachment. The nucleic acid is then sequenced by imaging the polymerase-mediated addition of fluorescently-labeled nucleotides incorporated into the growing strand surface oligonucleotide, at single molecule resolution. The following sections discuss general considerations for nucleic acid sequencing, for example, template considerations, polymerases useful in sequencing-by-synthesis, choice of surfaces, reaction conditions, signal detection and analysis.

Nucleic Acid Templates

Nucleic acid templates include deoxyribonucleic acid (DNA) and/or ribonucleic acid (RNA). Nucleic acid templates can be synthetic or derived from naturally occurring sources. In one embodiment, nucleic acid template molecules are isolated from a biological sample containing a variety of other components, such as proteins, lipids and non-template nucleic acids. Nucleic acid template molecules can be obtained from any cellular material, obtained from an animal, plant, bacterium, fungus, or any other cellular organism. Biological samples for use in

the present invention include viral particles or preparations. Nucleic acid template molecules can be obtained directly from an organism or from a biological sample obtained from an organism, e.g., from blood, urine, cerebrospinal fluid, seminal fluid, saliva, sputum, stool and tissue. Any tissue or body fluid specimen may be used as a source for nucleic acid for use in the invention. Nucleic acid template molecules can also be isolated from cultured cells, such as a primary cell culture or a cell line. The cells or tissues from which template nucleic acids are obtained can be infected with a virus or other intracellular pathogen. A sample can also be total RNA extracted from a biological specimen, a cDNA library, viral, or genomic DNA.

Nucleic acid obtained from biological samples typically is fragmented to produce suitable fragments for analysis. In one embodiment, nucleic acid from a biological sample is fragmented by sonication. Nucleic acid template molecules can be obtained as described in U.S. Patent Application Publication Number US2002/0190663 A1, published Oct. 9, 2003. Generally, nucleic acid can be extracted from a biological sample by a variety of techniques such as those described by Maniatis, et al., Molecular Cloning: A Laboratory Manual, Cold Spring Harbor, N.Y., pp. 280-281 (1982). Generally, individual nucleic acid template molecules can be from about 5 bases to about 20 kb. Nucleic acid molecules may be single-stranded, double-stranded, or double-stranded with single-stranded regions (for example, stem- and loop-structures).

A biological sample as described herein may be homogenized or fractionated in the presence of a detergent or surfactant. The concentration of the detergent in the buffer may be about 0.05% to about 10.0%. The concentration of the detergent can be up to an amount where the detergent remains soluble in the solution. In a preferred embodiment, the concentration of the detergent is between 0.1% to about 2%. The detergent, particularly a mild one that is nondenaturing, can act to solubilize the sample. Detergents may be ionic or nonionic. Examples of nonionic detergents include triton, such as the Triton® X series (Triton® X-100 t-Oct-$C_6H_4$-$(OCH_2\text{-}CH_2)_xOH$, x=9-10, Triton® X-100R, Triton® X-114 x=7-8), octyl glucoside, polyoxyethylene(9)dodecyl ether, digitonin, IGEPAL® CA630 octylphenyl polyethylene glycol, n-octyl-beta-D-glucopyranoside (betaOG), n-dodecyl-beta, Tween® 20 polyethylene glycol

sorbitan monolaurate, Tween® 80 polyethylene glycol sorbitan monooleate, polidocanol, n-dodecyl beta-D-maltoside (DDM), NP-40 nonylphenyl polyethylene glycol, C12E8 (octaethylene glycol n-dodecyl monoether), hexaethyleneglycol mono-n-tetradecyl ether (C14EO6), octyl-beta-thioglucopyranoside (octyl thioglucoside, OTG), Emulgen, and polyoxyethylene 10 lauryl ether (C12E10). Examples of ionic detergents (anionic or cationic) include deoxycholate, sodium dodecyl sulfate (SDS), N-lauroylsarcosine, and cetyltrimethylammoniumbromide (CTAB). A zwitterionic reagent may also be used in the purification schemes of the present invention, such as Chaps, zwitterion 3-14, and 3-[(3-cholamidopropyl)dimethylammonio]-1-propanesulf-onate. It is contemplated also that urea may be added with or without another detergent or surfactant.

Lysis or homogenization solutions may further contain other agents, such as reducing agents. Examples of such reducing agents include dithiothreitol (DTT), .beta.-mercaptoethanol, DTE, GSH, cysteine, cysteamine, tricarboxyethyl phosphine (TCEP), or salts of sulfurous acid.

Nucleotides

Nucleotides useful in the invention include any nucleotide or nucleotide analog, whether naturally-occurring or synthetic. For example, preferred nucleotides include phosphate esters of deoxyadenosine, deoxycytidine, deoxyguanosine, deoxythymidine, adenosine, cytidine, guanosine, and uridine. Other nucleotides useful in the invention comprise an adenine, cytosine, guanine, thymine base, a xanthine or hypoxanthine; 5-bromouracil, 2-aminopurine, deoxyinosine, or methylated cytosine, such as 5-methylcytosine, and N4-methoxydeoxycytosine. Also included are bases of polynucleotide mimetics, such as methylated nucleic acids, e.g., 2'-O-methRNA, peptide nucleic acids, modified peptide nucleic acids, locked nucleic acids and any other structural moiety that can act substantially like a nucleotide or base, for example, by exhibiting base-complementarity with one or more bases that occur in DNA or RNA and/or being capable of base-complementary incorporation, and includes chain-terminating analogs. A

nucleotide corresponds to a specific nucleotide species if they share base-complementarity with respect to at least one base.

Nucleotides for nucleic acid sequencing according to the invention preferably include a detectable label that is directly or indirectly detectable. Preferred labels include optically-detectable labels, such as fluorescent labels. Examples of fluorescent labels include, but are not limited to, 4-acetamido-4'-isothiocyanatostilbene-2,2'disulfonic acid; acridine and derivatives: acridine, acridine isothiocyanate; 5-(2'-aminoethyl)aminonaphthalene-1-sulfonic acid (EDANS); 4-amino-N-[3-vinylsulfonyl)phenyl]naphthalimide-3,5 disulfonate; N-(4-anilino-1-naphthyl)maleimide; anthranilamide; BODIPY; Brilliant Yellow; coumarin and derivatives; coumarin, 7-amino-4-methylcoumarin (AMC, Coumarin 120), 7-amino-4-trifluoromethylcouluarin (Coumaran 151); cyanine dyes; cyanosine; 4',6-diaminidino-2-phenylindole (DAPI); 5'5"-dibromopyrogallol-sulfonaphthalein (Bromopyrogallol Red); 7-diethylamino-3-(4'-isothiocyanatophenyl)-4-methylcoumarin; diethylenetriamine pentaacetate; 4,4'-diisothiocyanatodihydro-stilbene-2,2'-disulfonic acid; 4,4'-diisothiocyanatostilbene-2,2'-disulfonic acid; 5-[dimethylamino]naphthalene-1-sulfonyl chloride (DNS, dansylchloride); 4-dimethylaminophenylazophenyl-4'-isothiocyanate (DABITC); eosin and derivatives; eosin, eosin isothiocyanate, erythrosin and derivatives; erythrosin B, erythrosin, isothiocyanate; ethidium; fluorescein and derivatives; 5-carboxyfluorescein (FAM), 5-(4,6-dichlorotriazin-2-yl)aminofluorescein (DTAF), 2',7'-dimethoxy-4'5'-dichloro-6-carboxyfluorescein, fluorescein, fluorescein isothiocyanate, QFITC, (XRITC); fluorescamine; IR144; IR1446; Malachite Green isothiocyanate; 4-methylumbelliferoneortho cresolphthalein; nitrotyrosine; pararosaniline; Phenol Red; B-phycoerythrin; o-phthaldialdehyde; pyrene and derivatives: pyrene, pyrene butyrate, succinimidyl 1-pyrene; butyrate quantum dots; Reactive Red 4 (Cibacron.TM. Brilliant Red 3B-A) rhodamine and derivatives: 6-carboxy-X-rhodamine (ROX), 6-carboxyrhodamine (R6G), lissamine rhodamine B sulfonyl chloride rhodamine (Rhod), rhodamine B, rhodamine 123, rhodamine X isothiocyanate, sulforhodamine B, sulforhodamine 101, sulfonyl chloride derivative of sulforhodamine 101 (Texas Red); N,N,N',N'tetramethyl-6-carboxyrhodamine

(TAMRA); tetramethyl rhodamine; tetramethyl rhodamine isothiocyanate (TRITC); riboflavin; rosolic acid; terbium chelate derivatives; Cy3; Cy5; Cy5.5; Cy7; IRD 700; IRD 800; La Jolta Blue; phthalo cyanine; and naphthalo cyanine. Preferred fluorescent labels are cyanine-3 and cyanine-5. Labels other than fluorescent labels are contemplated by the invention, including other optically-detectable labels.

Nucleic Acid Polymerases

Nucleic acid polymerases generally useful in the invention include DNA polymerases, RNA polymerases, reverse transcriptases, and mutant or altered forms of any of the foregoing. DNA polymerases and their properties are described in detail in, among other places, DNA Replication 2nd edition, Kornberg and Baker, W. H. Freeman, New York, N.Y. (1991). Known conventional DNA polymerases useful in the invention include, but are not limited to, Pyrococcus furiosus (Pfu) DNA polymerase (Lundberg et al., 1991, Gene, 108: 1, Stratagene), Pyrococcus woesei (Pwo) DNA polymerase (Hinnisdaels et al., 1996, Biotechniques, 20:186-8, Boehringer Mannheim), Thermus thermophilus (Tth) DNA polymerase (Myers and Gelfand 1991, Biochemistry 30:7661), Bacillus stearothermophilus DNA polymerase (Stenesh and McGowan, 1977, Biochim Biophys Acta 475:32), Thermococcus litoralis (Tli) DNA polymerase (also referred to as Vent.TM. DNA polymerase, Cariello et al., 1991, Polynucleotides Res, 19: 4193, New England Biolabs), 9.degree.Nm.TM. DNA polymerase (New England Biolabs), Stoffel fragment, ThermoSequenase® (Amersham Pharmacia Biotech UK), Therminator.TM. (New England Biolabs), Thermotoga maritima (Tma) DNA polymerase (Diaz and Sabino, 1998 Braz J. Med. Res, 31:1239), Thermus aquaticus (Taq) DNA polymerase (Chien et al., 1976, J. Bacteoriol, 127: 1550), DNA polymerase, Pyrococcus kodakaraensis KOD DNA polymerase (Takagi et al., 1997, Appl. Environ. Microbiol. 63:4504), JDF-3 DNA polymerase (from thermococcus sp. JDF-3, Patent application WO 0132887), Pyrococcus GB-D (PGB-D) DNA polymerase (also referred as Deep Vent.TM. DNA polymerase, Juncosa-Ginesta et al., 1994, Biotechniques, 16:820, New England Biolabs), UlTma DNA polymerase (from thermophile

Thermotoga maritima; Diaz and Sabino, 1998 Braz J. Med. Res, 31:1239; PE Applied Biosystems), Tgo DNA polymerase (from thermococcus gorgonarius, Roche Molecular Biochemicals), E. coli DNA polymerase I (Lecomte and Doubleday, 1983, Polynucleotides Res. 11:7505), T7 DNA polymerase (Nordstrom et al., 1981, J. Biol. Chem. 256:3112), and archaeal DP1I/DP2 DNA polymerase II (Cann et al, 1998, Proc. Natl. Acad. Sci. USA 95:14250).

Both mesophilic polymerases and thermophilic polymerases are contemplated. Thermophilic DNA polymerases include, but are not limited to, ThermoSequenase®, 9.degree.Nm.TM., Therminator.TM., Taq, Tne, Tma, Pfu, Tfl, Tth, Tli, Stoffel fragment, Vent.TM. and Deep Vent.TM. DNA polymerase, KOD DNA polymerase, Tgo, JDF-3, and mutants, variants and derivatives thereof. A highly-preferred form of any polymerase is a 3' exonuclease-deficient mutant.

Reverse transcriptases useful in the invention include, but are not limited to, reverse transcriptases from HIV, HTLV-1, HTLV-II, FeLV, FIV, SIV, AMV, MMTV, MoMuLV and other retroviruses (see Levin, Cell 88:5-8 (1997); Verma, Biochim Biophys Acta. 473:1-38 (1977); Wu et al., CRC Crit. Rev Biochem. 3:289-347 (1975)).

Surfaces

In a preferred embodiment, nucleic acid template molecules are attached to a substrate (also referred to herein as a surface) and subjected to analysis by single-molecule sequencing as described herein. Nucleic acid template molecules are attached to the surface such that the template/primer duplexes are individually optically resolvable. Substrates for use in the invention can be two- or three-dimensional and can comprise a planar surface (e.g., a glass slide) or can be shaped. A substrate can include glass (e.g., controlled pore glass (CPG)), quartz, plastic (such as polystyrene (low cross-linked and high cross-linked polystyrene), polycarbonate, polypropylene and poly(methymethacrylate)), acrylic copolymer, polyamide, silicon, metal (e.g., alkanethiolate-derivatized gold), cellulose, nylon, latex, dextran, gel matrix (e.g., silica gel), polyacrolein, or composites.

Suitable three-dimensional substrates include, for example, spheres, microparticles, beads, membranes, slides, plates, micromachined chips, tubes (e.g., capillary tubes), microwells, microfluidic devices, channels, filters, or any other structure suitable for anchoring a nucleic acid. Substrates can include planar arrays or matrices capable of having regions that include populations of template nucleic acids or primers. Examples include nucleoside-derivatized CPG and polystyrene slides; derivatized magnetic slides; polystyrene grafted with polyethylene glycol, and the like.

Substrates are preferably coated to allow optimum optical processing and nucleic acid attachment. Substrates for use in the invention can also be treated to reduce background. Exemplary coatings include epoxides, and derivatized epoxides (e.g., with a binding molecule, such as an oligonucleotide or streptavidin).

Various methods can be used to anchor or immobilize the nucleic acid molecule to the surface of the substrate. The immobilization can be achieved through direct or indirect bonding to the surface. The bonding can be by covalent linkage. See, Joos et al., Analytical Biochemistry 247:96-101, 1997; Oroskar et al., Clin. Chem. 42:1547-1555, 1996; and Khandjian, Mol. Bio. Rep. 11:107-115, 1986. A preferred attachment is direct amine bonding of a terminal nucleotide of the template or the 5' end of the primer to an epoxide integrated on the surface. The bonding also can be through non-covalent linkage. For example, biotin-streptavidin (Taylor et al., J. Phys. D. Appl. Phys. 24:1443, 1991) and digoxigenin with anti-digoxigenin (Smith et al., Science 253:1122, 1992) are common tools for anchoring nucleic acids to surfaces and parallels. In certain embodiments, the nucleic acid molecule is attached to the substrate through the polymerase molecule. Alternatively, the attachment can be achieved by anchoring a hydrophobic chain into a lipid monolayer or bilayer. Other methods for known in the art for attaching nucleic acid molecules to substrates also can be used.

Detection

Any detection method can be used that is suitable for the type of label employed. Thus, exemplary detection methods include radioactive detection, optical absorbance detection, e.g., UV-visible absorbance detection, optical emission detection, e.g., fluorescence or chemiluminescence. For example, extended primers can be detected on a substrate by scanning all or portions of each substrate simultaneously or serially, depending on the scanning method used. For fluorescence labeling, selected regions on a substrate may be serially scanned one-by-one or row-by-row using a fluorescence microscope apparatus, such as described in Fodor (U.S. Pat. No. 5,445,934) and Mathies et al. (U.S. Pat. No. 5,091,652). Devices capable of sensing fluorescence from a single molecule include scanning tunneling microscope (siM) and the atomic force microscope (AFM). Hybridization patterns may also be scanned using a CCD camera (e.g., Model TE/CCD512SF, Princeton Instruments, Trenton, N.J.) with suitable optics (Ploem, in Fluorescent and Luminescent Probes for Biological Activity Mason, T. G. Ed., Academic Press, Landon, pp. 1-11 (1993), such as described in Yershov et al., Proc. Natl. Acad. Sci. 93:4913 (1996), or may be imaged by TV monitoring. For radioactive signals, a phosphorimager device can be used (Johnston et al., Electrophoresis, 13:566, 1990; Drmanac et al., Electrophoresis, 13:566, 1992; 1993). Other commercial suppliers of imaging instruments include General Scanning Inc., (Watertown, Mass. on the World Wide Web at genscan.com), Genix Technologies (Waterloo, Ontario, Canada; on the World Wide Web at confocal.com), and Applied Precision Inc. Such detection methods are particularly useful to achieve simultaneous scanning of multiple attached template nucleic acids.

A number of approaches can be used to detect incorporation of fluorescently-labeled nucleotides into a single nucleic acid molecule. Optical setups include near-field scanning microscopy, far-field confocal microscopy, wide-field epi-illumination, light scattering, dark field microscopy, photoconversion, single and/or multiphoton excitation, spectral wavelength discrimination, fluorophor identification, evanescent wave illumination, and total internal reflection fluorescence (TIRF) microscopy. In general, certain methods involve detection of laser-activated fluorescence using a microscope equipped with a camera. Suitable photon

detection systems include, but are not limited to, photodiodes and intensified CCD cameras. For example, an intensified charge couple device (ICCD) camera can be used. The use of an ICCD camera to image individual fluorescent dye molecules in a fluid near a surface provides numerous advantages. For example, with an ICCD optical setup, it is possible to acquire a sequence of images (movies) of fluorophores.

Some embodiments of the present invention use TIRF microscopy for imaging. TIRF microscopy uses totally internally reflected excitation light and is well known in the art. See, e.g., the World Wide Web at nikon-instruments.jp/eng/page/products/tirf.aspx. In certain embodiments, detection is carried out using evanescent wave illumination and total internal reflection fluorescence microscopy. An evanescent light field can be set up at the surface, for example, to image fluorescently-labeled nucleic acid molecules. When a laser beam is totally reflected at the interface between a liquid and a solid substrate (e.g., a glass), the excitation light beam penetrates only a short distance into the liquid. The optical field does not end abruptly at the reflective interface, but its intensity falls off exponentially with distance. This surface electromagnetic field, called the "evanescent wave", can selectively excite fluorescent molecules in the liquid near the interface. The thin evanescent optical field at the interface provides low background and facilitates the detection of single molecules with high signal-to-noise ratio at visible wavelengths.

The evanescent field also can image fluorescently-labeled nucleotides upon their incorporation into the attached template/primer complex in the presence of a polymerase. Total internal reflectance fluorescence microscopy is then used to visualize the attached template/primer duplex and/or the incorporated nucleotides with single molecule resolution.

Analysis

Alignment and/or compilation of sequence results obtained from the image stacks produced as generally described above utilizes look-up tables that take into account possible sequences changes (due, e.g., to errors, mutations, etc.). Essentially, sequencing results obtained

as described herein are compared to a look-up type table that contains all possible reference sequences plus 1 or 2 base errors. Any of a variety of other alignment techniques known to those of skill in the relevant art may also be used.

## Incorporation by Reference

References and citations to other documents, such as patents, patent applications, patent publications, journals, books, papers, web contents, have been made throughout this disclosure. All such documents are hereby incorporated herein by reference in their entirety for all purposes.

## Equivalents

The invention may be embodied in other specific forms without departing from the spirit or essential characteristics thereof. The foregoing embodiments are therefore to be considered in all respects illustrative rather than limiting on the invention described herein. Scope of the invention is thus indicated by the appended claims rather than by the foregoing description, and all changes which come within the meaning and range of equivalency of the claims are therefore intended to be embraced therein.

What is claimed is:

1. A method for sequencing a nucleic acid, the method comprising:

contacting a nucleic acid duplex comprising a primer nucleic acid hybridized to a template nucleic acid with a polymerase enzyme in the presence of a first detectably labeled nucleotide under conditions that permit the polymerase to add nucleotides to the primer in a template-dependent manner, wherein a unique oligonucleotide sequence is attached to the template nucleic acid so that the template nucleic acid may be differentiated from other template nucleic acid molecules;

detecting a signal from the incorporated labeled nucleotide; and

sequentially repeating the contacting and detecting steps at least once, wherein sequential detection of incorporated labeled nucleotide determines the sequence of the nucleic acid.

2. The method according to claim 1, wherein prior to the contacting step, the method further comprises ligating the oligonucleotide sequence to the template molecule.

3. The method according to claim 1, wherein the oligonucleotide sequence further comprises a primer sequence.

4. The method according to claim 1, wherein the primer sequence is a polyA tail.

5. The method according to claim 3, wherein the oligonucleotide sequence comprises from about 5 nucleotides to about 15 nucleotides excluding the primer sequence.

6. The method according to claim 1, wherein the oligonucleotide sequence excludes a terminal thymine on both the 5' and the 3' end of the oligonucleotide.

7. The method according to claim 1, wherein the oligonucleotide sequence excludes any homopolymer region.

8. The method according to claim 1, wherein the oligonucleotide sequence further comprises at least one locked nucleic acid.

9. The method according to claim 1, wherein the duplex is attached to a substrate.

10. The method according to claim 9, wherein at least a portion of the duplexes are individually optically resolvable.

11. The method according to claim 9, wherein the duplex is directly attached to the substrate.

12. The method according to claim 9, wherein the duplex is indirectly attached to the substrate.

13. The method according to claim 1, wherein the detectable label is an optically detectable label.

14. The method according to claim 13, wherein the optically detectable label is a fluorescent label.

15. A method for sequencing a plurality of nucleic acids from different samples, the method comprising:

contacting a plurality of nucleic acid duplexes comprising a primer nucleic acid hybridized to a template nucleic acid with a polymerase enzyme in the presence of a first detectably labeled nucleotide under conditions that permit the polymerase to add nucleotides to

the primer in a template-dependent manner, wherein the template nucleic acids are provided from a plurality of samples, and a unique oligonucleotide sequence is attached to the template nucleic acids from each sample so that the template nucleic acids from the different samples may be differentiated from each other;

detecting a signal from the incorporated labeled nucleotide; and

sequentially repeating the contacting and detecting steps at least once, wherein sequential detection of incorporated labeled nucleotide determines the sequence of the plurality of nucleic acids.

16. The method according to claim 15, wherein the samples are obtained from different tissues or body fluids in a single subject.

17. The method according to claim 15, wherein the samples are obtained from different subjects.

18. The method according to claim 15, wherein the duplexes are attached to a substrate.

19. The method according to claim 18, wherein at least a portion of the duplexes are individually optically resolvable.

20. A method for sequencing a plurality of nucleic acids from different samples, the method comprising:

obtaining template nucleic acids from a plurality of samples;

ligating the template nucleic acids from each sample with a unique oligonucleotide sequence so that the template nucleic acids from the different samples may be differentiated from each other;

pooling the template nucleic acid molecules from the plurality of samples;

hybridizing the pooled template nucleic acid molecules with a plurality of primers to form duplexes comprising a primer nucleic acid hybridized to a template nucleic acid;

contacting the plurality of nucleic acid duplexes with a polymerase enzyme in the presence of a first detectably labeled nucleotide under conditions that permit the polymerase to add nucleotides to the primer in a template-dependent manner;

detecting a signal from the incorporated labeled nucleotide; and

sequentially repeating the contacting and detecting steps at least once, wherein sequential detection of incorporated labeled nucleotide determines the sequence of the plurality of nucleic acids.

21. The method according to claim 20, wherein prior to the contacting step, the method further comprises attaching the duplexes to a substrate.

22. The method according to claim 21, wherein at least a portion of the duplexes are individually optically resolvable.

23. The method according to claim 20, wherein the samples are obtained from different tissues or body fluids in a single subject.

24. The method according to claim 20, wherein the samples are obtained from different subjects.


Encoding the 3´ end of genomic nucleic acid samples
5´
3´
3´
5´
Preparation of ligatable ends
A
A
Ligation of oligonucleotide with compatible ends containing:
barcode:lock;primer binding site:3´-block:label
Reverse compliment
Terminal Degradation site
A barcode lock
Primer Binding site
Block
Block
Primer Binding site
A
lock barcode
Terminal Degradation site
Reverse compliment
Digestion
A barcode lock
Primer Binding site
Block
Block
Primer Binding site
A
lock barcode
Denaturation
A barcode lock
Primer Binding site
Block
A barcode lock
Primer Binding site
Block

FIG. 1

**Encoding the 3′ end of genomic samples**
***compatible with dT50 surface and multiple sample types on single runs***




FIG. 2

# INTERNATIONAL SEARCH REPORT

International application No.
PCT/US 09/64001

**A. CLASSIFICATION OF SUBJECT MATTER**
IPC(8) - C12P 19/00; C12P 19/34 (2010.01)
USPC - 435/91.1; 435/91.5
According to International Patent Classification (IPC) or to both national classification and IPC

**B. FIELDS SEARCHED**

Minimum documentation searched (classification system followed by classification symbols)
USPC: 435/91.1; 435/91.5

Documentation searched other than minimum documentation to the extent that such documents are included in the fields searched
USPC: 435/41, 72, 91.1, 91.5
(text search)

Electronic data base consulted during the international search (name of data base and, where practicable, search terms used)
PubWEST(PGPB,USPT,USOC,EPAB,JPAB); Google; PubMed
Search terms: sequencing, sequencing-by-synthesis, barcode, bar code, locked nucleic acid, chip, multiplex, primer, unique tag

**C. DOCUMENTS CONSIDERED TO BE RELEVANT**

| Category* | Citation of document, with indication, where appropriate, of the relevant passages | Relevant to claim No. |
|---|---|---|
| Y | CRONN et al. Multiplex sequencing of plant chloroplast genomes using Solexa sequencing-by-synthesis technology. Nucleic Acids Res. 27 August 2008 (27.08.2008), Vol. 36, No. 19, article e122, pages 1-11; abstract; pg 2, para 4 - pg 3, para 1; Fig. 1; Supplementary Table 2 | 1-24 |
| Y | US 2008/0085840 A1 (BUZBY) 10 April 2008 (10.40.2008) para [0013], [0021], [0010], claim 9 | 1-24 |
| A | SEO et al. Four-color DNA sequencing by synthesis on a chip using photocleavable fluorescent nucleotides. Proc. Natl. Acad. Sci. USA. 26 April 2005 (26.04.2005), Vol. 102, No. 17, pages 5926-5931; | 9-12, 18-19, 21-22 |
| A | US 2008/0269068 A1 (CHURCH et al.) 30 October 2008 (30.10.2008) | 1-24 |

☐ Further documents are listed in the continuation of Box C. ☐

* Special categories of cited documents:
"A" document defining the general state of the art which is not considered to be of particular relevance
"E" earlier application or patent but published on or after the international filing date
"L" document which may throw doubts on priority claim(s) or which is cited to establish the publication date of another citation or other special reason (as specified)
"O" document referring to an oral disclosure, use, exhibition or other means
"P" document published prior to the international filing date but later than the priority date claimed
"T" later document published after the international filing date or priority date and not in conflict with the application but cited to understand the principle or theory underlying the invention
"X" document of particular relevance; the claimed invention cannot be considered novel or cannot be considered to involve an inventive step when the document is taken alone
"Y" document of particular relevance; the claimed invention cannot be considered to involve an inventive step when the document is combined with one or more other such documents, such combination being obvious to a person skilled in the art
"&" document member of the same patent family

| Date of the actual completion of the international search | Date of mailing of the international search report |
|---|---|
| 21 February 2010 (21.02.2010) | 12 APR 2010 |

| Name and mailing address of the ISA/US | Authorized officer: |
|---|---|
| Mail Stop PCT, Attn: ISA/US, Commissioner for Patents<br>P.O. Box 1450, Alexandria, Virginia 22313-1450<br>Facsimile No. 571-273-3201 | Lee W. Young<br>PCT Helpdesk: 571-272-4300<br>PCT OSP: 571-272-7774 |

# EXHIBIT B

Case 1:24-cv-00680-RGA-SRF Document 82 Filed 11/04/26 Page 106 of 131 PageID #: 2373

US 20090226975A1

(19) **United States**

(12) **Patent Application Publication** (10) **Pub. No.: US 2009/0226975 A1**

**Sabot et al.** (43) **Pub. Date: Sep. 10, 2009**

(54) **CONSTANT CLUSTER SEEDING**

(75) Inventors: **Andrea Sabot**, Essex (GB); **Roberto Rigatti**, Essex (GB); **Min-Jui Richard Shen**, Poway, CA (US)

Correspondence Address:
**ILLUMINA, INC.**
**LEGAL DEPARTMENT**
**9885 TOWNE CENTRE DRIVE**
**SAN DIEGO, CA 92121-1975 (US)**

(73) Assignee: **Illumina, Inc.**, San Diego, CA (US)

(21) Appl. No.: **12/395,299**

(22) Filed: **Feb. 27, 2009**

**Related U.S. Application Data**

(60) Provisional application No. 61/035,254, filed on Mar. 10, 2008.

**Publication Classification**

(51) **Int. Cl.**
*C12P 19/34* (2006.01)

(52) **U.S. Cl.** ........................................................ **435/91.5**

(57) **ABSTRACT**

The invention provides methods for controlling the density of different molecular species on the surface of a solid support. A first mixture of different molecular species is attached to a solid support under conditions to attach each species at a desired density, thereby producing a derivatized support having attached capture molecules. The derivatized support is treated with a second mixture of different molecular species, wherein different molecular species in the second mixture bind specifically to the different capture molecules attached to the solid support. One or more of the capture molecules can be reversibly modified such that the capture molecules have a different activity before and after the second mixture of molecular species are attached. In particular embodiments, the different molecular species are nucleic acids that are reversibly modified to have different activity in an amplification reaction.


(high conc.) PS-10T-Diol-P5
+
(high conc.) PS-10T-P7
+
(low conc.) PS-10T-Diol-P5-
P7
DNA insert
Seq Primer
P7
DNA insert
Seq primer
cP7
cDNA
P7
DNA
Seq primer
cP7
cDNA
cDNA
cP7
cDNA
cP7

Fig 1



5'
P7
insert
SBS3
Biotin-P5
B
SA-PMP
NaOH
SA-PMP
B
Streptavidin Paramagnetic Particle (SA-PMP)
Hyb buffer
Flow cell
Single stranded template DNA


Fig 2


Graft flow cell, Functional conc of primers diagram below
P5'
P7'
P5'- HybBlocked
Add ssTemplate DNA samples and saturate P5' primers with ssTemplate
Extend w/DNA pol then denature to remove template
Remove HybBlock group
Proceed to bridge amplification

Fig 3

# CONSTANT CLUSTER SEEDING

**[0001]** This application is based on, and claims the benefit of, U.S. Provisional Application Ser. No. 61/035,254, filed Mar. 10, 2008 and entitled "Constant Cluster Seeding," the entirety of which is hereby incorporated by reference.

## FIELD OF THE INVENTION

**[0002]** The current invention relates to the field of nucleic acid amplification. More specifically, the present invention provides methods for optimising the density of nucleic acid clusters produced on a solid support whilst eliminating the need for multiple sample titration steps.

## BACKGROUND TO THE INVENTION

**[0003]** Several publications and patent documents are referenced in this application in order to more fully describe the state of the art to which this invention pertains. The disclosure of each of these publications and documents is incorporated by reference herein.

**[0004]** A number of methods for high throughput nucleic acid sequencing rely on a universal amplification reaction, whereby a DNA sample is randomly fragmented, then treated such that the ends of the different fragments all contain the same DNA sequence. Fragments with universal ends can then be amplified in a single reaction with a single pair of amplification primers. Separation of the library of fragments to the single molecule level prior to amplification ensures that the amplified molecules form discrete populations that can then be further analysed. Such separations can be performed either in emulsions, or on a surface.

**[0005]** Polynucleotide arrays have been formed based on 'solid-phase' nucleic acid amplification. For example, a bridging amplification reaction can be used wherein a template immobilised on a solid support is amplified and the amplification products are formed on the solid support in order to form arrays comprised of nucleic acid clusters or 'colonies'. Each cluster or colony on such an array is formed from a plurality of identical immobilised polynucleotide strands and a plurality of identical immobilised complementary polynucleotide strands. The arrays so formed are generally referred to herein as 'clustered arrays.'

**[0006]** In common with several other amplification techniques, solid-phase bridging amplification uses forward and reverse amplification primers which include 'template specific' nucleotide sequences which are capable of annealing to sequences in the template to be amplified, or the complement thereof, under the conditions of the annealing steps of the amplification reaction. The sequences in the template to which the primers anneal under conditions of the amplification reaction may be referred to herein as 'primer binding' sequences.

**[0007]** Certain embodiments of clustering methods make use of 'universal' primers to amplify a variable template portion that is to be amplified and that is flanked 5' and 3' by common or 'universal' primer binding sequences. The 'universal' forward and reverse primers include sequences capable of annealing to the 'universal' primer binding sequences in the template construct. The variable template portion, or 'target' may itself be of known, unknown or partially known sequence. This approach has the advantage that it is not necessary to design a specific pair of primers for each target sequence to be amplified; the same primers can be used for amplification of different templates provided that each template is modified by addition of the same universal primer-binding sequences to its 5' and 3' ends. The variable target sequence can therefore be any DNA fragment of interest. An analogous approach can be used to amplify a mixture of templates (targets with known ends), such as a plurality or library of target nucleic acid molecules (e.g. genomic DNA fragments), using a single pair of universal forward and reverse primers, provided that each template molecule in the mixture is modified by the addition of the same universal primer-binding sequences.

**[0008]** Such 'universal primer' approaches to PCR amplification, and in particular solid-phase bridging amplification, are advantageous since they enable multiple template molecules of the same or different, known or unknown sequence to be amplified in a single amplification reaction, which may be carried out on a solid support bearing a single pair of 'universal' primers. Simultaneous amplification of a mixture of templates of different sequences can otherwise be carried out with a plurality of primer pairs, each pair being complementary to each unique template in the mixture. The generation of a plurality of primer pairs for each individual template can be cumbersome and expensive for complex mixtures of templates.

**[0009]** In preparing a clustered array, typically the higher the concentration of template used, the higher the density of clusters that will be produced on a clustered array. If the density of clusters is too great, it may be difficult to individually resolve each cluster and overlapping colonies may be formed. A titration can be performed to determine the optimal template concentration to achieve an optimal cluster density on the array wherein each cluster can be separately resolved. However, such titrations can lead to a loss of valuable flow cell channels due to a cluster density that is too high or too low, a loss of template sample, an increase in the level of reagents required or increase in sample processing time.

**[0010]** Thus, there is a need for a method of controlling and achieving desired cluster density that is independent of the concentration of the original nucleic acid sample and avoids nucleic acid titration steps. The present invention satisfies this need and provides other advantages as well.

## SUMMARY OF THE INVENTION

**[0011]** The invention provides a method of amplifying polynucleotides. The method can include (a) providing a plurality of oligonucleotides immobilised to a solid support, wherein the plurality of oligonucleotides includes first species having a capture sequence and second species having an amplification sequence, wherein the first species are immobilised at a lower density than the second species; (b) applying a plurality of single stranded template polynucleotides to the solid support under conditions wherein the single stranded template polynucleotide molecules hybridise to the capture sequence but do not hybridise to the amplification sequence; (c) extending the first species to generate polynucleotide complements of the single stranded polynucleotide template molecules, wherein the polynucleotide complements are immobilised on the solid support; and (d) amplifying the polynucleotide complements, wherein the amplifying includes hybridizing the amplification sequences to the complements.

**[0012]** In a particular aspect, the invention provides a method of controlling the density of colonies of amplified

single stranded polynucleotides formed on a solid support. The method can include the steps of (a) providing a plurality of single stranded template polynucleotides; (b) providing a plurality of at least three oligonucleotides immobilised to a solid support wherein at least one of the oligonucleotides is a capture sequence capable of hybridising to the single stranded template polynucleotides, and at least two of the oligonucleotides are amplification sequences which are incapable of hybridising to the single stranded template polynucleotides, wherein the capture sequences are immobilised at a lower density than the amplification sequences; (c) applying the single stranded template polynucleotides to the solid support under suitable conditions such that the single stranded template polynucleotide molecules hybridise to the capture sequences; (d) extending the capture sequences using a nucleic acid polymerase to generate double stranded extension products complementary to the single stranded template polynucleotides; (e) denaturing the double stranded extension products to remove the hybridised single stranded polynucleotide template molecules from the extension products to produce single stranded template molecules immobilised on the solid support; and (f) amplifying the single stranded template molecules immobilised on the solid support using the two or more amplification sequences immobilised on the solid support; wherein the density of the immobilised colonies is controlled by the density of the capture primers rather than the concentration of the single stranded template polynucleotides.

**[0013]** The invention further provides a flow cell uniformly grafted with a plurality of oligonucleotides, wherein the plurality includes three species of oligonucleotides having different sequences, wherein one of the three species is present at a lower density than the other two species.

## BRIEF DESCRIPTION OF THE DRAWINGS

**[0014]** FIG. **1** shows a method of the invention wherein the capture sequence is longer than the amplification sequences, and the template selectively hybridises to the capture sequence that extends beyond the amplification sequence. The capture sequence is extended opposite the template strand, and the template strand is denatured and removed. The immobilised template copy can hybridise to one of the immobilised amplification sequences, and the amplification sequence can be extended. The capture sequence also comprises a sequence corresponding to one of the amplification sequences, and hence upon synthesising a duplex from the immobilised template copy, both ends of the immobilised duplex can comprise sequences complementary to one of the amplification sequences.

**[0015]** FIG. **2** shows an exemplary method of preparing a single stranded template library suitable for amplification.

**[0016]** FIG. **3** shows an exemplary method of the invention wherein one of the amplification primers is initially blocked from strand elongation. After extending the immobilised template strand, the block is removed and the sample can proceed through cycles of bridge amplification.

## DETAILED DESCRIPTION OF THE INVENTION

**[0017]** The invention relates to methods for controlling the density of different molecular species derivatized on a surface. In particular embodiments, the molecular species are nucleic acids having different sequences. The invention is particularly useful for controlling the density of nucleic acid clusters produced on a solid support. An advantage of the methods is the reduction or even elimination of the need for multiple sample titration steps for controlling density of molecules on surfaces.

**[0018]** In embodiments wherein surfaces are derivatized with nucleic acids for subsequent formation of amplified clusters, the density of the cluster on the support is controlled by the density of one of the immobilised primers used for capturing the template samples. The density of primers on every chip can be controlled during manufacturing, simply by the ratio of the three or more immobilized primers, and hence the density of clusters is independent of the concentration or dilution of the template sample. This concentration independence removes the need to accurately measure the initial concentration of double stranded template, and is independent of the accurate dilution of the sample. The density of clusters on multiple chips can be made substantially uniform by controlling the ratio and concentration of capture sequences to amplification sequences attached to the chip surface. Because primers can typically be synthesized and manipulated under more controlled conditions than template samples that are derived from different biological sources, the methods set forth herein provide increased reproducibility in creating cluster arrays. Further advantages are provided by creating pools of primers in a desired ratio that can be reused for creating multiple cluster arrays having reproducible density.

**[0019]** In accordance with the methods set forth herein a plurality of oligonucleotides can be immobilised to a solid support. The plurality can include different species of oligonucleotide molecule each having a different sequence. For example, a plurality of oligonucleotides can include at least two different species, at least three different species or more, wherein a first species has a different sequence than the other species in the plurality. It will be understood that different species of oligonucleotide can share a common sequence so long as there is a sequence difference between at least a portion of the different species. For example, as shown in FIG. **3**, the two species identified as P5' and P5'HybBlocked share a common sequence but the P5'HybBlocked species has an additional hairpin forming sequence not found in the P5' species.

**[0020]** The term 'immobilised' as used herein is intended to encompass direct or indirect attachment to a solid support via covalent or non-covalent bond(s). In certain embodiments of the invention, covalent attachment may be used, but generally all that is required is that the molecules (for example, nucleic acids) remain immobilised or attached to a support under conditions in which it is intended to use the support, for example in applications requiring nucleic acid amplification and/or sequencing. Typically oligonucleotides are immobilized such that a 3' end is available for enzymatic extension and at least a portion of the sequence is capable of hybridizing to a complementary sequence. Immobilization can occur via hybridization to a surface attached oligonucleotide. Alternatively, immobilization can occur by means other than base-pairing hybridization, such as the covalent attachment set forth above.

**[0021]** The term 'solid support' as used herein refers to any insoluble substrate or matrix to which molecules can be attached, such as for example latex beads, dextran beads, polystyrene surfaces, polypropylene surfaces, polyacrylamide gel, gold surfaces, glass surfaces and silicon wafers. The solid support may be a planar glass surface. The solid support

may be mounted on the interior of a flow cell to allow the interaction with solutions of various reagents.

**[0022]** In certain embodiments the solid support may comprise an inert substrate or matrix which has been 'functionalised', for example by the application of a layer or coating of an intermediate material comprising reactive groups that permit covalent attachment to molecules such as polynucleotides. By way of non-limiting example such supports may include polyacrylamide hydrogel layers on an inert substrate such as glass. In such embodiments the molecules (for example, polynucleotides) may be directly covalently attached to the intermediate layer (for example, a hydrogel) but the intermediate layer may itself be non-covalently attached to other layers of the substrate or matrix (for example, a glass substrate). Covalent attachment to a solid support is to be interpreted accordingly as encompassing this type of arrangement.

**[0023]** 'Primer oligonucleotides' or 'amplification sequences' are polynucleotide sequences that are capable of annealing specifically to a single stranded polynucleotide sequence to be amplified under conditions encountered in a primer annealing step of an amplification reaction. Generally, the terms "nucleic acid," "polynucleotide" and "oligonucleotide" are used interchangeably herein. The different terms are not intended to denote any particular difference in size, sequence, or other property unless specifically indicated otherwise. For clarity of description the terms may be used to distinguish one species of molecule from another when describing a particular method or composition that includes several molecular species.

**[0024]** A polynucleotide sequence that is to be amplified is generally referred to herein as a "template." A template can include primer binding sites that flank a template sequence that is to be amplified. In particular embodiments, as set forth in further detail below, a plurality of template polynucleotides includes different species that differ in their template sequences but have primer binding sites that are the same for two or more of the different species. The two primer binding sites that flank a particular template sequence can have the same sequence, such as a palindromic sequence or homopolymeric sequence, or the two primer binding sites can have different sequences. Accordingly, a plurality of different template polynucleotides can have the same primer binding sequence or two different primer binding sequences at each end of the template sequence. Thus, species in a plurality of template polynucleotides can include regions of known sequence that flank regions of unknown sequence that are to be evaluated, for example, by sequencing.

**[0025]** Generally amplification reactions use at least two amplification primers, often denoted 'forward' and 'reverse' primers. Generally amplification sequences are single stranded polynucleotide structures. They may also contain a mixture of natural or non-natural bases and also natural and non-natural backbone linkages, provided, at least in some embodiments, that any non-natural modifications do not permanently or irreversibly preclude function as a primer—that being defined as the ability to anneal to a template polynucleotide strand during conditions of an extension or amplification reaction and to act as an initiation point for the synthesis of a new polynucleotide strand complementary to the annealed template strand. That being said, in certain embodiments the present invention may involve the use of a subset of primers, either forward or reverse, that have been modified to preclude hybridisation to a template polynucleotide strand, the modification being altered or reversed at some point such that hybridisation is no longer precluded.

**[0026]** Primers may additionally comprise non-nucleotide chemical modifications, for example to facilitate covalent attachment of the primer to a solid support. Certain chemical modifications may themselves improve the function of the molecule as a primer or may provide some other useful functionality, such as providing a cleavage site that enables the primer (or an extended polynucleotide strand derived therefrom) to be cleaved from a solid support. Useful chemical modifications can also provide reversible modifications that prevent hybridisation or extension of the primer until the modification is removed or reversed. Similarly, other molecules attached to a surface in accordance with the invention can include cleavable linker moieties and or reversible modifications that alter a particular chemical activity of function of the molecule.

**[0027]** A plurality of oligonucleotides used in the methods set forth herein can include species that function as capture oligonucleotides. The capture oligonucleotides may include a 'template specific portion', namely a sequence of nucleotides capable of annealing to a primer binding sequence in a single stranded polynucleotide molecule of interest such as one that is to be amplified. The primer binding sequences will generally be of known sequence and will therefore be complementary to a region of known sequence of the single stranded polynucleotide molecule. The capture oligonucleotides may include a capture sequence and an amplification sequence. For example, as shown in FIG. **1**, a capture oligonucleotide may be of greater length than amplification primers that are attached to the same substrate, in which case the 5' end of the capture sequences may comprise a region with the same sequence as one of the amplification primers. A portion of a template, such as the 3' end of the template, may be complementary to the 3' of the capture sequences. The 5' end of the template may contain a region that comprises a sequence identical to one of the amplification primers such that upon copying the template, the copy can hybridise to the immobilised amplification primer. Thus, an oligonucleotide species that is useful in the methods set forth herein can have a capture sequence, an amplification sequence or both. Conversely, an oligonucleotide species can lack a capture sequence, an amplification sequence or both. In this way the hybridization specificity of an oligonucleotide species can be tailored for a particular application of the methods.

**[0028]** The length of primer binding sequences need not be the same as those of known sequences of polynucleotide template molecules and may be shorter, being particularly 16-50 nucleotides, more particularly 16-40 nucleotides and yet more particularly 20-30 nucleotides in length. The desired length of the primer oligonucleotides will depend upon a number of factors. However, the primers are typically long (complex) enough so that the likelihood of annealing to sequences other than the primer binding sequence is very low. Accordingly, known sequences that flank a template sequence can include a primer binding portion and other portions such as a capture sequence, tag sequence or combination thereof.

**[0029]** 'Solid phase amplification,' when used in reference to nucleic acids, refers to any nucleic acid amplification reaction carried out on or in association with a solid support. Typically, all or a portion of the amplified products are synthesised by extension of an immobilised primer. In particular the term encompasses solid phase amplification reactions

analogous to standard solution phase amplifications except that at least one of the amplification primers is immobilised on the solid support.

**[0030]** As will be appreciated by the skilled reader, a given nucleic acid amplification reaction can be carried out with at least one type of forward primer and at least one type of reverse primer specific for the template to be amplified. However, in certain embodiments, the forward and reverse primers may include template specific portions of identical sequence. In other words, it is possible to carry out solid phase amplification using only one type of primer and such single primer methods are encompassed within the scope of the invention. The one type of primer may include (a) subset(s) of modified primer(s) that have been modified to preclude hybridisation to a template polynucleotide strand, the modification being removed, altered or reversed at some point such that hybridisation is no longer precluded. Other embodiments may use forward and reverse primers which contain identical template specific sequences but which differ in some structural features. For example, one type of primer may contain a non-nucleotide modification which is not present in the other. In still yet another embodiment, the template specific sequences are different and only one primer is used in a method of linear amplification. In other embodiments of the invention the forward and reverse primers may contain specific portions of different sequence.

**[0031]** In certain embodiments of the invention, amplification primers for solid phase amplification are immobilised by covalent attachment to the solid support at or near the 5' end of the primer, such that a portion of the primer is free to anneal to its cognate template and the 3' hydroxyl group is free to function in primer extension. Again, in certain embodiments there is provided a subset of modified primers that are prevented from hybridisation and/or extension until the modification is removed, reversed or altered. In particular embodiments, the amplification primers will be incapable of hybridisation to the initial single stranded template. In such embodiments, hybridisation of the single stranded template will typically be specific for the capture sequences such that the amount of capture sequences on the surface determines the amount of template captured and thus the density of the resulting amplified clusters.

**[0032]** The chosen attachment chemistry will typically depend on the nature of the solid support and any functionalization or derivatization applied to it. In the case of nucleic acid embodiments, the primer itself may include a moiety which may be a non-nucleotide chemical modification to facilitate attachment. For example, the primer may include a sulphur containing nucleophile such as a phosphorothioate or thiophosphate at the 5' end. In the case of solid supported polyacrylamide hydrogels, this nucleophile may bind to a bromoacetamide group present in the hydrogel. In one embodiment, the means of attaching primers to the solid support is via St phosphorothioate attachment to a hydrogel comprised of polymerised acrylamide and N-(5-bromoacetamidylpentyl) acrylamide (BRAPA).

**[0033]** A uniform, homogeneously distributed 'lawn' of immobilised oligonucleotides may be formed by coupling (grafting) a solution of oligonucleotide species onto the solid support. The solution can contain a homogenous population of oligonucleotides but will typically contain a mixture of different oligonucleotide species. The mixture can include, for example, at least two, three or more different species of oligonucleotide. Each surface that is exposed to the solution therefore reacts with the solution to create a uniform density of immobilised sequences over the whole of the exposed solid support. As such, a portion of the surface having a mixture of different immobilized sequences can be surrounded by an area of the surface having a mixture of the same immobilized sequences. A suitable density of amplification oligonucleotides is at least 1 fmol/mm$^2$ ($6\times10^{10}$ per cm$^2$), or more optimally at least 10 fmol/mm$^2$ ($6\times10^{11}$ per cm$^2$). The density of the capture oligonucleotides can be controlled to give an optimum cluster density of $10^6$-$10^9$ clusters per cm$^2$. The ratio of capture oligonucleotide species to the amplification oligonucleotide species can be any desired value including, but not limited to at least 1:100, 1:1000 or 1:100000 depending on the desired cluster density and brightness. Similar densities or ratios of other molecular species can be used in embodiments where molecules other than nucleic acids are attached to a surface.

**[0034]** Previously, the density of attached single stranded polynucleotide molecules and hence the density of clusters has been controlled by altering the concentration of template polynucleotide molecules applied to a support. It has now been discovered that by utilising a modified primer or capture sequence, the density of clusters on the amplified array can be controlled without relying on careful titration of the starting concentration of template polynucleotide strand applied to the solid support. This has the significant advantage that the methods need not rely on accurate concentration measurements and dilutions of the template polynucleotide molecules, thereby leading to increased reliability, reduction in dilution errors and a reduction in time and quantity of reagents required in downstream processes. For each solid support that contains too many or too few clusters, there is a reduction in the amount of data generated for an analysis of the clusters. This can mean that to generate the required depth of coverage of the sample may require additional analytical runs that would not be required if the cluster density was optimal. Too many clusters gives optical saturation and an increase in overlap between two amplified molecules; too few clusters gives undesirably high amounts of dark space that do not generate any data, thereby wasting reagents that are more efficiently used with a densely populated surface.

**[0035]** In a particular embodiment, for each cluster, an immobilised complementary copy of a single stranded polynucleotide template molecule is attached to the solid support by a method of hybridisation and primer extension. Methods of hybridisation for formation of stable duplexes between complementary sequences by way of Watson-Crick base-pairing are known in the art. The immobilised capture oligonucleotides can include a region of sequence that is complementary to a region or template specific portion of the single stranded template polynucleotide molecule. An extension reaction may then be carried out wherein the capture sequence is extended by sequential addition of nucleotides to generate a complementary copy of the single stranded polynucleotide sequence attached to the solid support via the capture oligonucleotide. The single stranded polynucleotide sequence not immobilised to the support may be separated from the complementary sequence under denaturing conditions and removed, for example by washing.

**[0036]** The terms 'separate' and 'separating,' when used in reference to strands of a nucleic acid, refer to the physical dissociation of the DNA bases that interact within for example, a Watson-Crick DNA-duplex of the single stranded polynucleotide sequence and its complement. The terms also

refer to the physical separation of these strands. Thus, the term can refer to the process of creating a situation wherein annealing of another primer oligonucleotide or polynucleotide sequence to one of the strands of a duplex becomes possible. After the first extension reaction, the duplex is immobilised through a single 5' attachment, and hence strand separation can result in loss of one of the strands from the surface. In cases where both strands of the duplex are immobilised, separation of the strands means that the duplex is converted into two immobilised single strands.

**[0037]** In one aspect of the invention, one or more of the amplification primers can be modified to prevent hybridisation of a region or template specific portion of the single stranded polynucleotide molecule. Alternatively or additionally, one or more of the amplification primers may be modified to prevent extension of the primer during one or more extension reactions, thus preventing copying of the hybridised templates. These modifications can be temporary or permanent.

**[0038]** Generally, the capture sequences will include a region of the same sequence as the plurality of amplification oligonucleotides. Once the 3' end of the extended immobilised template copy has hybridised to one of the amplification primers and been extended, the resulting duplex will be immobilised at both ends and all of the bases in the capture oligonucleotide sequence will have been copied. Thus the capture oligonucleotide may include both the amplification primer sequence, plus a further sequence that is complementary to the end of the template. Typically the sequence complementary to the end of the template will not be present in any of the amplification primers. Alternatively, the amplification primers can contain the sequences complementary to the ends of the single stranded templates, but the amplification primers can be reversibly blocked to prevent hybridisation and/or extension during one or more extension step, such as a first extension step in a particular amplification process.

**[0039]** According to one aspect of the invention, one or more of the amplification primers may include a modification that acts as a reversible block to either template hybridisation or extension or both. By way of non-limiting example, such modifications can be presence of an additional sequence of nucleotides that is complementary to the amplification primer. This additional sequence can be present in a portion of the amplification primer and thus acts as an intramolecular hairpin duplex, or a 3' blocking group that prevents extension of the primer. Alternatively, the additional sequence can be found on a separate oligonucleotide that hybridizes to the amplification primer. A particular feature of such a modification is that it can be removed, altered or reversed such that the functionality of the modified primer oligonucleotide is restored and the primer is able to undergo hybridisation and extension during later steps of the methods. Among other examples, the blocking group may be a small chemical species such as a 3' phosphate moiety that can be removed enzymatically, may be an abasic nucleotide such that the 3' end of the primer is not capable of hybridisation (and thereby extension), or may be a sequence of nucleotides that can be selectively excised from the immobilised strands, for example, using restriction endonucleases that selectively cleave particular sequences or deglycosylases that selectively cleave oligonucleotides having exogenous bases such as uracil deoxyribonucleotides or 8-oxoguanine.

**[0040]** In one embodiment a plurality of three types of oligonucleotides (for example comprising capture sequences, forward and reverse primers) are immobilised to a solid support. Alternatively the three oligonucleotides may be forward amplification, blocked forward amplification and reverse amplification, where the unblocked forward primer acts as the capture sequence.

**[0041]** The single stranded polynucleotide molecules may have originated in single-stranded form, as DNA or RNA or may have originated in double-stranded DNA (dsDNA) form (e.g. genomic DNA fragments, PCR and amplification products and the like). Thus a single stranded polynucleotide may be the sense or antisense strand of a polynucleotide duplex. Methods of preparation of single stranded polynucleotide molecules suitable for use in the method of the invention using standard techniques are well known in the art. The precise sequence of the primary polynucleotide molecules may be known or unknown during different steps of the methods set forth herein. It will be understood that a double stranded polynucleotide molecule can be hybridized to an immobilized capture oligonucleotide as exemplified herein for single stranded polynucleotide molecules, so long as a single stranded region of the double stranded polynucleotide is available and complementary to the capture oligonucleotide sequence.

**[0042]** An exemplary method for the isolation of one strand of a double stranded molecular construct is shown in FIG. **2**. A sample of unknown sequence may be fragmented, and adapters attached to the ends of each fragment. One strand of the adapters may contain a moiety for surface immobilisation, for example a biotin that can be captured onto a streptavidin surface. The adapters may be mismatch adapters, for example as described in copending application US 2007/0128G24, the contents of which are incorporated herein by reference in their entirety. Amplification of the mismatch or forked adapters using a pair of amplification primers, one of which carries a biotin modification means that one strand of each duplex carries a biotin modification. Immobilisation of the strands onto a streptavidin surface means that the non-biotinylated strand can be eluted simply by denaturation/strand separation. The eluted constructs will be in single stranded form and upon exposure to hybridisation conditions can be used to hybridise against the immobilised capture sequences which can be extended.

**[0043]** In a particular embodiment, the single stranded polynucleotide molecules are DNA molecules. More particularly, the single stranded polynucleotide molecules represent genomic DNA molecules, or amplicons thereof, which include both intron and exon sequence (coding sequence), as well as non-coding regulatory sequences such as promoter and enhancer sequences. Still yet more particularly, the single stranded polynucleotide molecules are human genomic DNA molecules, or amplicons thereof.

**[0044]** In a particular embodiment, a single stranded target polynucleotide molecule has two regions of known sequence. Yet more particularly, the regions of known sequence will be at the 5' and 3' termini of the single stranded polynucleotide molecule such that the single stranded polynucleotide molecule will be of the structure:

5'[known sequence I]-[target polynucleotide sequence]-[known sequence II]-3'

**[0045]** Typically "known sequence I" and "known sequence II" will consist of more than 20, or more than 40, or more than 50, or more than 100, or more than 300 consecutive nucleotides. The precise length of the two sequences may or may not be identical. The primer binding sequences generally

will be of known sequence and will therefore particularly be complementary to a sequence within known sequence I and known sequence II of the single stranded polynucleotide molecule. The length of the primer binding sequences need not be the same as those of known sequence I or II, and may be shorter, being particularly 16-50 nucleotides, more particularly 16-40 nucleotides and yet more particularly 20-30 nucleotides in length. Known sequence I can be the same as known sequence II or the two can be different.

**[0046]** Methods of hybridisation for formation of stable duplexes between complementary sequences by way of Watson-Crick base pairing are known in the art. A region or part of the single stranded polynucleotide template molecules can be complementary to at least a part of the immobilised capture sequence oligonucleotides. Since the amplification oligonucleotides are either modified to prevent hybridisation and/or extension, or are non-complementary to the known ends of the template strands, only the capture sequences will be capable of hybridisation and extension. An extension reaction may then be carried out wherein the capture sequence primer is extended by sequential addition of nucleotides to generate a complementary copy of the single stranded template polynucleotide attached to the solid support via the capture sequence oligonucleotide. The single stranded template polynucleotide sequence not immobilised to the support may be separated from the complementary sequence under denaturing conditions and removed, for example by washing. The distance between the individual capture sequence oligonucleotides on the surface therefore controls the density of the single stranded template polynucleotides and hence the density of clusters formed later on the surface is also controlled.

**[0047]** In embodiments such as that shown in FIG. **3** wherein the modified forward primer oligonucleotides are blocked and are unable to be extended, generally all of the amplification primer oligonucleotides will hybridise to the single stranded template polynucleotides. When the extension reaction is carried out only the unmodified forward capture primer oligonucleotides are extended by sequential addition of nucleotides to generate a complementary copy of the single stranded template polynucleotide attached to the solid support via the unmodified forward primer oligonucleotide. The single stranded template polynucleotide sequences not hybridised to the support may be separated from the unextended blocked forward primer oligonucleotides under denaturing conditions and removed, for example by washing with a chemical denaturant such as formamide. The distance between the individual unmodified forward primer oligonucleotides on the surface therefore controls the density of the single stranded template polynucleotides and hence the density of clusters formed later on the surface is also controlled.

**[0048]** Following the attachment of the complementary single stranded template polynucleotides, the modified/blocked primers can be treated to reverse, remove or alter the modification such that they become functionally equivalent to the unmodified forward primer oligonucleotides. For example, the double stranded structure may be removed either by denaturation, for example by heating or treatment with an alkaline solution when it is formed by a separate hybridised polynucleotide. Alternatively, where the hybridised polynucleotide is covalently linked, enzymatic digestion could be used to sequence-selectively cleave the strand, followed by denaturation. Such methods for removing the double stranded structure are known in the art and would be apparent to the skilled person (Sambrook and Russell, *Molecular Cloning, A Laboratory Manual*, third edition, Cold Spring Harbor Laboratory Press (2001)).

**[0049]** In one embodiment of the invention, the single stranded template polynucleotide molecule can be attached to the solid support by ligation to double stranded primers immobilised to the solid support using ligation methods known in the art (Sambrook and Russell, supra). Such methods utilise ligase enzymes such as DNA ligase to effect or catalyse the joining of the ends of the two polynucleotide strands, in this case, the single stranded template polynucleotide molecule and the primer oligonucleotide ligate such that covalent linkages are formed. In this context "joining" means covalent linkage of two polynucleotide strands that were not previously covalently linked. Thus, an aim of the invention can also be achieved by modifying the 3' end of a subset of primer oligonucleotides such that they are unable to ligate to the single stranded template polynucleotides. By way of non-limiting example, the addition of 2'3'dideoxy AMP (dideoxyAMP) by the enzyme terminal deoxynucleotidyl transferase (TdT) effectively prevents T4 DNA ligase from ligating treated molecules together.

**[0050]** An alternative method would be to have the capture sequences as duplex strands and the amplification sequences as single strands. Upon ligation of the single strands to the capture duplexes (which would be the only immobilised species carrying a free **5'** phosphate) the 3' end of the immobilised strand can be extended as described above. Upon denaturation of the hybridised template sequence, amplification of the immobilised strand can proceed as described. Other such methods for attaching single strands will be apparent to others skilled in the art.

**[0051]** In a next step according to particular embodiments of the present invention, suitable conditions are applied to the immobilised single stranded polynucleotide molecule and the plurality of amplification primer oligonucleotides such that the single stranded polynucleotide molecule hybridises to an amplification primer oligonucleotide to form a complex in the form of a bridge structure. Suitable conditions such as neutralising and/or hybridising buffers are well known in the art (See Sambrook et al., supra; Ausubel et al., *Current Protocols in Molecular Biology*, John Wiley and Sons, Baltimore, Md. (1998)). The neutralising and/or hybridising buffer may then be removed.

**[0052]** Next by applying suitable conditions for extension an extension reaction is performed. The primer oligonucleotide of the complex is extended by sequential addition of nucleotides to generate an extension product complimentary to the single stranded polynucleotide molecule. The resulting duplex is immobilised at both 5' ends such that each strand is immobilised.

**[0053]** Suitable conditions such as extension buffers/solutions comprising an enzyme with polymerase activity are well known in the art (See Sambrook et al., supra; Ausubel et al. supra). In a particular embodiment dNTP's may be included in the extension buffer. In a further embodiment dNTP's could be added prior to the extension buffer. This bridge amplification technique can be carried out as described, for example, in U.S. Pat. No. 7,115,400 and US 2005/0100900 A1, the contents of which are incorporated herein by reference.

**[0054]** Examples of enzymes with polymerase activity which can be used in the present invention are DNA polymerase (Klenow fragment, T4 DNA polymerase), heat-stable DNA polymerases from a variety of thermostable bacteria

(such as Taq, VENT, Pfu, or Tfl DNA polymerases) as well as their genetically modified derivatives (TaqGold, VENTexo, or Pfu exo). A combination of RNA polymerase and reverse transcriptase can also be used to generate the extension products. Particularly the enzyme has strand displacement activity, more particularly the enzyme will be active at a pH of about 7 to about 9, particularly pH 7.9 to pH 8+, yet more particularly the enzymes are Est or Klenow.

**[0055]** The nucleoside triphosphate molecules used are typically deoxyribonucleotide triphosphates, for example dATP, dTTP, dCTP, dGTP, or are ribonucleoside triphosphates for example ATP, UTP, CTP, GTP, The nucleoside triphosphate molecules may be naturally or non-naturally occurring.

**[0056]** After the hybridisation and extension steps, the support and attached nucleic acids can be subjected to denaturation conditions. A flow cell can be used such that, the extension buffer is generally removed by the influx of the denaturing buffer. Suitable denaturing buffers are well known in the art (See Sambrook et al., supra; Ausubel et al. supra). By way of example it is known that alterations in pH and low ionic strength solutions can denature nucleic acids at substantially isothermal temperatures. Formamide and urea form new hydrogen bonds with the bases of nucleic acids disrupting hydrogen bonds that lead to Watson-Crick base pairing. In a particular embodiment the concentration of formamide is 50% or more. These result in single stranded nucleic acid molecules. If desired, the strands may be separated by treatment with a solution of very low salt (for example less than 0.01 M cationic conditions) and high pH (>12) or by using a chaotropic salt (e.g. guanidinium hydrochloride). In a particular embodiment a strong base is used. A strong base is a basic chemical compound that is able to deprotonate very weak acids in an acid base reaction. The strength of a base is indicated by its $pK_b$ value, compounds with a $pK_b$ value of less than about 1 are called strong bases and are well known to one skilled in the art. In a particular embodiment the strong base is Sodium Hydroxide (NaOH) solution used at a concentration of from 0.05 M to 0.25 M, particularly 0.1 M.

**[0057]** Following the hybridization, extension and denaturation steps exemplified above, two immobilised nucleic acids will be present, the first being the first template single stranded polynucleotide molecule (that was initially immobilised) and the second being a nucleic acid complementary thereto, extending from one of the immobilised primer oligonucleotides. Both the original immobilised single stranded polynucleotide molecule and the immobilised extended primer oligonucleotide formed are then able to initiate further rounds of amplification by subjecting the support to further cycles of hybridisation, extension and denaturation.

**[0058]** It may be advantageous to perform optional washing steps in between each step of the amplification method. For example an extension buffer without polymerase enzyme with or without dNTP's could be applied to the solid support before being removed and replaced with the full extension buffer.

**[0059]** Such further rounds of amplification can be used to produce a nucleic acid colony or "cluster" comprising multiple immobilised copies of the single stranded polynucleotide sequence and its complementary sequence.

**[0060]** The initial immobilisation of the single stranded polynucleotide molecule means that the single stranded polynucleotide molecule can hybridise with primer oligonucleotides located at a distance within the total length of the single stranded polynucleotide molecule. Other surface bound primers that are out of reach will not hybridize to the polynucleotide. Thus the boundary of the nucleic acid colony or cluster formed is limited to a relatively local area surrounding the location in which the initial single stranded polynucleotide molecule was immobilised.

**[0061]** Once more copies of the single stranded polynucleotide molecule and its complement have been synthesised by carrying out further rounds of amplification, i.e. further rounds of hybridisation, extension and denaturation, then the boundary of the nucleic acid colony or cluster being generated will be able to be extended further, although the boundary of the colony formed is still limited to a relatively local area around the location in which the initial single stranded polynucleotide molecule was immobilised. For example the size of each amplified cluster may be 0.5-5 microns.

**[0062]** It can thus be seen that the method of the present invention allows the generation of a plurality of nucleic acid colonies from multiple single immobilised single stranded polynucleotide molecules and that the density of these colonies can be controlled by altering the proportions of modified capture/amplification oligonucleotides used to graft the surface of the solid support.

**[0063]** In one embodiment, the hybridisation, extension and denaturation steps are all carried out at the same, substantially isothermal temperature. For example the temperature is from 37° C. to about 75° C., particularly from 50° C. to 70° C., yet more particularly from 60° C. to 65° C. In a particular embodiment the substantially isothermal temperature may be the optimal temperature for the desired polymerase.

**[0064]** In a particular aspect, the method according to the first aspect of the invention is used to prepare clustered arrays of nucleic acid colonies, analogous to those described in U.S. Pat. No. 7,115,400, US 2005/0100900 A1, WO 00/18957 and WO 98/44151 (the contents of which are herein incorporated by reference), by solid-phase amplification.

**[0065]** In yet another aspect more than one capture sequences and more than two amplification sequences, for example, at least three or four or more, different amplification primer sequences may be grafted to the solid support. In this manner more than one library, with common sequences which differ between the libraries, could be utilised to prepare clusters, such as, for example libraries prepared from two different patients. Whilst the cluster may overlap in space, they would be able to be sequenced one after the other due to the differences between the ends of the templates. For example, two different samples can be captured using two different capture sequences. These can be amplified from the same two amplification primers. The samples can be differentiated due to the two different capture sequences, which can be used as the sites for hybridisation of two different sequencing primers. The use of different capture sequences thereby gives rise to a method of sample indexing using different sequencing primers.

**[0066]** Clustered arrays formed by the methods of the invention are suitable for use in applications usually carried out on ordered arrays such as micro-arrays. Such applications by way of non-limiting example include hybridisation analysis, gene expression analysis, protein binding analysis, sequencing, genotyping, nucleic acid methylation analysis and the like. The clustered array may be sequenced before

being used for downstream applications such as, for example, hybridisation with fluorescent RNA or binding studies using fluorescent labelled proteins.

Sequencing Methods

**[0067]** The invention also encompasses methods of sequencing amplified nucleic acids generated by solid-phase amplification. Thus, the invention provides a method of nucleic acid sequencing comprising amplifying a pool of nucleic acid templates using solid-phase amplification as described above and carrying out a nucleic acid sequencing reaction to determine the sequence of the whole or a part of at least one amplified nucleic acid strand produced in the solid-phase amplification reaction.

**[0068]** Sequencing can be carried out using any suitable sequencing technique. A particularly useful method is one wherein nucleotides are added successively to a free **31** hydroxyl group, resulting in synthesis of a polynucleotide chain in the 5' to 3' direction. The nature of the nucleotide added may be determined after each nucleotide addition or at the end of the sequencing process. Sequencing techniques using sequencing by ligation, wherein not every contiguous base is sequenced, and techniques such as massively parallel signature sequencing (MPSS) where bases are removed from, rather than added to the strands on the surface are also within the scope of the invention.

**[0069]** The initiation point for the sequencing reaction may be provided by annealing of a sequencing primer to a product of the solid-phase amplification reaction. In this connection, one or both of the adaptors added during formation of the template library may include a nucleotide sequence which permits annealing of a sequencing primer to amplified products derived by whole genome or solid-phase amplification of the template library.

**[0070]** The products of solid-phase amplification reactions wherein both forward and reverse amplification primers are covalently immobilised on the solid surface are so-called 'bridged' structures formed by annealing of pairs of immobilised polynucleotide strands and immobilised complementary strands, both strands being attached to the solid support at the 5' end. Arrays comprised of such bridged structures provide inefficient templates for typical nucleic acid sequencing techniques, since hybridisation of a conventional sequencing primer to one of the immobilised strands is not favoured compared to annealing of this strand to its immobilised complementary strand under standard conditions for hybridisation.

**[0071]** In order to provide more suitable templates for nucleic acid sequencing, it may be advantageous to remove or displace substantially all or at least a portion of one of the immobilised strands in the 'bridged' structure in order to generate a template which is at least partially single-stranded. The portion of the template which is single-stranded will thus be available for hybridisation to a sequencing primer. The process of removing all or a portion of one immobilised strand in a 'bridged' double-stranded nucleic acid structure may be referred to herein as 'linearization', and is described in further detail in WO07010251, the contents of which are incorporated herein by reference in their entirety.

**[0072]** Bridged template structures may be linearized by cleavage of one or both strands with a restriction endonuclease or by cleavage of one strand with a nicking endonuclease. Other methods of cleavage can be used as an alternative to restriction enzymes or nicking enzymes, including inter alia chemical cleavage (e.g. cleavage of a diol linkage with periodate), cleavage of abasic sites by cleavage with endonuclease (for example 'USER', as supplied by NEB, part number M5505S), or by exposure to heat or alkali, cleavage of ribonucleotides incorporated into amplification products otherwise comprised of deoxyribonucleotides, photochemical cleavage or cleavage of a peptide linker.

**[0073]** Following the cleavage step, regardless of the method used for cleavage, the product of the cleavage reaction may be subjected to denaturing conditions in order to remove the portion(s) of the cleaved strand(s) that are not attached to the solid support. Suitable denaturing conditions, for example sodium hydroxide solution, formamide solution or heat, will be apparent to the skilled reader with reference to standard molecular biology protocols (Sambrook et al., supra; Ausubel et al. supra). Denaturation results in the production of a sequencing template which is partially or substantially single-stranded. A sequencing reaction may then be initiated by hybridisation of a sequencing primer to the single-stranded portion of the template.

**[0074]** Thus, the invention encompasses methods wherein the nucleic acid sequencing reaction comprises hybridising a sequencing primer to a single-stranded region of a linearized amplification product, sequentially incorporating one or more nucleotides into a polynucleotide strand complementary to the region of amplified template strand to be sequenced, identifying the base present in one or more of the incorporated nucleotide(s) and thereby determining the sequence of a region of the template strand.

**[0075]** One sequencing method which can be used in accordance with the invention relies on the use of modified nucleotides having removable **3'** blocks, for example as described in WO04018497, US 2007/0166705A1 and U.S. Pat. No. 7,057,026, the contents of which are incorporated herein by reference in their entirety. Once the modified nucleotide has been incorporated into the growing polynucleotide chain complementary to the region of the template being sequenced there is no free **3'**-OH group available to direct further sequence extension and therefore the polymerase can not add further nucleotides. Once the nature of the base incorporated into the growing chain has been determined, the 3' block may be removed to allow addition of the next successive nucleotide. By ordering the products derived using these modified nucleotides, it is possible to deduce the DNA sequence of the DNA template. Such reactions can be done in a single experiment if each of the modified nucleotides has a different label attached thereto, known to correspond to the particular base, to facilitate discrimination between the bases added during each incorporation step. Alternatively, a separate reaction may be carried out containing each of the modified nucleotides separately.

**[0076]** The modified nucleotides may carry a label to facilitate their detection. A fluorescent label, for example, may be used for detection of modified nucleotides. Each nucleotide type may thus carry a different fluorescent label, for example, as described in U.S. Provisional Application No. 60/801,270 (Novel dyes and the use of their labelled conjugates), published as WO07135368, the contents of which are incorporated herein by reference in their entirety. The detectable label need not, however, be a fluorescent label. Any label can be used which allows the detection of an incorporated nucleotide.

**[0077]** One method for detecting fluorescently labelled nucleotides comprises using laser light of a wavelength spe-

cific for the labelled nucleotides, or the use of other suitable sources of illumination. The fluorescence from the label on the nucleotide may be detected by a CCD camera or other suitable detection means. Suitable instrumentation for recording images of clustered arrays is described in U.S. Provisional Application No. 60/788,248 (Systems and devices for sequence by synthesis analysis), published as WO07123744, the contents of which are incorporated herein by reference in their entirety.

**[0078]** The invention is not intended to be limited to use of the sequencing method outlined above, as essentially any sequencing methodology which relies on successive incorporation of nucleotides into a polynucleotide chain can be used. Suitable alternative techniques include, for example, Pyrosequencing™, FISSEQ (fluorescent in situ sequencing), MPSS and sequencing by ligation-based methods, for example as described in U.S. Pat. No. 6,306,597 which is incorporated herein by reference.

**[0079]** The nucleic acid sample may be further analysed to obtain a second read from the opposite end of the fragment. Methodology for sequencing both ends of a cluster are described in co-pending applications WO07010252 and PCTGB2007/003798, the contents of which are incorporated by reference herein in their entirety. In one example, the series of steps may be performed as follows; generate clusters, linearize, hybridise first sequencing primer and obtain first sequencing read. The first sequencing primer can be removed, a second primer hybridised and the tag sequenced. The nucleic acid strand may then be 'inverted' on the surface by synthesising a complementary copy from the remaining immobilised primers used in cluster amplification. This process of strand resynthesis regenerates the double stranded cluster. The original template strand can be removed, to linearize the resynthesized strand that can then be annealed to a sequencing primer and sequenced in a third sequencing run.

**[0080]** In the cases where strand resynthesis is employed, both strands can be immobilised to the surface in a way that allows subsequent release of a portion of the immobilised strand. This can be achieved through a number of mechanisms as described in WO07010251, the contents of which are incorporated herein by reference in their entirety. For example, one primer can contain a uracil nucleotide, which means that the strand can be cleaved at the uracil base using the enzymes uracil glycosylase (UDG) which removes the nucleoside base, and endonuclease VIII that excises the abasic nucleotide. This enzyme combination is available as USER™ from New England Biolabs (NEB part number M5505). The second primer may comprise an 8-oxoguanine nucleotide, which is then cleavable by the enzyme FPG (NEB part number M0240). This design of primers gives control of which primer is cleaved at which point in the process, and also where in the cluster the cleavage occurs. The primers may also be chemically modified, for example with a disulfide or diol modification that allows chemical cleave at specific locations.

Flow Cells

**[0081]** The invention also relates to flow cells for the preparation of amplified arrays of nucleic acids wherein the flow cells contain a uniform coating of three or more immobilised primers. Thus a substrate described herein can occur within or as a part of a flow cell and the methods set forth herein can be carried out in a flow cell. In contrast to spotted arrays of multiple sequences, the three or more oligonucleotides can be coated over the whole of the array surface rather than in discreet locations that comprise different sequences in each small location. The arrays may be of a size of 1 $cm^2$ or greater whereby the whole 1 $cm^2$ or greater comprises a homogeneous coating of multiple copies of the same three or more sequences. A flow cell can be distinguished from a 'spotted array' or photolithographically synthesised array due to the fact that the oligonucleotides are attached to each and every surface; top, bottom, walls and ends of the flow cell chamber, rather than being an array that is mounted in a housing. However, if desired a flow cell that is used in a method set forth herein can have surfaces with different reactivity for oligonucleotides such that the oligonucleotides are only attached to one or a subset of the aforementioned surfaces or even to only a subset of regions within these surfaces.

**[0082]** The flow cell may be coated with exactly three oligonucleotide species of different sequence composition, namely two amplification primers and a capture primer. The capture primer may be present at a lower concentration than the amplification primer, for example at least 100, 1000 or 100,000 fold lower relative concentration. The two amplification primers may be present at similar ratios to each other, for example varying by less than a factor of two. The capture primers may be longer than the amplification primers, and may comprise the amplification primer sequence region plus a capture sequence region, as shown for example in FIG. **1**. Alternatively or additionally, the amplification primers may be blocked to prevent hybridisation and/or extension.

**[0083]** Although the invention has been exemplified herein for embodiments using nucleic acid species, it will be understood that the same principles can be applied to other molecular species. For example, surfaces of substrates can be derivatized with other synthetic molecules such as peptides, small molecule ligands, saccharides or the like. By controlling the amount of different species of such molecules in the derivatization step, a desired density of each species can result. Samples of molecules that bind to one or more of these solid phase molecules can be used without the need for titrating the samples because the density of molecules from the sample that bind to the surfaces will be controlled by the density of their binding partners on the surface. Accordingly, attachment of molecules from the sample can be controlled thermodynamically in a process that is allowed to proceed to equilibrium as opposed to a kinetic process that requires more precise control of reaction conditions and incubation times. Once bound to the surface the molecules from the sample can be subsequently modified or detected. In such embodiments, the surface can include reversibly modified synthetic molecules such that altering or removing the modification can allow the molecules from the sample to be modified or detected for a particular analytical assay or step.

**[0084]** While the foregoing invention has been described in some detail for purposes of clarity and understanding, it will be clear to one skilled in the art from a reading of this disclosure that various changes in form and detail can be made without departing from the true scope of the invention. For example, all the techniques and apparatus described above may be used in various combinations. All publications, patents, patent applications, or other documents cited in this application are incorporated by reference in their entirety for all purposes to the same extent as if each individual publication, patent, patent application, or other document were individually indicated to be incorporated by reference for all purposes.

**1**. A method of amplifying polynucleotides, comprising:

(a) providing a plurality of oligonucleotides immobilised to a solid support, wherein the plurality of oligonucleotides comprises first oligonucleotide species comprising a capture sequence and second oligonucleotide species comprising an amplification sequence, wherein the first oligonucleotide species are immobilised on the solid support at a lower density than the second oligonucleotide species;

(b) applying a plurality of template polynucleotide molecules to the solid support under conditions wherein the template polynucleotide molecules hybridise to the capture sequence of the first oligonucleotide species but do not hybridise to the second oligonucleotide species;

(c) extending the first oligonucleotide species to generate polynucleotide complements of the template polynucleotide molecules, wherein the polynucleotide complements are immobilised on the solid support; and

(d) amplifying the polynucleotide complements under conditions wherein the polynucleotide complements hybridize to the amplification sequences of the second oligonucleotide species.

**2**. The method of claim **1**, wherein the plurality of oligonucleotides further comprises a third oligonucleotide species.

**3**. The method of claim **2**, wherein the third oligonucleotide species comprises a second amplification sequence.

**4**. The method of claim **3**, wherein the amplifying occurs under conditions wherein the template polynucleotide molecules hybridize to the second amplification sequences of the third oligonucleotide species.

**5**. The method of claim **1**, wherein the first oligonucleotide species is immobilised at a density of at least 1000 fold lower than the amplification sequences.

**6**. The method of claim **1**, wherein the oligonucleotide species is immobilised at a density of $10^6$-$10^9$ copies per $cm^2$.

**7**. The method of claim **1**, wherein the capture sequence is longer than the amplification sequences.

**8**. The method of claim **1**, wherein the second oligonucleotide species comprises a reversible blocking group.

**9**. The method of claim **8**, wherein the reversible blocking group comprises a chemical species attached to the 3' end of the second oligonucleotide species.

**10**. The method of claim **9**, wherein the chemical species is a phosphate group.

**11**. The method of claim B, wherein the reversible blocking group comprises a self-complementary hairpin structure.

**12**. The method of claim **11**, wherein the second oligonucleotide species is cleaved after extension of the capture sequence, thereby removing the self-complementary hairpin structure from the amplification sequence on the solid support.

**13**. The method of claim **1**, wherein the amplification is isothermal.

**14**. The method of claim **13**, wherein the isothermal amplification comprises cycles of polymerase extension and chemical denaturation.

**15**. The method of claim **1**, wherein the template polynucleotide molecules that are applied to the solid support are single stranded.

* * * * *

# EXHIBIT C

REVIEW

nature biotechnology

# The challenges of sequencing by synthesis

Carl W Fuller[1], Lyle R Middendorf[2], Steven A Benner[3], George M Church[4], Timothy Harris[5], Xiaohua Huang[6], Stevan B Jovanovich[7], John R Nelson[8], Jeffery A Schloss[9], David C Schwartz[10] & Dmitri V Vezenov[11]

**DNA sequencing-by-synthesis (SBS) technology, using a polymerase or ligase enzyme as its core biochemistry, has already been incorporated in several second-generation DNA sequencing systems with significant performance. Notwithstanding the substantial success of these SBS platforms, challenges continue to limit the ability to reduce the cost of sequencing a human genome to $100,000 or less. Achieving dramatically reduced cost with enhanced throughput and quality will require the seamless integration of scientific and technological effort across disciplines within biochemistry, chemistry, physics and engineering. The challenges include sample preparation, surface chemistry, fluorescent labels, optimizing the enzyme-substrate system, optics, instrumentation, understanding tradeoffs of throughput versus accuracy, and read-length/phasing limitations. By framing these challenges in a manner accessible to a broad community of scientists and engineers, we hope to solicit input from the broader research community on means of accelerating the advancement of genome sequencing technology.**

© 2009 Nature America, Inc. All rights reserved.

npg

Attaining the Human Genome Project goal of sequencing the human genome and rapidly and publicly disseminating the data was a milestone in human biomedical research that was enabled by scientific, technical and cultural innovation. Central to the project's success was the development of robust, automated methods and technologies to identify the linear sequence of nucleotides. Recognizing the opportunities to use dramatically expanded sequencing technology in the subsequent phase of genomics research, in 2004 the National Human Genome Research Institute (NHGRI) of the National Institutes of Health (NIH) initiated a funding program with a goal of reducing the cost of genome sequencing to ~$1,000 in 10 years, with an intermediate goal of $100,000 by the end of 2009 (ref. 1; http://grants.nih.gov/grants/guide/rfa-files/RFA-HG-04-003.html). Numerous grant awards have been made in this program (http://www.genome.gov/10000368), which has stimulated a strong record of publications and patents and the successful commercialization of several second-generation sequencing platforms now in active use worldwide (e.g., https://www.roche-applied-science.com/sis/sequencing/index.jsp, http://www.illumina.com/pages.ilmn?ID=204, https://products.appliedbiosystems.com/ab/en/US/adirect/ab?cmd=catNavigate2&catID=604416, http://www.polonator.org/ and http://www.helicosbio.com/) with others in the wings (http://www.pacificbiosciences.com/, http://visigenbio.com/, http://www.intelligentbiosystems.com/ and http://www.completegenomicsinc.com/technology). At annual grantee meetings, open discussions of advances and challenges have stimulated collaboration and considerably accelerated research.

Several peer-reviewed articles have identified the strengths and limitations of commercial SBS platforms from a user's perspective[2–13] (for reviews, see refs. 5,14–16) and an assessment of the challenges facing nanopore sequencing has recently been published[17]. Here, we present current views of some of the investigators who received the technology development grants mentioned above on the underlying limitations and challenges of next-generation sequencing, with the goal of informing and engaging the broader research and engineering communities. Successful engagement requires the cross-pollination of ideas from experts across various disciplines to develop and identify solutions, as few scientists and engineers, including all but the most sophisticated users and active developers of technology, understand the full complexities of seamlessly integrating instrumentation, reagents and protocols necessary to promote scientific discovery.

## SBS platforms

A common SBS strategy is to use DNA polymerase (**Fig. 1**) or ligase enzymes to extend many DNA strands in parallel. Nucleotides or short oligonucleotides are provided either one at a time or modified with identifying tags so that the base type of the incorporated nucleotide or oligonucleotide can be determined as extension proceeds.

SBS strategies may be categorized as either single molecule–based (involving the sequencing of a single molecule) or ensemble based (involving the sequencing of multiple indentical copies of a DNA molecule, typically amplified together on isolated surfaces or beads). They may be real-time (that is, with a free-running DNA polymerase given all nucleotides required) or synchronous-controlled (that is, using a priori temporal information to facilitate the identification process in a 'stop-and-go' iterative fashion). This can be achieved by using nucleotide substrates that are reversibly blocked or by simply adding only a single kind of nucleotide (e.g., dATP) at a time.

[1]GE Healthcare Life Sciences, Piscataway, New Jersey, USA. [2]LI-COR Biosciences, Lincoln, Nebraska, USA. [3]Foundation for Applied Molecular Evolution, Alachua, Florida, USA. [4]Harvard Medical School, Boston, Massachusetts, USA. [5]Howard Hughes Medical Institute, Janelia Farm Research Campus, Ashburn, Virginia, USA. [6]University of California, San Diego, La Jolla, Californi, USA. [7]Microchip Biotechnologies Inc., Dublin, California, USA. [8]General Electric Global Research Center, Niskayuna, New York, USA. [9]National Human Genome Research Institute, NIH, Bethesda, Maryland, USA. [10]University of Wisconsin-Madison, Madison, Wisconsin, USA. [11]Lehigh University, Bethlehem, Pennsylvania, USA. Correspondence should be addressed to C.W.F. (carl.fuller@alumni.upenn.edu).

Published online 6 November 2009; doi:10.1038/nbt.1585




**Figure 1** Schemes for SBS. Approaches include both single-molecule and ensemble methods requiring features populated with identical copies of DNA fragments. Ensemble methods monitor synthesis either using labeled substrates or detecting products of synthesis (pyrophosphate). Detection can be discontinuous (sequential) when labels can remain fixed for hours while a microscope scans up to hundreds of millions of sequence features[26,32]. It may also be continuous (simultaneous) as in the case where pyrophosphate, which can diffuse from the region of synthesis, is detected[23]. Similarly, single-molecule methods can be detected in a discontinuous (sequential) scanning mode[24] or continuous (simultaneous) mode by constant observation of synthesis of single molecules using labeled substrates[19,22]. The discontinuous scanning methods can take advantage of very large numbers of sequence features to assemble genome sequences from relatively short reads of 25–100 bases. The continuous-detection schemes read less than a million features but can achieve read-lengths of 3,000 or potentially more bases.

© 2009 Nature America, Inc. All rights reserved.

Real-time SBS requires identification of the newly incorporated nucleotide ‘on-the-fly’ without interrupting the synthesis process. The method requires the use of optical or physical confinement to distinguish free-solution tagged nucleotides from those bound and involved in synthesis[18–22]. **Table 1** shows the general approach used by several selected commercial platforms.

Synchronous-controlled approaches include pulsing the delivery of the nucleotide substrates (dNTPs) one at a time[23,24] or temporarily limiting extension using modified nucleotides, such as nucleotide reversible terminators (NRTs)[25–31], or cycling oligonucleotides[32,33] or omitting metal catalysts ($Mg^{2+}$ or $Mn^{2+}$)[34,35] during enzymatic labeling, followed by washing away excess reactants and imaging while synthesis is stopped. When only one of the four dNTP types is presented at a time, the mere fact that synthesis has taken place is sufficient to determine sequence. This can be done with relatively simple single-color fluorescence optics[24] or with coupled-enzyme chemiluminescence assays for pyrophosphate[23,36]. When all four types of dNTP are present at once, more complex, differential tagging schemes, usually with different fluorescence wavelengths to discriminate among the bases, must be used[19–22,27–32].

## Challenges to SBS

Single molecule–based SBS and ensemble-based SBS face different problems. The former requires unique attention to such challenges as fluorescent labels, optics and instrumentation, whereas the latter requires further understanding of how phasing (that is, maintaining synchronous synthesis among all the identical templates of the ensemble) limits read-length.

These technical challenges have been accommodated to varying degrees in commercially available systems. The specifications of these systems, costs to use them and challenges to applying them to the production of particular biological data sets are under constant review[16] (**Box 1**). The success of companies in further enhancing the performance of their existing second-generation systems may well take place without the need to identify the challenges to the broader community of scientists and engineers. However, their ability to introduce third-generation sequencers may be predicated on how they address and solve many of the technical challenges through fundamental, innovative advances.

We detail below the technical challenges identified by NIH/NHGRI grantees as being associated with SBS. These include sample preparation, surface chemistry, fluorescent labels, optimizing the enzyme-substrate system, optics, instrumentation, understanding tradeoffs of throughput versus accuracy and read-length/phasing limitations (for additional challenges, such as data management and error correction, the reader is referred to recent reviews on sequence assemply[37] and mapping[38].

## Sample preparation

With the development of relatively efficient enzyme, substrate and detection combinations, a potential cost bottleneck is the multistep sample preparation process. For ensemble-based SBS, sample preparation generally involves extraction and purification of DNA from tissues or other samples, fragmentation of the DNA, the repair of frayed ends in a polishing step, addition of adapters with ligases or transferases for solid-phase attachment and polymerase priming, and the clonal DNA amplification of a single DNA molecule to generate an ensemble containing thousands to millions of identical copies of the DNA molecule, bound to a surface in a localized packet (**Fig. 2**).

Several novel amplification techniques have been introduced, including the following: polony technology[33,39,40]; beads, emulsion, amplification magnetics (BEAM)[41]; emulsion polymerase chain reaction (emPCR)[23,42–44]; a cloning strategy developed for massively parallel signature sequencing (MPSS)[45]; and the PCR bridge amplification scheme[46,47]. The labor costs for these steps, which are borne by the user, have not been thoroughly addressed by system providers, especially if gel purification (as in paired-end tag libraries[33]) or emulsion formation are required. Efforts to automate as many steps as possible are underway. The amount of sample needed rises linearly with distance between paired-ends. Although pre-amplification has the disadvantages of being subject to contamination and the potential to introduce bias into a DNA library, its use has enabled successful sequencing with as little as 2 femtograms input (equivalent to a small bacterial genome molecule or 0.03% of a human diploid genome) with less than one amplification error per 100,000 base pair (bp)[48,49].

Rolling circle amplification (RCA) and multiple displacement amplification have also been used to prepare samples for SBS and other sequencing techniques[50–52]. To be efficient, these methods require displacement of the nontemplate strand. For circular templates smaller than ~100 nucleotides, displacement occurs spontaneously[53–55], but for larger DNA circles, it is preferable to use elevated temperatures or the DNA polymerase from bacteriophage Phi 29 (refs. 50,52,56–58). Phi 29 DNA polymerase has the ability to processively displace the nontemplate strand while replicating the template strand thousands of times. It also has proofreading activity and thus high fidelity. Overall signal strengths have also been improved by combining RCA with emPCR[51].

Ensemble-based SBS has the additional costs of library construction, single-molecule manipulation, amplification and associated technical

**Table 1 Selected SBS platforms**

| Synthesis strategy | Company | Platform | Colors | Sequencing process | Amplification | Enzyme |
|---|---|---|---|---|---|---|
| Real-time | Pacific Biosciences | Zero-mode waveguide array | 4 | Continuous polymerization of labeled dNTPs | Single molecule | Polymerase |
| | Life Technologies; Visigen | Array of polymerase complexes | 4 | Continuous polymerization of labeled dNTPs | Single molecule | Polymerase |
| Synchronous-controlled | Life Technologies; ABI | SOLiD | 4 | Ligation of labeled 5 nt oligos | Yes, emulsion PCR | Ligase |
| | Danaher; Dover | Polonator | 4 | Ligation of fluorescently labeled 9 nt oligos | Yes, emulsion PCR | Ligase |
| | Illumina | Genome Analyzer | 4 | Polymerization using fluorescently labeled, reversibly terminating dNTPs | Yes, bridge amplification | Polymerase |
| | Roche; 454 Life Sciences | Genome Sequencer FLX | 1 | Polymerization of dNTPs added singly, luminescence detection of pyrophosphate | Yes, emulsion PCR | Polymerase |
| | Helicos | Heliscope | 1 | Polymerization of fluorescently labeled dNTPs added singly | Single molecule | Polymerase |
| Asynchronous with base-specific terminators | Various; requires high-resolution electrophoresis | Sanger dideoxy-sequencing | 1, 4 | Polymerization of fluorescently labeled ddNTPs with unlabeled dNTPs | Yes, clones or PCR | Polymerase |

ddNTP, 2',3'-dideoxy-nucleotides.

© 2009 Nature America, Inc. All rights reserved.
npg

problems (e.g., PCR amplification errors). Although extremely powerful, the multistep sample preparation and the clonal DNA amplification scheme are done manually and are very labor intensive. The complex workflow for ensemble-based SBS typically includes several enzymatic steps interspersed with cleanup steps using a spin column or beads. Mistakes at any step can ruin the preparation, and if not caught by the quality control checks, can waste not only the sample preparation reagents but also the downstream SBS reagents and instrument time. The sample preparation costs include several days of intense work by a well-trained researcher to prepare one to four libraries as well as the costs of kits (~$300 in reagents just for library construction and emPCR kits). In addition, the laboratory infrastructure requirements are significant, particularly when library construction is sensitive to contamination and necessitates work in a high-efficiency particulate air filtered hood or room and separate pre-amplification and post-amplification rooms.

A downside of ensemble-based SBS architectures is that sample preparation passes the analyte molecules through a single-molecule stage, only then to re-amplify them. The amplification from single molecules makes the process sensitive to amplification errors and products must be strictly isolated to reduce contamination of other libraries under construction. In addition to equipment routinely found in molecular biology laboratories, sample preparation involves quantitative PCR instrumentation, a fluorometer, a Bioanalyzer (Agilent Technologies) and a particle counter as well as other assorted supplies and reagents. Although challenging and still expensive, the process is successfully performed in research laboratories and improvements in methodology and automation are being addressed by both commercial suppliers and academic laboratories.

Single molecule–based SBS architectures that can acquire sequence information directly from individual DNA molecules without amplification[59] may reduce the sample preparation challenges, but introduce other problems for detection and resolution (see 'Optics challenges'). At first glance, the preparation of sample templates for single molecule–based SBS appears simple. But as with ensemble-based SBS, steps must be taken to provide DNA that is free from proteins or other contaminants. The collection of DNA fragments must provide full representation of the genome to be sequenced in fragments that both have usable ends, linkers or priming sites and are in the necessary size range. Furthermore, surfaces must be neither overpopulated nor underpopulated with template fragments. As with ensemble-based SBS, this requires careful control of the amount and size of DNA applied to the apparatus. Ideally, a surface could be devised that has properly spaced sites where single molecules of templates can be immobilized. Such a surface may increase the density of productive templates over a slide by two- to fourfold, and be immune to overloading (see also 'Surface chemistry challenges').

Widespread clinical applications will likely require streamlined, robust sample preparation techniques for supporting typical clinical loads. A 2-day sample preparation time by itself may restrict clinical applications and the ultrahigh throughput of gigabases of data per run must be matched to clinical needs, which may be for only thousands of bases of sequence per patient. One option would be an effective technology to judiciously add sequence tags to the fragments of several different samples, then combine and process the DNA samples (encoding and binning) together, separating the resulting sequences by their tags in the computer analysis phase[60]. This reduces the inefficiencies of ensemble-based SBS architectures (e.g., when abundant DNA is available to be sequenced as is the case when the patient is at hand). Any approach that directly sequences genomic DNA samples might offer a rapid and economical path to routine sequence-based clinical analysis. Additional challenges to overcome by sample preparation strategies include the following: first, handling double (or multiple) sequences due to diploidy and/or cross-hybridization of multigene family members; second, optimizing for the hybridization kinetics of single-copy genes; third, maintaining long-range haplotype information[48]; and four, generating binning reagents that give uniform yields (e.g., genome-tiling oligonucleotides).

Meeting the challenges of SBS sample preparation for research or clinical applications, regardless of whether the approach is ensemble-based or single molecule–based, will benefit from reducing costs and volumes of the biochemistry and automating the processes, thus eliminating the need for highly skilled molecular biology technicians. The throughput of the analysis portion must be matched by individual sample preparation instruments or banks of instruments. Applying massively parallel SBS methods to medical samples will require an affordable (e.g., $1,000) full genome or sequencing only specific regions of the genome (e.g., the 1% coding regions) from multiple patients together. Approaches to selecting

© 2009 Nature America, Inc. All rights reserved.

## Box 1 How improvements impact cost

Because the technical challenges of SBS are not independent of one another, it is difficult to assign a metric that would identify how improvements for a particular challenge might affect overall system goals, such as increased throughput, lowered cost and reduced error rate. For example, polymerase incorporation rates of dNTP analogs and the bandwidth of the output amplifier on a CCD camera monitoring the real-time incorporation both affect throughput and one or the other may limit the sequencing rate[108]. Ultimately, information theory describes the overall relationship between throughput and accuracy and design teams are well advised to understand the theoretical limitations imposed by information theory and how throughput and accuracy create design trade-offs[84–103,106–108]. An example of this kind of trade-off is found in nature, which has optimized the coding for amino acids with nucleotide triplets[110].

Notwithstanding information theory, one can cautiously make some estimates of the impact of improvements in one challenge area by assuming 'ideal world' performance in the other challenge areas. Bifurcating between consumables (e.g., reagents and flow cells) and instrumentation can be a first-order approach to prioritizing the technical challenges with respect to cost. For example, ignoring consumable costs, a prediction of costs associated with the instrument (including purchase price, depreciation schedule, service contract pricing, performance-upgrade pricing and downtime) can be merged with various system throughput and accuracy targets to generate an estimated genome equivalent cost.

For the sake of illustration—without reflecting on the specifications of current commercially available next-generation sequencers—a $365,000 instrument with a depreciation lifetime of 5 years, with no service contract or upgrade costs, and with no downtime or bad samples, would cost $200 per day to run. If the throughput is 10 raw gigabases per day, and tenfold redundant sequencing is required for acceptable accuracy, then a 3 gigabase genome equivalent would cost $600 (not including consumable costs) and take 3 days. In contrast, a $500,000 instrument with a depreciation lifetime of 5 years and a $10,000 per year service contract but with free upgrades, 10% downtime, 3 gigabase per day throughput and 30× redundant sequencing, a 3 gigabase genome equivalent would cost $10,000 (not including consumable costs) and take 33 days. Through 'crystal-ball' spreadsheet analysis, one can project how instrument-related costs such as manufacturing costs (parts, labor and overhead) or the instrument robustness (which contributes to downtime costs as well as service contract costs), can directly affect the genome equivalent cost as well as the sequencing throughput.

appropriate subsets of genome sequence by hybridization capture or targeted circularization have already appeared[61,62]. Additional challenges include extending the length of clonally amplified DNA, minimizing sample preparation reagent and equipment costs, preventing cross-contamination, and barcoding[63] when using multiple patients' samples. Library and amplification reactions, whether done in multiwell plates or flow cells, typically occur in small microliter volumes and thus reagent costs should be similar to conventional molecular biology reagent costs (e.g., $1 per reaction step). Opportunities exist for using single cells and even '*in situ* tissues' as RNA or DNA sources.




**Figure 2** Sample preparation includes arraying individual fragments of DNA on beads or other solid surface. For ensemble methods the fragments are amplified, providing a collection of identical copies for sequencing.

### Surface chemistry

Surface chemistry strategies arise from the critical interface between the sequencing biochemistry and detection. Trade-offs or compromises between the ideal characteristics of these two design elements require close communication and understanding among the molecular biologists, the chemists and the optical and mechanical engineers of the design team. All SBS schemes involve the use of surface-bound components that provide a means for parallel synthesis of DNA molecules, either singly or as ensembles of identical sequences (**Fig. 3**). The surfaces also provide a structure for optimizing imaging, and for flowing-in substrates and removing products. Surfaces used include flat slides, beads and specialized fabricated structures (e.g., waveguides and microfluidic channels)[18,19].

The challenges of surface chemistry include providing surfaces compatible with enzymatic processing of nucleotides along with the DNA, eliminating stray 'sticking' of dye molecules and maximizing the density of SBS features over the surface. For this reason, structures are typically coated with a hydrophilic, functional surface layer, like those used for microarrays, designed to tightly or covalently bind the molecules of interest (to minimize loss of molecules and thus of signal) but to be inert to binding other materials during sequencing. These aspects of surface chemistry are even more important in single-molecule forms of SBS[18,19,64]. To immobilize single polymerase enzyme molecules in the bottom of zero mode waveguides, a surface coating was developed that sticks to the metal sides of the waveguide and repels proteins but doesn't coat the glass floor of the waveguide chamber[19]. In addition, the topology of surfaces for holding the growing chains of SBS experiments can influence the density of chains distributed within the imaging area of the instrument, directly influencing imaging efficiency.

The surfaces of slides or specialized structures are commonly treated with silanes, polyethylene glycol, pluoronics, proteins or other surface-modifying agents to produce highly uniform, biocompatible surfaces[21,46,59] because they must both anchor biomolecules and ensure enzymatic activities. These chemistries inherently do not have

well-defined stoichiometry and attaining reproducibility may require substantial optimization whenever any change is made in the surface chemistry, the biochemistry or the detection conditions.

Another challenge in managing surfaces for both single molecule–based and ensemble-based SBS relates to the effective use of geometry, which in turn relates to the cost and speed of the imaging system. Primers, target DNA or polymerase are distributed, often at random, across two dimensions to a surface, with Poissonian statistics driving the throughput trade-off between lower-density populations of DNA-polymerase complexes versus spatial aliasing of overpopulated surfaces. This often results in densities less than a third of that which is maximally resolvable. Resolving this challenge requires surface chemistry strategies that enable ordered, closely packed arrays with better density than random attachment or directed nonrandom placement of DNA-polymerase complexes[19].

Resolving the challenges specific to single molecule–based SBS requires surface chemistry that eliminates stray sticking of dyes, enzymes or DNA and improved ways of obtaining high-density distributions of single molecules of target DNA. For ensemble-based SBS methods, the accumulated experience with microarray technology makes it easier to build useful arrays of DNA molecules suitable for manipulation and detection. Small beads[32–34,45,65,66] provide one convenient method for the rapid assembly of high-density arrays to provide the necessary solution to interfacing the sequencing biochemistry and the detection. In methods involving both beads and slides, the surface chemistry of the beads needs to be optimized to prevent nonspecific binding between the relatively large bead and the slide surface, yet allow the bead to approach the surface to bind with DNA[22].

Several of the above challenges arise because the molecular presentation approaches work hand in hand with detection schemes that are currently bound by resolution limits of light microscopy. The trade-off between biochemistry and detection may be addressed by more efficient SBS systems that use radically different detection schemes such as electronic read-out techniques that are engendered within the same sequencing device.

## Fluorescent labels

The commercial introduction of several ensemble-based SBS systems makes it clear that the fluorescent dyes used for electrophoretic sequencing and microarrays are well suited for ensemble-based SBS. With much more limited commercial experience with single molecule–based SBS systems, there still may be a need for careful choice of dye tags when every relevant single molecule needs to be detected. Failure to detect a single dye molecule may result in a deletion error (false negative) and detection of a stray molecule may similarly result in an insertion error (false positive).

Single molecule–based SBS approaches require the sensitive and versatile detection offered by fluorescent labels. Some schemes require four distinct fluorescent labels[26,32,50], each detected at a different wavelength. Others get by with a single fluorescent tag[23,24] or rely on additional dyes used in energy-transfer schemes[2]. In all cases, the choice of dye is largely dictated by sensitivity of the optical system, in particular the detector. Because detection can involve complex design trade-offs with respect to dye characteristics, it is important to identify suitable dyes as early as possible in the design process of single molecule–based SBS.

With fluorescence, suitability of a particular dye is a matter of at least a half-dozen characteristics beyond simple quantum efficiency. These characteristics include the ability to capture excitation photons (of the wavelength available in the instrument), rapid release of emitted photons, quantum efficiency and photostability. The efficiency of capturing photons of the excitation wavelength is conventionally expressed as the




**Figure 3** Surface chemistry. Surfaces may assist in producing optically resolvable sites for sequencing and must be compatible with the enzymes used for synthesis. Nonspecific binding of labels must also be minimized.

extinction coefficient or molar absorptivity, and varies with wavelength. For example, the molar absorptivity of fluorescein at 488 nm is about 80,000 $M^{-1}cm^{-1}$. This value is sufficient for sensitive measurements and there are several families of dyes (e.g., the cyanine dyes) with two- to threefold greater molar absorptivity[67].

Once a photon is captured by a fluorescent dye, it remains in the excited state for a characteristic period of time (the fluorescence lifetime of the dye), which can range from nanoseconds to milliseconds. For applications like single molecule–based sequencing, where data collection must be completed quickly and a large number of photons must be collected to distinguish the different dyes, lifetimes of less than about 5 ns are preferred. With adequate illumination, a single dye molecule can cycle between the ground and excited states millions of times per second, providing a sufficient number of emitted photons for reliable detection within a few milliseconds.

The photostability of a dye, particularly when performing single-molecule detection, is more difficult to predict based on its structure. Because the dye molecules will reside for a substantial fraction of the time in the excited state, when a high photon flux is needed, the stability of the excited state becomes critical. Some dyes will cross over from the excited state to a long-lived triplet state, during which no photons are emitted. Other dyes may lose activity by isomerizing while in the excited state. When these two processes are reversible, single molecules of dye can appear to 'blink' off and on during extended observation periods and may result in sequence errors. Therefore, for single molecule–based SBS, where every fluorophore counts, fluorophore purity and storage conditions are also crucial. 'Dead' or bleached fluorophores (duds) and blinking are not an issue with ensemble-based SBS; however, for single molecule–based SBS, bleaching and blinking would cause false negatives unless multiple fluorophores can be used[43]. Fortunately, the frequency of crossing over to triplet states is usually very low and isomerization can be avoided by designing dyes with rigid structures.

For single molecule–based SBS, contamination of labeled dNTPs by unlabeled dNTPs (e.g., impurities or hydrolysis products) is another potential source of false negatives. For phosphate-labeled dNTP substrates, a phosphatase can be used before or during the sequencing reaction to convert background unlabeled dNTPs to nucleosides (which are not substrates for polymerases) while not affecting the desired, phosphate-labeled dNTPs[21,68].

Perhaps the greatest challenge is the elimination of stray signals from dye molecules that stick to the sequencing surfaces. Efforts to make surfaces more uniform and nonattractive to dyes may be required. In addition, the dye parameters (e.g., charge or hydrophobicity) need to be carefully chosen during dye design to avoid ionic attraction or promote

© 2009 Nature America, Inc. All rights reserved.
npg




**Figure 4** Enzyme substrate system. Although the enzymology of DNA synthesis is well understood, modified building blocks must be used for labeling and controlling the rate of synthesis. For example, labels have been attached to nucleotides at the phosphates, the sugars and the bases to get suitable activity. This is illustrated here for a single-molecule real-time SBS method. The polymerase is modified by attachment to substrate, and the nucleotides have fluorescent tags attached to the phosphates. Reprinted with permission from Pacific Biosciences.

© 2009 Nature America, Inc. All rights reserved.

repulsion from as many surfaces as possible without interfering with enzyme functionality.

### The enzyme-substrate system

SBS is based on the stepwise enzymatic synthesis of DNA (or potentially RNA) complementary to the template DNA to be sequenced (**Fig. 4**). For a subset of polymerase-based SBS approaches, the identity of a template base is determined by observing the stepwise addition to the synthesized DNA strand of a labeled dNTP substrate complementary to that template base (pyrosequencing SBS approaches use a polymerase in conjunction with unlabeled dNTP substrates with the template base identified by quantitatively assaying pyrophosphate release). When using a polymerase with a labeled dNTP substrate system, the label needs to be removed or deactivated (e.g., photobleached) once it is detected, so that the next stepwise addition can be observed without background. This requirement for efficient removal has led to the development of schemes in which immobilized templates or enzymes are used, with substrates and products flushed in and out of the system, in a process synchronously coordinated with detection. To obtain long read-lengths using ensemble-based SBS, repeated additions must be accommodated with virtually 100% stepwise yields so that chain extension is synchronous over all the molecules of the sample. This includes both the enzymatic addition and any subsequent chemical, enzymatic or photolytic steps that may be needed to unblock the substrate or remove the dye for the next addition.

This need for rapid, nearly quantitative activity means that sequence determination depends on the characteristics of the polymerase enzyme and the tagged and often blocked (e.g., by 3′ modification) dNTP substrates used for chain extension. The relative activity between the polymerase and the dNTP substrates depends on the nucleotide base, the tags and linker, the template sequence context, the presence of competing nucleotides or reaction products and reaction conditions. It may also be affected by the practice of adding a single nucleotide rather than a mixture of all four. This may increase the incidence of misincorporation, and additional analysis may be needed to properly interpret the data[22,23]. Optimizing a sequencing scheme may require exploration of the kinetics of several polymerases under a range of conditions for each tagged nucleotide and with a range of template sequences. Nucleotides and polymerases that appear to work well in isolation may not do so when used in combination (C.W.F., unpublished data).

With a nearly infinite variety of reaction conditions, dyes, linkers and blocking groups potentially available for the four dNTP substrates, one must choose a limited, compromise subset for testing new enzymes and other system components. Although full optimization in such a large experimental space may not be possible, a variety of modified nucleotides have been used successfully for DNA sequencing with polymerases including ones labeled or modified on the base[24–30,68–70], sugar[25–29,71–74] and phosphate[34,64,75–80]. A few principles can be used as guides to optimization, but in general polymerases are remarkably tolerant to modifications of the substrate nucleotides. For example, attaching a dye through linker arms to the major-groove side of the nucleoside base usually affects activity with polymerase by less than one order of magnitude, depending somewhat on the net electrostatic charge of the dye and linker. Modifications on the phosphate are also remarkably well tolerated and several sequencing schemes have been developed to take advantage of this architecture[19,22,68]. Thus, it is reasonable to collect a number of polymerases and modified nucleotides and test them under a variety of reaction conditions, paying particular attention to reaction rates and yields.

Whereas it may be more challenging to obtain novel polymerases than to synthesize labeled nucleotides, many different DNA polymerases have already been isolated and studied, and they are available for experimentation. Because they are useful for sequencing, amplification and cloning, many diverse polymerases are available commercially as well. There are even some generalized observations that can facilitate optimization. First, most polymerases have exonuclease activity (exo$^+$). Although these exo$^+$ polymerases are essential for repair and high-fidelity DNA replication, the exonuclease activity is usually detrimental to sequencing. Fortunately, the active site for nuclease catalysis is typically distinct from the polymerase site and can be readily recognizable in primary sequence. Inactivation of the exo$^+$ site can then usually be achieved by simple, directed mutagenesis or deletion. Many commercially available DNA polymerases and reverse transcriptases have reduced exonuclease activity (exo$^-$); these should be among the first ones tested with any modified nucleotide.

Several polymerase-based SBS schemes (e.g., synchronous-controlled SBS) require using blocking groups that allow the addition of a single nucleotide at a time. Of particular interest in these schemes is the deoxyribose sugar because it is part of the backbone chain of DNA. A hydroxyl group at the 3′ position of the sugar is required for further extension of the nascent chain so this position is ideal for blocking extension after each addition. The activity of most DNA polymerases is reduced by more than 10,000-fold simply by replacing the 3′-hydroxyl of dNTP with a hydrogen (resulting in a 2′,3′-dideoxy-nucleotide). Similar responses are observed when the 3′-hydroxyl group is replaced by larger groups or when the 2′ position is altered. One exception to this general rule is the well-known activity of T7 DNA polymerase with 2′,3′-dideoxy-nucleotides. This polymerase has the hydroxyl of a tyrosine in the binding site of the nucleotide[73,74] instead of the consensus phenylalanine. This change compensates for the lack of an oxygen atom at the nucleotide 3′ position.

Even with relatively simple activity assays, the process of finding the critical tyrosine amino acid and verifying its importance for T7 DNA polymerase was a difficult and time-consuming task. Although this single amino acid change provides a very useful benefit, it is much more likely that the selection of polymerases with improved functionality with other modified nucleotides will require multiple amino acid changes and result in more gradual improvements in activity. Strategies for creating libraries of mutated polymerases with improved properties for using other modified nucleotides may require a combination of both random and directed steps[81]. In addition, a survey of reaction conditions involving dNTP concentration, metal choice ($Mg^{2+}$ or $Mn^{2+}$), metal concentration, pH, operating temperature and salts (particularly ammonium and sulfate) should be done so that beneficial changes are not overlooked. Fidelity and lack of terminal transferase functionality are also critical to successful polymerase selection. Polymerases with faster catalytic rates could increase both the speed and the phasing efficiency of ensemble-based SBS reactions by increasing the percentage of templates going to completion on each cycle.

Ligase-based SBS architectures pose similar optimization issues, but because an oligonucleotide can be tagged far from the 5′ phosphate position where the reaction takes place, specific interactions between tags, blocking groups and ligase may not arise. Fewer DNA ligases are available on the commercial market, but some from bacteria, archaea and bacteriophage are available for testing. Because SBS that involve ligation use a diverse mix of 6-mers to 9-mers, efforts to get the enzyme substrate pairs to be more uniform in catalysis with respect to melting temperature (or GC content) could reduce errors or increase speed[33,63]. As with polymerization, the most important criterion is to maintain near-quantitative yields so that all the copies of a template in a feature remain in phase so that read-length and accuracy are not compromised.

© 2009 Nature America, Inc. All rights reserved. npg

## Optics

The optical detection limits for real-time and synchronous-controlled SBS sequencing differ as do methods based on single-molecule detection compared with ensemble-based approaches. To date, single-molecule methods require high (>1.3) numerical aperture (NA) microscope objectives for detection to compensate for the limited emission and high speed. The maximum useful field of view is ~2,000 pixels diameter. A four megapixel camera captures all available image area and the camera read rate determines the ultimate throughput. For the preferred commercially available electron multiplying charge-coupled device (CCD) cameras, current limits are 1 megapixel size and 35 million pixels per second read rates. One bottleneck related to the read rate is the bandwidth of the output amplifier on the CCD camera. Synchronous-controlled methods rely on a moving stage to sequentially acquire many thousand fields of view, so stage move and stop times also become critical. For synchronous, single-molecule methods, the objective field of view limit remains important. For synchronous, ensemble-based methods, collection optics with lower NA and much larger fields of view can be used. For example, a commercial f#/1 (NA = 0.5) 4 × 5 camera lens has a field of view >40,000 pixels wide, far beyond any single element camera chip. Going forward, improvements in molecule emission (photons per second and photobleaching limits), camera size and read rate, collection optics efficiency and field of view, and stage move times will all affect sequencing rate in the complex parameter space of sequencing performance.

Throughput for all the above methods is improved if fewer pixels per sequencing site can be used. Random arrays 'consume' ~100 pixels per sequencing site. New CCD camera technology that would allow the simultaneous detection of one million sequencing sites would need to have ~20 million pixels for zero-mode waveguide technology. This assumes approaching the theoretical limit of random distribution in which 37% of waveguides are loaded with exactly one enzyme molecule[19]. With array assembly methods enabled by micro- and nanofabrication technology, it may be feasible to array the DNA samples such that the spacing and geometry of the individual DNA templates match the resolution of the imaging lens, excitation pattern and the camera to dramatically increase the imaging and data acquisition efficiency[62,65]. It is currently feasible to image each DNA template with only four pixels (X.H., unpublished data). Further imaging improvements may enable detection of each template with only one pixel. However, when using fluorescently labeled dNTPs with four different wavelength spectra, reducing chromatic aberration in the optics to achieve this resolution may introduce considerable cost, depending on the wavelength separation. Substantially overlapping fluorescence spectra and the potential of chromatic aberration may compromise read accuracy. New far-field optics, such as synthetic aperture optics[82,83] that enable optical scanning of a very large area of arrays without the use of mechanical stages may also enable rapid excitation for sequence readout.




**Figure 5** Read-length and phasing. For ensemble sequencing methods, thousands of identical copies of a DNA sequence are synthesized together. Whenever synthesis lags behind or steps ahead, signal is lost and background increases. Ultimately, this limits the length over which synthesis can be read.

Successfully combining an increase in the detection area containing thousands of sequencing sites along with an increase in the percent usable chip area may promise to increase SBS throughput while maintaining data quality. But the engineering required is not trivial and is ultimately subject to limits imposed by information theory, as the task of fluorescence systems is to transduce the stochastic (uninformative) photons emitted by a light source into ordered (informative) photons. Information theory imparts, for a given set of engineering design parameters and fluorescent dye characteristics, a relationship among input power, sampling bandwidth, throughput and accuracy. Certainly increasing the input power should increase the signal-to-noise ratio, and thus the overall throughput for a given accuracy. This can be done by merely adding more sequencing instruments (which adds cost proportionally) or by increasing the laser power in a given sequencing instrument, which will increase the rate of photobleaching. Rapid photobleaching can be mitigated by the use of multiple fluorescent dyes (possibly attached to nanoparticles) for the critical stepwise detection events, particularly for sequencing single DNA templates.

For example, information theory predicts that a single molecule–based SBS system designed for extremely long reads, 100 milliwatts of total input laser power split into four signal channels (A, C, G or T), each of which irradiate a large number of sequencing sites (within a 100 μm diameter spot size), using state-of-the-art collection optics, a high-sensitivity CCD camera with 20 ms integration and highly efficient fluorophores can yield ~30 bases per second per sequencing site with an error rate <0.28% (L.R.M., unpublished data; refs. 29–36,84–103).

However, increasing the integration period to 50 ms 'rate limits' the throughput to 20 bases per second but decreases the error rate by over five orders of magnitude by reducing the overlap between signal and background. Reducing laser power to 50 milliwatts also has a complex effect, increasing error rates by over four orders of magnitude but reducing throughput only by about half.

A similar analysis can be performed for systems that have short reads and so require a moving CCD camera stage to generate high throughput. The optimum design parameters for various kinds of systems will differ, but the relationship among input power, sampling bandwidth, throughput and accuracy and other parameters is still ultimately dictated by information theory.

Currently, adequate signal-to-noise characteristics exist to detect single molecules directly given enough sampling time, so one might expect that detection in ensemble-based SBS approaches (e.g., multimolecule polonies) would have little room to improve. However, extra signal (or greater signal-to-noise) could permit use of faster and/or cheaper CCD or complementary metal-oxide semiconductor (CMOS) detectors. The trade-offs among pixel size, pixel-to-template ratio, array size, readout speed, spectral responsivity and readout noise may be affected substantially by the signal level generated by the fluorescent tags. In the case of single molecule–based SBS, the throughput is particularly limited by the number of photons per unit time that one can detect from single small organic fluorophore molecules. Increasing the speed of incorporation from 10 bases per second to 50 bases per second would require some other kind of detection technology.

Notwithstanding the ability to detect single molecules directly, the necessity for detecting and identifying single molecules for single molecule–based SBS brings additional challenges[19,104]. These challenges include scanning large areas with sufficient sensitivity to detect, and in some cases spectrally identify, single dye molecules to distinguish real from stray molecules (e.g., collecting fluorescence from smaller and smaller optical excitation volumes to reduce the background signal associated with the large fraction of labeled nucleotides required to provide adequate enzyme kinetics) and to complete the scans quickly enough to avoid damage to the dyes. With single molecule–based SBS schemes, it is difficult to determine when an error might have been encountered in the data stream. Dark periods with no signal due to the blinking of the dye molecules are normal events, often (but not always) safely ignored. One simply waits until a signal is detected, and then interprets it appropriately.

Overcoming the challenges of single molecule–based SBS will likely require a combination of careful analysis of the fluorescence properties of dyes that are used, careful control of the environment used for observation, high-efficiency optics, reliable methods to distinguish dyes of interest from those free in solution and measures to verify image analysis results. In some cases, it may be possible to either resequence the same template (e.g., using RCA sequencing with strand-displacement on the same template[50]) or substantially extend read-length to reduce errors (e.g., false negatives due to missed nucleotides).

One might also envision using a multiply labeled spectrally encoded bead or nanoparticle in conjunction with single DNA template sequencing to retain the signal-to-noise strengths of ensemble-based detection. With respect to multiply labeled beads, the current state-of-the-art detection is well below (50-fold) the maximum signal achievable by packing conventional fluorophores into a size near the diffraction limit (G.M.C., unpublished data). One could attempt to approach this maximum signal by increasing the packing density limit while avoiding fluorescence quenching and/or steric interference with enzyme functionality.

## Instrumentation

Design of sensitive, high-speed instruments like those to be used for SBS is always a complex process. A system for SBS involves producing suitable template strands for sequencing, sometimes amplifying them, and finally delivering them to the active portion of the instrument. Synthesis reagents, such as enzymes and/or tagged nucleotides, are subsequently introduced. Detection is done continuously or, more commonly, in cycles after removal of excess tagged materials. Finally, data are collected from as many template sequences as possible in parallel, often requiring rapid determination of color and intensity of signals. Because sequence is usually built by assembly of sequential imaging steps, images must be brought into register and individual templates identified repeatedly.

The challenges are to introduce DNA, manipulated in microgram quantities and in microliter volumes, into sensing volumes having just one to a few thousand molecules and ~$10^6$-fold smaller than the initial sample volumes. These challenges have been overcome by using a variety of manipulations, most notably PCR, on surfaces and on beads. Separation of bound, reacting molecules from those free in solution has also been achieved by using optical methods (e.g., zero-mode waveguides[18,19]) and immobilization on beads. These methods are not simple to monitor and evaluate, and one can expect that further progress in the area of manipulating templates, substrates and enzymes within detection instruments will be required to achieve efficient, trouble-free sequencing experiments whose costs readily match clinical expectations.

Several technologies need to be integrated into the instrumentation required by SBS, including electronics, optics, mechanical (static and dynamic design), packaging, embedded software and graphical user interface software as well as various technologies specific to the sample and reagent presentation such as micro- or nanofluidics, nanotechnology, pumping and valving[105]. The amortization schedule of instrumentation cost is affected by component reliability, lifetime, availability (e.g., second sourcing) as well as system design reliability. In some cost models, the ultimate cost bottleneck may not be dictated by the sample preparation or the reagents, but rather by the tradeoffs among sequencing speed, instrument reliability (servicing costs and/or amortization lifetime), and initial instrumentation cost. SBS instrumentation may not be able to achieve the economies of scale associated with other complex systems that can be produced in high volume (e.g., computers or automobiles) to significantly drive down component and manufacturing costs.

## Throughput versus accuracy

All designers and users of complex sequencing systems strive to increase system throughput while enhancing, or at least without compromising, accuracy. When system efficiency approaches the limits dictated by information theory, all attempts to improve throughput will result in reduced accuracy. For this reason, the multidisciplinary teams should build models based on information theory to test system efficiency, and heed the advice of user-informaticians[84,106–108].

The concepts of sequencing throughput, read-length, coverage or even cost are meaningless without a definition of accuracy. The 'standard' proposed in the NHGRI grant solicitations included both per-base sequence accuracy and assembly statistics[108]. When the first solicitation was published in 2004, achieving that quality required some effort with Sanger/capillary array methods, and it has not been met for *de novo* sequencing of a human-sized genome by any of the current next-generation sequencing technologies. Furthermore, that standard is insufficient for most medical studies. The Archon X prize attempts to specify a goal for an affordable genome that might approach utility for specific disease-gene studies or possibly for individual patient diagnostics (http://genomics.xprize.org/) using the following criteria: (i) 98% of the genome covered; (ii) 10 days per 100 human diploid genomes at

© 2009 Nature America, Inc. All rights reserved.
npg

© 2009 Nature America, Inc. All rights reserved.
npg

$10,000 each; (iii) "no more than one error in every 100,000 base pairs" (note that this differs from "no more than one error per 100,000 averaged over the whole genome"); and (iv) "a rearrangement or haplotype error counts as one error; insertion and deletion errors (indels) count as the sum of each base in the indel."

To properly assess throughput versus accuracy versus cost, a comprehensive cost model needs to be developed that includes accuracy as a variable parameter. Such a model would both be anchored by actual run costs on a system where actual reagent costs are relatively transparent (both including and excluding marketing and royalty costs) and capture the network of cost inter-dependencies among components. It would also permit the determination of a variety of cost projections with different parameters, enabling comparisons of trade-offs (speed, percent and which parts of the genome covered), analysis of rates of various types of errors (e.g., point, indel, rearrangement or haplotype phase errors) and assessment of how changes in sequencing system parameters affect cost and accuracy. A particularly important error to consider is in the discrimination of heterozygotes from homozygotes. Typically, heterozygotes are undercalled, and incorrect calls of homozygous for a deleterious recessive allele cause a false-positive indication, whereas incorrect calls of the nondeleterious allele would result in a false-negative diagnosis. For single nucleotide polymorphism (SNP) genotypes, this problem is fairly independent of read-length, enzymology or single molecule–based SBS versus ensemble-based SBS. Calling accuracy is highly dependent on redundancy (at least 30-fold coverage of each region or 15-fold coverage of each allele is desirable to achieve Archon X prize accuracy levels) and somewhat dependent on raw error rate because sequencing errors can be seen two (or more) times at a given base and thus misinterpreted.

Signal-to-noise ratios have an impact on the theoretical throughput of information for a given accuracy level and, as earlier emphasized, an enhanced understanding of this relationship using information theory, particularly for single molecule–based SBS embodiments, would be instructive in providing a sense of whether throughput can be improved for a certain level of accuracy or whether one is already near the limit[106]. Information theory can also assess the impact of redundant sequencing coverage to increase accuracy. Stochastic errors associated with SBS techniques may be eliminated by means of minor redundant (low-coverage) sequencing to generate high-accuracy finished sequence as contrasted to systematic errors. For those synchronous-controlled SBS systems that have excess signal-to-noise in their early cycles, one may be able to enhance overall throughput without sacrificing accuracy by reducing the scan time for the early cycles.

## Read-length and phasing limitations

Ensemble-based SBS includes methods of creating collections of identical sequences (by PCR, RCA or other processes) and determining their sequence by synthesis of the complement in a stepwise, synchronous fashion. The result is an 'average' sequence signal from all the copies present, and typically accuracy drops with successive steps as synthesis on some templates lags behind that on other templates (**Fig. 5**). This trend to lose synchrony can establish the limit of accurate read-lengths. Single-molecule or real-time SBS methods have entirely different factors determining read-length and accuracy. In this case, read-length depends more on overall incorporation-cycle efficiency and reliability of accurate detection of the dye tags. Termination of chain growth on a single template molecule ends a read in the single-molecule case, whereas for ensemble sequencing it can merely reduce the signal level.

The ensemble pyrosequencing method used by 454/Roche (Basel) has been shown to maintain reasonable phasing through 400 cycles of addition using natural dNTP substrates[23]. It is unknown whether this is an upper limit or whether a similar number of cycles could be achieved for polymerase approaches using labeled or blocked dNTPs or for ligation reactions with 5-mer or 6-mer additions, either of which theoretically could mean five- to sixfold longer reads.

Long read-lengths require an effective solution to the synchrony problems in ensemble-based SBS. All primers must be extended by one nucleotide. Extension must then completely stop for a sufficient amount of time to collect the data needed to call the added nucleotide. Then, whatever chemistry is required to permit extension to resume must have a 100% yield. Such problems occur in analogous forms in other settings (e.g., the solid-phase synthesis of DNA or the sequential Edman degradation of polypeptides), and one expects that they will be solved in ensemble-based SBS in the same way that they have been solved in other settings—by innovation of new chemical and enzymatic reagents and system integration.

A better understanding of exactly which parts of the sequencing process can be asynchronous is critical. As an example, in four-color DNA SBS using cleavable fluorescent NRTs, to negate any lagging fluorescence signal that is caused by a previously unextended priming strand, a synchronization step can be added to reduce the amount of unextended priming strands after the extension with the fluorescent nucleotides. For example, Ju *et al.*[29] have described a protocol in which a synchronization reaction mixture consisting of four 3′-*O*-modified-dNTPs, which have a higher polymerase incorporation efficiency due to the lack of a fluorophore, is used along with the DNA polymerase to extend any remaining priming strand that has a free 3′-OH group. The extension by 3′-*O*-modified-dNTPs also enhances the enzymatic incorporation of the next nucleotide analog because after removal of the 3′-*O*-capping group, the DNA product extended by 3′-*O*-modified-dNTPs lacks a modification group.

## Conclusions

The challenges identified above have both near-term and long-term implications and trade-offs—depending on the particular SBS strategy (real-time or synchronous-controlled), the particular stepwise approach (if synchronously controlled), the stepwise manner in which dNTPs are delivered (simultaneously or sequentially in time) and whether the approach is ensemble-based or single molecule–based. Building and integrating instrumentation around these biochemical systems further exposes the weakest links in the individual challenge areas.

Several next-generation SBS approaches have already been commercialized. These have dramatically increased throughput and have substantially reduced the cost of sequencing compared to traditional Sanger-based methods. For the near-term, these commercial systems are constantly undergoing further improvements by the manufacturer as well as their customers.

When NHGRI launched the current technology development program, it linked the cost goals to a quality metric; the technologies should be capable of producing genome sequence at least as good as the mouse draft genome sequence assembly published in 2002 (ref. 109). Through implementation of SBS it appears likely that the goal of achieving human sequence of that quality for about $100,000 will be achieved imminently; precise costs are difficult to validate for technology that is changing so fast. Even so, at the current state of the technology, that success is highly dependent upon complex and costly bioinformatics solutions (that are beyond the scope of this article) to assemble very large numbers of relatively short sequence reads, and it is not yet clear that whole human genome sequences can be assembled entirely from the read and mapping information obtained by current SBS methods, though resequencing (with benefit of a reference sequence) has fallen below that price-point.

The degree to which SBS approaches can lead to further substantial cost reductions below $100,000, toward the $1,000 genome, is predicated on the degree of success of continued development and enhancement of the already commercialized systems as well as the introduction of potentially revolutionary single molecule–based SBS approaches[24] based on development by groups such as Pacific Biosciences (Menlo Park, CA, USA)[18,19,50], Helicos Biosciences (Cambridge, MA, USA)[24] and VisiGen Biotechnologies (Houston)[22]. The decisive, long-term cost bottleneck may ultimately be in the sample preparation (which requires a high degree of automation), the read-length per fragment and the cost of instrumentation (purchase price, operational lifetime and support costs)—as modulated by the instrument throughput and accuracy. It may also reside in subsequent data analysis and storage as well. Successful elimination of one or more of these bottlenecks may require the full engagement and intellectual wherewithal of the broader scientific and engineering community as its constituents recognize their collaborative role in applying their expertise to developing technologies that enable rapid, cost-effective access to DNA sequence information for a myriad of research and personalized medical uses.

ACKNOWLEDGMENT
This work was supported in part by the National Human Genome Research Institute, National Institutes of Health.

AUTHOR CONTRIBUTIONS
C.W.F. and L.R.M. wrote this review, with additions and editorial assistance from S.A.B., G.M.C., T.H., X.H., S.B.J., J.R.N., D.C.S. and D.V.V., who contributed portions of the text and read drafts of the manuscript for accuracy. J.A.S. is the scientific manager of the NHGRI Sequencing Technology Development Program; he proposed the idea for the review, provided a forum to begin its formulation at a program meeting and read the manuscript for accuracy.

COMPETING INTERESTS STATEMENT
The authors declare competing financial interests: details accompany the full-text HTML version of the paper at http://www.nature.com/naturebiotechnology/.

Published online at http://www.nature.com/naturebiotechnology/.
Reprints and permissions information is available online at http://npg.nature.com/reprintsandpermissions/.

© 2009 Nature America, Inc. All rights reserved.

1. Schloss, J. How to get genomes at one ten-thousandth the cost. *Nat. Biotechnol.* **26**, 1113–1115 (2008).
2. Dohm, J.C., Lottaz, C., Borodina, T. & Himmelbauer, H. Substantial biases in ultra-short read data sets from high-throughput DNA sequencing. *Nucleic Acids Res.* **36**, e105, 2008.
3. Craig, D.W. *et al.* Identification of genetic variants using bar-coded multiplexed sequencing. *Nat. Methods* **5**, 887–893 (2008).
4. Li, H., Ruan, J. & Durbin, R. Mapping short DNA sequencing reads and calling variants using mapping quality scores. *Genome Res.* **18**, 1851–1858 (2008).
5. Morozova, O. & Marra, M.A. Applications of next-generation sequencing technologies in functional genomics. *Genomics* **92**, 255–264 (2008).
6. Mardis, E. Next-generation DNA sequencing methods. *Annu. Rev. Genomics Hum. Genet.* **9**, 387–402 (2008).
7. Mardis, E.R. The impact of next-generation sequencing technology on genetics. *Trends Genet.* **24**, 133–141 (2008).
8. Chi, K.R. The year of sequencing. *Nat. Methods* **5**, 11–14 (2008).
9. Marguerat, S., Wilhelm, B.T. & Bähler, J. Next-generation sequencing: applications beyond genomes. *Biochem. Soc. Trans.* **36**, 1091–1096 (2008).
10. Smith, D.R. *et al.* Rapid whole-genome mutational profiling using next-generation sequencing technologies. *Genome Res.* **18**, 1638–1642 (2008).
11. Quinn, N.L. *et al.* Assessing the feasibility of GS FLX Pyrosequencing for sequencing the Atlantic salmon genome. *BMC Genomics* **9**, 404 (2008).
12. Sarin, S. *et al. Caenorhabditis elegans* mutant allele identification by whole-genome sequencing. *Nat. Methods* **5**, 865–867 (2008).
13. Holt, R.A. & Jones, S.J.M. The new paradigm of flow cell sequencing. *Genome Res.* **18**, 839–846 (2008).
14. Rothberg, J.M. & Leamon, J.H. The development and impact of 454 sequencing. *Nat. Biotechnol.* **26**, 1117–1124 (2008).
15. Kahvejian, A., Quackenbush, J. & Thompson, J.F. What would you do if you could sequence everything? *Nat. Biotechnol.* **26**, 1125–1133 (2008).
16. Shendure, J. & Hanlee, J. Next-generation DNA sequencing. *Nat. Biotechnol.* **26**, 1135–1145 (2008).
17. Branton, D. *et al.* Nanopore sequencing. *Nat. Biotechnol.* **26**, 1146–1153 (2008).
18. Levene, M.J. *et al.* Zero-mode waveguides for single-molecule analysis at high concentrations. *Science* **299**, 682–686 (2003).
19. Korlach, J. *et al.* Selective aluminum passivation for targeted immobilization of single DNA polymerase molecules in zero-mode waveguide nanostructures. *Proc. Natl. Acad. Sci. USA* **105**, 1176–1181 (2008).
20. Williams, J. System and method for nucleic acid sequencing by polymerase synthesis. US patent application US20030194740 (2003).
21. Willams, J. & Anderson, J. Field-switch sequencing. US patent application US20050266456 (2005).
22. Hardin, S., Gao, X., Briggs, J., Willson, R. & Tu, S.C. Real-time sequence determination. US patent application US20030064366 (2003).
23. Margulies, M. *et al.* Genome sequencing in microfabricated high-density picolitre reactors. *Nature* **437**, 376–380 (2005).
24. Harris, T.D. *et al.* Single-molecule DNA sequencing of a viral genome. *Science* **320**, 106–109 (2008).
25. Milton, J. *et al.* Modified nucleotides (for polynucleotide sequencing). World and US patent application WO2004/018497, US2007/0166705 (2004).
26. Bentley, D.R. *et al.* Accurate whole human genome sequencing using reversible terminator chemistry. *Nature* **456**, 53–59 (2008).
27. Turcatti, G., Romieu, A., Fedurco, M. & Tairi A.P. A new class of cleavable fluorescent nucleotides: synthesis and optimization as reversible terminators for DNA sequencing by synthesis. *Nucleic Acids Res.* **36,** e25 (2008).
28. Guo, J. *et al.* Four-color DNA sequencing with 3′-O-modified nucleotide reversible terminators and chemically cleavable fluorescent dideoxynucleotides. *Proc. Natl. Acad. Sci. USA* **105**, 9145–9150 (2008).
29. Ju, J. *et al.* Four-color DNA sequencing by synthesis using cleavable fluorescent nucleotide reversible terminators. *Proc. Natl. Acad. Sci. USA* **103**, 19635–19640 (2006).
30. Seo, T.S. *et al.* Four-color DNA sequencing by synthesis on a chip using photo-cleavable fluorescent nucleotides. *Proc. Natl. Acad. Sci. USA* **102**, 5926–5931 (2005).
31. Wu, W. *et al.* Termination of DNA synthesis by *N*6-alkylated, not 3′-*O*-alkylated, photocleavable 2′-deoxyadenosine triphosphates. *Nucleic Acids Res.* **35**, 6339–6349 (2007).
32. McKernan, K., Blanchard, A., Kotler, L. & Costa, G. Reagents, methods and libraries for bead-based sequencing. PCT patent application WO2006084132 (2007).
33. Shendure, J. *et al.* Accurate multiplex polony sequencing of an evolved bacterial genome. *Science* **309**, 1728–1732 (2005).
34. Fuller, C.W. & Nelson, J.R. Method for nucleic acid analysis. PCT patent application WO2005123957 (2005).
35. Fuller, C.W. Rapid parallel nucleic acid analysis. US patent application US20060051807 (2006).
36. Ronaghi, M., Uhlén, M. & Nyrén, P. A sequencing method based on real-time pyrophosphate. *Science* **281**, 363–365 (1998).
37. Scheibye-Alsing, K. *et al.* Sequence assembly. *Comput. Biol. Chem.* **33**, 121–136 (2009).
38. Trapnell, C. & Salzberg, S.L. How to map billions of short reads onto genomes. *Nat. Biotechnol.* **27**, 455–457 (2009).
39. Chetverina, H.V. & Chetverin, A.B. Cloning of RNA molecules *in vitro. Nucleic Acids Res.* **21**, 2349–2353 (1993).
40. Church, G.M. Replica amplification of nucleic acid arrays. US patent 6,432,360 (2002).
41. Dressman, D., Yan, H., Traverso, G., Kinzler, K.W. & Vogelstein, B. Transforming single DNA molecules into fluorescent magnetic particles for detection and enumeration of genetic variations. *Proc. Natl. Acad. Sci. USA* **100**, 8817–8822 (2003).
42. Embleton, M.J., Gorochov, G., Jones, P.T. & Winter, G.P. *In situ* recombinant PCR within single cells US Patent 5,830,663 (1998).
43. Griffiths, A. & Tawfik, D. *In vitro* sorting method. US patent 6,489,103 (2002).
44. Holliger, P. & Ghadessy, F. Emulsion compositions. US patent 7,429,467 (2008).
45. Brenner, S. *et al. In vitro* cloning of complex mixtures of DNA on microbeads: physical separation of differentially expressed cDNAs. *Proc. Natl. Acad. Sci. USA* **97**, 1665–1670 (2000).
46. Adessi, C., Kawashima, E., Mayer, P., Mermod, J.J. & Turcatti, G. Methods of nucleic acid amplification and sequencing. PCT patent application WO2000018957 (2000).
47. Boles, T.C., Kron, S.J. & Adams, C.P. Nucleic acid-containing polymerizable complex. US patent 5,932,711 (1999).
48. Zhang, K. *et al.* Long-range polony haplotyping of individual human chromosome molecules. *Nat. Genet.* **38**, 382–387 (2006).
49. Zhang, K. *et al.* Sequencing genomes from single cells via polymerase clones. *Nat. Biotechnol.* **24**, 680–686 (2006).
50. Eid, J. *et al.* Real-time DNA sequencing from single polymerase molecules. *Science* **323**, 133–138 (2009).
51. Li, M., Diehl, F., Dressman, D., Vogelstein, B. & Kinzler, K.W. BEAMing up for detection and quantification of rare sequence variants. *Nat. Methods* **3**, 95–97 (2006).
52. Pihlak, A. *et al.* Rapid genome sequencing with short universal tiling probes. *Nat. Biotechnol.* **26**, 676–684 (2008).
53. Liu, D., Daubendiek, S.L., Zillman, M.A., Ryan, K. & Kool, E.T. Rolling circle DNA synthesis: small circular oligonucleotides as efficient templates for DNA polymerases. *J. Am. Chem. Soc.* **118**, 1587–1594 (1996).

54. Baner, J., Nilsson, M., Mendel-Hartvig, M. & Landegren, U. Signal amplification of padlock probes by rolling circle replication. *Nucleic Acids Res.* **26**, 5073–5078 (1998).
55. Fire, A. & Xu, S.Q. Rolling replication of short DNA circles. *Proc. Natl. Acad. Sci. USA* **92**, 4641–4645 (1995).
56. Blanco, L. *et al.* Highly efficient DNA synthesis by the phage phi 29 DNA polymerase. Symmetrical mode of DNA replication. *J. Biol. Chem.* **264**, 8935–8940 (1989).
57. Dean, F.B., Nelson, J.R., Giesler, T.L. & Lasken, R.S. Rapid amplification of plasmid and phage DNA using Phi 29 DNA polymerase and multiply-primed rolling circle amplification. *Genome Res.* **11**, 1095–1099 (2001).
58. Lizardi, P.M. *et al.* Mutation detection and single-molecule counting using isothermal rolling-circle amplification. *Nat. Genet.* **19**, 225–232 (1998).
59. Ramanathan, A. *et al.* An integrative approach for the optical sequencing of single DNA molecules. *Anal. Biochem.* **330**, 227–241 (2004).
60. Parameswaran, P. *et al.* A pyrosequencing-tailored nucleotide barcode design unveils opportunities for large-scale sample multiplexing. *Nucleic Acids Res.* **35**, e130 (2007).
61. Albert, T.J. *et al.* Direct selection of human genomic loci by microarray hybridization. *Nat. Methods* **4**, 903–905 (2007).
62. Porreca, G.J. *et al.* Multiplex amplification of large sets of human exons. *Nat. Methods* **4**, 931–936 (2007).
63. Kim, J.B. *et al.* Polony multiplex analysis of gene expression (PMAGE) in mouse hypertrophic cardiomyopathy. *Science* **316**, 1481–1484 (2007).
64. Williams, J.G. *et al.* An artificial processivity clamp made with streptavidin facilitates oriented attachment of polymerase-DNA complexes to surfaces. *Nucl. Acids Res.* **36**, e121 (2008).
65. Barbee, K.D. & Huang, X. Magnetic assembly of high-density DNA arrays for genomic analyses. *Anal. Chem.* **80**, 2149–2154 (2008).
66. Brenner, S. Gene expression analysis by massively parallel signature sequencing (MPSS) on microbead arrays. *Nat. Biotechnol.* **18**, 630–634 (2000).
67. Mujumdar, R.B., Ernst, L.A., Mujumdar, S.R. & Waggoner, A.S. Cyanine dye labeling reagents containing isothiocyanate groups. *Cytometry* **10**, 11–19 (1989).
68. Sood, A. *et al.* Terminal phosphate-labeled nucleotides with improved substrate properties for homogeneous nucleic acid assays. *J. Am. Chem. Soc.* **127**, 2394–2395 (2005).
69. Prober, J.M. *et al.* A system for rapid DNA sequencing with fluorescent chain-terminating dideoxynucleotides. *Science* **238**, 336–341 (1987).
70. Langer, P.R., Waldrop, A.A. & Ward, D.C. Enzymatic synthesis of biotin-labeled polynucleotides: novel nucleic acid affinity probes. *Proc. Natl. Acad. Sci. USA* **78**, 6633–6637 (1981).
71. Wu, W. *et al.* Termination of DNA synthesis by N6-alkylated, not 3′-*O*-alkylated, photocleavable 2′-deoxyadenosine triphosphates. *Nucleic Acids Res.* **35**, 6339–6349 (2007).
72. Canard, B. & Sarfati, R.S. DNA polymerase fluorescent substrates with reversible 3′-tags. *Gene* **148**, 1–6 (1994).
73. Tabor, S. & Richardson, C.C. A single residue in DNA polymerases of the *Escherichia coli* DNA polymerase I family is critical for distinguishing between deoxy- and dideoxyribonucleotides. *Proc. Natl. Acad. Sci. USA* **92**, 6339–6343 (1995).
74. Doublié, S., Tabor, S., Long, A.M., Richardson, C.C. & Ellenberger, T. Crystal structure of a bacteriophage T7 DNA replication complex at 2.2 Ǻ resolution. *Nature* **391**, 251–258 (1998).
75. Kumar, S. *et al.* Terminal phosphate labeled nucleotides: synthesis, applications, and linker effect on incorporation by DNA polymerases. *Nucleosides Nucleotides Nucleic Acids* **24**, 401–408 (2005).
76. Mulder, B.A. *et al.* Nucleotide modification at the gamma-phosphate leads to the improved fidelity of HIV-1 reverse transcriptase. *Nucleic Acids Res.* **33**, 4865–4873 (2005).
77. Williams, J.G.K., Anderson, J.P., Urlacher, T.M. & Steffens, D.L. Mutant polymerases for sequencing and genotyping. US patent application US20070048748 (2007).
78. Williams, J.G.K. Polymerases with charge-switch activity and methods of generating such polymers. US published patent application US20040259082 (2004).
79. Korlach, J. *et al.* Long, processive enzymatic DNA synthesis using 100% dye-labeled terminal phosphate-linked nucleotides. *Nucleosides Nucleotides Nucleic Acids* **27**, 1072–1083 (2008).
80. Reynolds, B., Miller, R., Williams, J.G. & Anderson, J.P. Synthesis and stability of novel terminal phosphate-labeled nucleotides. *Nucleosides Nucleotides Nucleic Acids* **27**, 18–30 (2008).
81. Steffens, D.L. & Williams, J.G. Efficient site-directed saturation mutagenesis using degenerate oligonucleotides. *J. Biomol. Tech.* **18**, 147–149 (2007).
82. Ryu, J., Hong, S.S., Horn, B.K.P., Freeman, D.M. & Mermelstein, M.S. Multibeam interferometric illumination as the primary source of resolution in optical microscopy. *Appl. Phys. Lett.* **88**, 171112 (2006).
83. Mico, V. *et al.* Transverse resolution improvement using rotating-grating time-multiplexing approach. *J. Opt. Soc. Am. A Opt. Image Sci. Vis.* **25**, 1115–1129 (2008).
84. Pierce, J.R. *An Introduction to Information Theory*, edn. 2 (Dover Press, Mineola, NY, 1980).
85. Lundstrom, M. Moore's law forever? *Science* **299**, 210–211 (2001).
86. Stelzer, E.H.K. Beyond the diffraction limit? *Nature* **417**, 806–807 (2002).
87. Lloyd, S. Ultimate physical limits to computation. *Nature* **406**, 1047–1054 (2000).
88. Lloyd, S., Giovannetti, V. & Maccone, L. Physical limits to communication. *Phys. Rev. Lett.* **93**, 100501–100504 (2004).
89. Stelzer, E.H.K. & Grill, S. The uncertainty principle applied to estimate focal spot dimensions. *Opt. Commun.* **173**, 51–56 (2000).
90. Moerner, W.E. & Fromm, D.P. Methods of single-molecule fluorescence spectroscopy and microscopy. *Rev. Sci. Inst.* **74**, 3597–3619 (2003).
91. Basché, Th., Ambrose, W.P. & Moerner, W.E. Optical spectra and kinetics of single impurity molecules in a polymer: spectral diffusion and persistent spectral hole burning. *J. Opt. Soc. Am. B* **9**, 829–836 (1992).
92. Stevenson, C.L. & Winefordner, J.D. Estimating detection limits in ultratrace analysis. Part I: The variability of estimated detection limits. *Applied Spect.* **45**, 1217–1224 (1991).
93. Stevenson, C.L. & Winefordner, J.D. Estimating detection limits in ultratrace analysis. Part II: Detecting and counting atoms and molecules. *Applied Spect.* **46**, 407–419 (1992).
94. Stevenson, C.L. & Winefordner, J.D. Estimating detection limits in ultratrace analysis. Part III: Monitoring atoms and molecules with laser-induced fluorescence. *Applied Spect.* **46**, 715–724 (1992).
95. Landauer, R. Minimal energy requirements in communication. *Science* **272**, 1914–1918 (1996).
96. Zurek, W.H. Thermodynamic cost of computation, algorithmic complexity and the information metric. *Nature* **341**, 119–124 (1989).
97. Simon, S.H., Moustakas, A.L., Stoytchev, M. & Safar, H. Communication in a disordered world. *Phys. Today* **54**, 38–43 (2001).
98. Méray, L. & Demény, O. Detection limit and decision thresholds in spectrometry. *Appl. Spect.* **55**, 1102–1108 (2001).
99. Lachmann, M., Newman, M.E.J. & Moore, C. The physical limits of communication. *Am. J. Phys.* **72**, 1290–1293 (2004).
100. Gordon, J.M. & Feuermann, D. Optical performance at the thermodynamic limit with tailored imaging designs. *Appl. Opt.* **44**, 2327–2331 (2005).
101. Sheehan, P.E. & Whitman, L.J. Detection limits for nanoscale biosensors. *Nano Lett.* **5**, 803–807 (2005).
102. Prummer, M. Sick., B. Renn, A. & Wild, U.P. Multiparameter microscopy and spectroscopy for single-molecule analytics. *Anal. Chem.* **76**, 1633–1640 (2004).
103. Hubaux, A. & Vos, G. Decision and detection limits for linear calibration curves. *Anal. Chem.* **42**, 849–855 (1970).
104. Lundquist, P.M. *et al.* Parallel confocal detection of single molecules in real time. *Opt. Lett.* **33**, 1026–1028 (2008).
105. Bashford, G. *et al.* Automated bead-trapping apparatus and control system for single-molecule DNA sequencing. *Opt. Express* **16**, 3445–3455 (2008).
106. Gibson, J.D. *Principles of Digital and Analog Communications*, edn. 2 (Macmillan Publishing, New York, 1993).
107. Honigs, D. The sayings of Tomas Hirschfeld. *Applied Spect.* **40**, 11A (1986).
108. Hirschfeld, T. Limits of analysis. *Anal. Chem.* **48**, 16A–31A (1976).
109. Mouse Genome Sequencing Consortium. Initial sequencing and comparative analysis of the mouse genome. *Nature* **420**, 520–562 (2002).
110. Eckmann, J.-P. Trading codes for errors. *Proc. Natl. Acad. Sci. USA* **105**, 8165–8166 (2008).

© 2009 Nature America, Inc. All rights reserved.
npg